IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 4:23-cr-061 |
| | ) | |
| v. | ) | INDICTMENT |
| | ) | |
| ZACHARY JAMES FLAHERTY, | ) | T. 18 U.S.C. § 2 |
| | ) | T. 18 U.S.C. § 1341 |
| Defendant. | ) | T. 18 U.S.C. § 1343 |
| | ) | T. 18 U.S.C. § 1349 |
| | ) | T. 18 U.S.C. § 1957 |
| | ) | T. 18 U.S.C. § 981(a)(1)(C) |
| | ) | T. 18 U.S.C. § 982(a)(1) |
| | ) | T. 28 U.S.C. § 2461(c) |
| | ) | |

**THE GRAND JURY CHARGES:**

## INTRODUCTION TO ALL COUNTS

At all times relevant to this Indictment:

1.     From a date unknown, but no later than in or about 2010, and continuing to in or about March 2023, the defendant, ZACHARY JAMES FLAHERTY, used his position as an insurance agent or broker (sometimes called a "producer") to befriend elderly individuals, serve as their financial advisor, and defraud them of their savings. As a result of FLAHERTY's actions, several of FLAHERTY's clients, including Victims #1-#12 described herein, lost substantial sums of money—money which many of them had set aside to live on, for retirement, or for future medical and assisted-living needs. FLAHERTY also used his position as an insurance producer to defraud insurance companies out of commission payments.

2.     Beginning on a date unknown, but no later than in or about September 2015, and continuing to a date unknown, but until at least in or about

1

January 2021, FLAHERTY conspired with another person known to the grand jury, Individual #1, to commit mail and wire fraud; that is, FLAHERTY and his coconspirator agreed to devise a scheme and artifice to defraud elderly individuals (primarily individuals in the areas in and surrounding Kansas City, Kansas and Kansas City, Missouri, including, but not limited to, Victim #10, Victim #13, and Victim #14) and insurance companies, and obtain money and property from those individuals and companies by means of materially false and fraudulent pretenses, representations, and promises, and by means of material omissions and active concealment, and thereafter to execute the scheme and artifice so devised, to cause materials to be mailed and to transmit or cause materials to be transmitted by wire communications in interstate commerce.

### Defendant, Entities He Operates, and His Coconspirator

3.  FLAHERTY is a resident of Clive, Iowa, which is within the Southern District of Iowa.

4.  At all times relevant to this Indictment, FLAHERTY was an insurance producer licensed to sell life-insurance and annuity products in multiple states, including, but not limited to, Iowa, Kansas, Missouri and Nebraska. In Iowa, a licensed insurance producer is prohibited from holding himself or herself out as an investment advisor or financial advisor, or suggesting to customers that the individual may provide investment advice to others.

5.  In September 2010, FLAHERTY founded Midwest Senior Solutions Retirement Group, Inc. (Midwest Senior Solutions). FLAHERTY owns and operates

2

the company, which is located in West Des Moines, Iowa, within the Southern District of Iowa.

6. In December 2018, FLAHERTY founded Infinity Construction Group, LLC (Infinity Construction). FLAHERTY owns and operates the company, which offers various construction services in the Des Moines, Iowa area. Infinity Construction is located in Clive, Iowa, within the Southern District of Iowa.

7. Individual #1 resides in the Kansas City, Kansas area. Individual #1 was a licensed insurance producer in Iowa, Kansas, and Missouri.

### Defendant's Work as an Independent Agent or Broker for Life-Insurance and Annuity Companies

8. FLAHERTY served as an independent insurance producer for, and his conduct described herein affected, several different life insurance and annuity companies which offer a variety of life-insurance and annuity products. Those companies included, but are not limited to: American Equity Investment Life Insurance Company (American Equity); Clear Spring Life and Annuity Company (Clear Spring), formerly known as Guggenheim Life and Annuity Company (Guggenheim); and SILAC Insurance Company (SILAC), formerly known as Equitable Life & Casualty Insurance Company (Equitable)

9. To serve as an independent producer for an insurance company, FLAHERTY was required to complete the company's training and educational requirements.

10. In serving as an independent producer for insurance companies, FLAHERTY completed, and caused to be submitted to the insurance companies,

applications on behalf of clients (including many of Victims #1-#14) for annuity policies offered by the insurance companies.

11.     After a client's application for an annuity with one of the insurance companies was approved by the company and the client paid the insurance company the required premium to put the policy in force, FLAHERTY, based on his agreement with the insurance companies, was entitled to receive a commission payment for having placed a policy with one of the companies. The amount of FLAHERTY's commission payments varied from company-to-company and policy-to-policy. FLAHERTY also completed, and caused to be submitted to the insurance companies, paperwork relevant to the issued annuities.

Annuities

12.     Annuities are a form of life insurance sold by insurance companies. The annuity, essentially, is a contract between an insurance company and the policyholder, by which the policyholder agrees to invest with the company a certain amount of money, known as the premium, and in exchange, the company promises to make payments to the policyholder in the future at a certain time or over a certain time period.

13.     Annuities are considered long-term investments which require the policyholder's premium to be kept in the annuity for several years. As a result, often, the annuity policy will include a "surrender-charge period" designed to discourage the policyholder from cancelling the annuity or taking monetary withdrawals from the annuity. Surrender-charge periods vary in length but can be as long as sixteen years. During the surrender-charge period, if the policyholder cancels (or "surrenders") the

4

annuity or withdraws funds from the annuity beyond the withdrawals permitted by the policy, then the policyholder will incur surrender charges, taxes, and other fees.

14.     Because of the long-term nature of annuities, insurance companies perform "suitability" evaluations of the policyholder prior to issuing an annuity policy. The suitability process varies from company-to-company. But generally, to obtain an annuity, the policyholder must work with an insurance producer to complete the annuity application materials. In those materials, the policyholder and insurance producer, typically, must indicate, among other things, how long the policyholder intends to keep the annuity, how long the policyholder intends not to take withdrawals of funds from the annuity, and the extent of the policyholder's assets, particularly the policyholder's liquid assets. The insurance company reviews the application materials and decides whether the applied-for policy is suitable for the policyholder given the policyholder's stated financial goals, financial plans, and available assets. Primary considerations in the suitability evaluation are whether the policyholder will have sufficient liquid assets outside of the annuity on which the policyholder can live during the surrender-charge period and whether the policyholder understands the benefits and risks of the applied-for policy.

15.     In the annuity application materials, the policyholder and insurance producer must state whether the applied-for annuity is a "replacement" annuity. A replacement annuity is an annuity funded in whole, or in part, by monies taken from an existing annuity. Replacement annuities are subject to more-stringent suitability evaluations due to the costs associated with withdrawing funds from an existing

annuity. Thus, it is imperative that an annuity application correctly notes whether the applied-for annuity is a replacement.

### COUNTS 1-17
**(Mail and Wire Fraud)**

16. Paragraphs 1 through 15 of this Indictment are realleged and incorporated as if set forth fully herein

17. From a date unknown, but no later than in or about 2010, and continuing to in or about March 2023, the defendant, ZACHARY JAMES FLAHERTY, did knowingly and intentionally devise, and participate in, a scheme and artifice to defraud several of his clients (including, but not limited to, Victims #1-#12) and insurance companies, and to obtain money and property belonging to those clients and insurance companies, by means of materially false and fraudulent pretenses, representations, and promises, and by means of material omissions and active concealment.

18. The purposes and objects of FLAHERTY's scheme and artifice were to obtain funds in his client's possession and control and to obtain commission payments from insurance companies, which said funds and commission payments FLAHERTY, upon receipt, used for his own benefit and purposes.

**Manner and Means**

19. FLAHERTY used a variety of methods to accomplish his scheme and artifice, including, but not limited to, the following methods.

20.     As an insurance producer and through his operation of Midwest Senior Solutions, FLAHERTY often held himself out as being a financial advisor, primarily to elderly individuals.

21.     In pitching potential clients, FLAHERTY made materially false and fraudulent pretenses, representations, and promises to, and he omitted and actively concealed material information from, potential clients. Among other things, FLAHERTY failed to inform potential clients that he was only an insurance producer; he failed to inform potential clients that he would invest their funds in annuities; he misrepresented the returns and bonuses clients could expect to receive by investing with him; he misrepresented to clients that they could not lose the money they invested with him; and he misrepresented that clients would be able to make penalty-free withdrawals from their investments with him and failed to inform clients that they would be penalized for making withdrawals or cancelling the contract for years to come.

22.     As a result of FLAHERTY's materially false and fraudulent pretenses, misrepresentations, promises, omissions, and active concealment client-victims often incorrectly believed, among other things, that FLAHERTY was their financial advisor; that their investments with FLAHERTY could not lose the premiums they invested; that they would receive returns greater than those actually provided by the investment in which FLAHERTY placed their funds; that they had immediate access to the bonuses of which FLAHERTY had informed them; and that they would not be penalized for withdrawing funds from, or cancelling, an investment.

23. After clients agreed to invest with him, FLAHERTY invested his clients' funds into annuities. To do so, FLAHERTY completed annuity paperwork, including application materials and surrender (cancellation) forms, on behalf of his clients. In the paperwork, FLAHERTY made materially false and fraudulent pretenses, representations, and promises to, and omitted and actively concealed material information from, the recipient insurance companies. Among other things, in the annuity paperwork, FLAHERTY forged the policyholder's signatures, misrepresented the policyholder's assets, misrepresented in application materials that the applied-for annuities were not replacements; and misrepresented where the paperwork was signed.

24. Once his clients were invested in annuities, FLAHERTY continued to make materially false and fraudulent pretenses, representations, and promises to, and omit and actively conceal material information from, his clients. FLAHERTY, among other things, misrepresented the amount of money his clients had or the interest his clients were earning; he failed to inform his clients about surrender charges and other costs associated with withdrawing funds or cancelling their investments; and he told his clients about those costs but misrepresented to his clients that they would make the money back through the investments or by investing in a new product. FLAHERTY also encouraged clients to cancel investments so that they could invest in new products, which FLAHERTY misrepresented would result in clients receiving more monies.

25. As FLAHERTY continued to make materially false and fraudulent pretenses, misrepresentations, and promises to, and to omit and actively conceal material information from, his clients, his client-victims withdrew funds from their investments with him; they cancelled their investments altogether; they withdrew money from their investments with FLAHERTY and then paid Infinity Construction to perform construction projects at their residences; and they agreed to invest with FLAHERTY in new financial products he recommended.

26. Through FLAHERTY's material pretenses, misrepresentations, promises, omissions, and active concealment, FLAHERTY obtained at least thirty-five annuities on behalf of Victims #1-#9 and Victims #11-#12. Several of those policies were cancelled less than two years after they were issued. As a result of cancelling policies and withdrawing funds from those policies, Victims #1-#9, Victims #11-#12, and their spouses incurred surrender charges, taxes, and other fees of over $900,000. As a result of those policies being issued, insurance companies awarded commissions of over $650,000.

27. FLAHERTY also made materially false and fraudulent pretenses, representations, and promises to, and omitted and actively concealed material information from, victims about checks they wrote to FLAHERTY, Midwest Senior Solutions, and "Infinity." FLAHERTY made false representations to victims and actively concealed from victims that if they wrote checks to FLAHERTY or his businesses, he would invest the funds on victims' behalf. At the same time, FLAHERTY omitted and actively concealed from his clients that he intended to use

the funds for his own personal benefit and purposes. Based on FLAHERTY's materially false pretenses, representations, promises, omissions, and active concealment numerous clients wrote checks to FLAHERTY, Midwest Senior Solutions, or "Infinity" on the understanding that FLAHERTY would invest the funds into accounts that would be held on their behalf. But, instead, upon receiving the checks, FLAHERTY caused the checks to be deposited into bank accounts under his control and used the funds for his own benefit and purposes, including for payments on his residential mortgage and vehicle loans.

28.     In all, FLAHERTY received from Victims #1-#12 checks payable to him, Midwest Senior Solutions, "Infinity," and Infinity Construction which totaled over $1 million.

29.     FLAHERTY concealed his scheme by, among other things, befriending his clients, submitting forged or altered documents, misrepresenting to clients the state of their financial affairs, and issuing checks to his clients that he misrepresented were the result of their investments with him.

### Defendant's Relationship with Victims #1-#12

30.     FLAHERTY's scheme and artifice described above in paragraphs 19-29 affected numerous individuals, including, but not limited to, Victims #1-#12 discussed below.

31.     <u>Victim #1</u>. Victim #1 was born in 1948 and resides in the Des Moines area.

32.     After Victim #1's husband passed away in September 2017, FLAHERTY developed a close relationship with Victim #1. Among other things, FLAHERTY, weeks after Victim #1's husband passed away, helped Victim #1 get a new will, in which FLAHERTY was named a secondary trustee; FLAHERTY gave Victim #1 guitar lessons; FLAHERTY's company Infinity Construction performed work at Victim #1's home; and FLAHERTY regularly texted and visited Victim #1.

33.     From approximately September 2017 to approximately January 2022, Victim #1 considered FLAHERTY to be her financial advisor.

34.     From 2013 to 2019, FLAHERTY obtained at least twelve annuities for Victim #1 and completed and submitted paperwork which caused Victim #1 to surrender eleven of those annuities. From 2017 to 2020, the annuities FLAHERTY obtained for Victim #1 were held on average for only approximately thirteen months.

35.     As a result of withdrawing funds from the investments and cancelling the investments, Victim #1 suffered losses (in the form of penalties, surrender charges, taxes, and other costs) of more than $500,000.

36.     During the time he worked with Victim #1, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, Victim #1. FLAHERTY, among other things, misrepresented the rate of returns Victim #1 was making on her investments with him and falsely represented that Victim #1 was making money, even though she was losing money.

37.     FLAHERTY also told Victim #1 to write checks to him and his businesses, and he falsely represented and actively concealed that he would then invest the funds on Victim #1's behalf. Based on FLAHERTY's statements, Victim #1 wrote checks of over $300,000 to Midwest Senior Solutions and FLAHERTY, including, but not limited to, a $25,000 check to "Zachary Flaherty" dated September 13, 2018, and a $200,000 check to "Zachary Flaherty" dated December 11, 2020. Instead of investing those funds on Victim #1's behalf, FLAHERTY used the funds for his own benefit and purposes, spending the money on, among other things, his mortgage, vehicle loans, and utility payments.

38.     In the annuity paperwork FLAHERTY completed and caused to be submitted to insurance companies on Victim #1's behalf, and in other communications with insurance companies relating to Victim #1, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, the insurance companies. Among other things, FLAHERTY, in application materials he submitted to Clear Spring (Guggenheim) on Victim #1's behalf in or about July 2018, misrepresented that the applied-for annuity was not a replacement, when the applied-for annuity was, in fact, a replacement, and he misrepresented Victim #1's finances and assets.

39.     Victim #2. Victim #2 was born in 1973 and resides in the Des Moines area. Victim #2 is related to Victim #1. In 2021, Victim #2's father passed away. As a result, Victim #2 expected to inherit a sum of money. Later that year, Victims #1 and #2 approached FLAHERTY about him assisting with the inheritance.

40.     During conversations with Victim #2, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, Victim #2. Among other things, FLAHERTY told Victim #2 to write "Infinity" a $10,000 check, which he would then use to open an account so that when she received the inheritance, an account would be open and ready where the inheritance could be deposited and invested. Based on FLAHERTY's representations, Victim #2 wrote "Infinity" the $10,000 check, which was dated October 19, 2021.

41.     But FLAHERTY did not use the $10,000 as he had represented to Victim #2; he, instead, on October 21, 2021, caused the check to be deposited in Infinity Construction's account ending -9503 at Premier Credit Union. FLAHERTY used the funds for his own benefit and purposes.

42.     <u>Victims #3 and #4</u>. Victim #3 was born in 1957 and is related to Victim #4. Victim #4 was born in 1956. Victims #3 and #4 reside in the Des Moines area.

43.     Victims #3 and #4 met FLAHERTY in approximately June 2015. From that time until at least January 2023, FLAHERTY developed a close relationship with Victims #3 and #4, particularly with Victim #3. FLAHERTY regularly visited and communicated with Victims #3 and #4; he gave Victim #4 a guitar; and he helped with tasks around their home.

44.     From approximately June 2015 to at least January 2023, Victim #3 considered FLAHERTY to be her financial advisor, and on at least two occasions

during that period, Victim #4 agreed that FLAHERTY could invest money on Victim #4's behalf.

45. From 2015 to 2022, FLAHERTY obtained at least nine annuities on behalf of Victims #3 and #4. As of January 2023, all but one of those annuities had been cancelled. As a result of cancelling annuities and withdrawing money from annuity accounts, Victims #3 and #4 incurred approximately $194,748 in surrender charges, taxes, and other fees.

46. For most of their relationship with FLAHERTY, Victims #3 and #4 did not know FLAHERTY had invested their money in annuities.

47. During the time he worked with Victims #3 and #4, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, Victims #3 and #4. Among other things, in or about October 2022, FLAHERTY stated in a text exchange with Victim #3, that Victim #3 still had over $400,000 invested with him; and in or about January 2023, he misrepresented to Victims #3 and #4 that Victim #3 had over $400,000 invested with him.

48. FLAHERTY encouraged Victim #3 to write checks to him, and he falsely represented and actively concealed that he would then invest the funds on Victims #3 and #4's behalf. Based on FLAHERTY's representations, from 2016 to 2022, Victim #3 wrote checks to FLAHERTY totaling approximately $293,500. From after February 3, 2020, until January 2023, Victim #3 wrote checks totaling over $100,000 to FLAHERTY personally, and none of those funds were used on behalf of Victims #3

or #4. Instead, FLAHERTY caused the checks to be deposited into accounts he controlled and then used the funds for his own benefit and purposes.

49. In the annuity paperwork FLAHERTY completed and caused to be submitted on Victim #3 and 4's behalf, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, the insurance companies. Among other things, FLAHERTY misrepresented that at least one of the applied-for annuities was not a replacement, when the applied-for annuity was, in fact, a replacement; he misrepresented Victim #3 and #4's finances and assets; and he misrepresented that the policyholder intended to keep the policy for ten or more years and not make withdrawals for ten or more years.

50. <u>Victim #5</u>. Victim #5 was born in 1948 and resides in the Des Moines area. Victim #5 was introduced to FLAHERTY through Victim #1.

51. In June 2020, Victim #5 met and communicated with FLAHERTY. During their conversations, they discussed Victim #5's finances, including her two annuities through Prudential which provided Victim #5 income of approximately $1200 each month.

52. During their conversations, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, Victim #5. Among other things, FLAHERTY misrepresented that Victim #5 could earn more money by cancelling her Prudential

annuities and switching to another annuity, and he actively concealed that the bonus associated with the new annuity would only be fully vested years in the future.

53.    Victim #5 agreed to surrender her Prudential annuities and invest in a new SILAC (Equitable) annuity. As a result of surrendering her Prudential policies, Victim #5 incurred surrender charges, taxes, and other losses of approximately $12,929. Further, FLAHERTY actively concealed from Victim #5 that the SILAC (Equitable) annuity would not provide Victim #5 with monthly income payments and would penalize her for withdrawing funds from the SILAC (Equitable) annuity for at least the first year of the policy.

54.    FLAHERTY also told Victim #5 about a potential investment, which he called a "PMI" account. FLAHERTY falsely represented that this "PMI" account would come with an approximately $10,000 bonus and earn 3% interest per month. At FLAHERTY's direction, Victim #5 wrote a $100,000 check to "Infinity" to open a "PMI" account. The check was dated June 18, 2020. In the following weeks, FLAHERTY actively concealed the falsely represented "PMI" investment by providing Victim #5 with $14,000 which FLAHERTY falsely represented was interest for the "PMI" account. Further, FLAHERTY falsely represented to Victim #5 that he could set up regular interest payments for Victim #5's "PMI" account.

55.    But FLAHERTY never placed Victim #5's $100,000 into an investment account. Rather, on or about June 19, 2020, FLAHERTY caused the $100,000 check to be deposited into Infinity Construction's account ending -5478 at Bank Iowa. On or about June 22, 2020, FLAHERTY transferred $25,000 to FLAHERTY and his

wife's account ending -9068 at Bank Iowa. Subsequently, the same day as the transfer, FLAHERTY purchased, for $63,000, a 2017 Crownline Boat, Manufacturer's I.D. No. KIS83565L617.

56. In the annuity paperwork FLAHERTY completed and caused to be submitted on Victim #5's behalf in or about June 2020, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, the insurance companies. Among other things, FLAHERTY misrepresented Victim #5's finances and assets; he falsely represented that Victim #5's existing Prudential annuities did not have an income rider; and he misrepresented that Victim #5 had no current plans to access the funds in the annuity.

57. <u>Victims #6 and #7</u>. Victim #6 was born in 1925; she resides in or near Toledo, Iowa. Victim #7 was born in 1956; she resides in or near Toledo, Iowa. Victim #7 is related to Victim #6.

58. Victims #6 and #7 were introduced to FLAHERTY through a relative. They first met with FLAHERTY in approximately summer 2018. They, again, met with FLAHERTY in November 2018, along with another relative.

59. During the November 2018 meeting, FLAHERTY discussed Victims #6 and #7's assets, financial goals, and needs.

60. During their conversations, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, Victims #6 and #7. Among other things,

17

FLAHERTY misrepresented the rate of return they could expect from investing with him, misrepresented that the investments he was offering were only available for a short time, and misrepresented that the investments had no penalties for withdrawing money out of the investments.

61.     As a group, Victim #6, Victim #7, and their relative decided that Victim #6 should invest $250,000 with FLAHERTY. Victim #7 elected to invest $5000 with FLAHERTY. At FLAHERTY's direction, Victims #6 and #7 signed application materials for the investments. FLAHERTY actively concealed that the investments he was offering Victims #6 and #7 were annuities.

62.     FLAHERTY had Victim #6 sign application materials for a GILICO annuity, which FLAHERTY later caused to be submitted to GILICO. GILICO approved and issued the policy.

63.     FLAHERTY had Victim #7 sign application materials for an American Equity annuity, which FLAHERTY later caused to be submitted to American Equity. American Equity approved and issued the policy.

64.     In the annuity paperwork FLAHERTY completed and caused to be submitted to GILICO on Victim #6's behalf, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, GILICO. Among other things, FLAHERTY misrepresented Victim #6's annual income, and he misrepresented that Victim #6 had a net worth greater than $1 million.

65.     In the annuity paperwork FLAHERTY completed and caused to be submitted to American Equity on Victim #7's behalf, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, American Equity. Among other things, FLAHERTY misrepresented Victim #7's finances, assets, and sources of income.

66.     Victims #8 and #9. Victim #8 was born in 1950; she resides in the Omaha, Nebraska area. Victim #8 is related to Victim #3.

67.     Victims #8 and #9 met FLAHERTY in approximately 2016. Victim #9 was born in 1946 and resides in the Omaha, Nebraska area.

68.     Since 2016, FLAHERTY has obtained at least five annuities on Victim #8's behalf; at least two of those annuities have been cancelled. As a result of cancelling her annuities or withdrawing funds from them, Victim #8 has lost approximately $100,000 in surrender charges, taxes, and other fees.

69.     Since 2016, FLAHERTY has obtained at least three annuities on Victim #9's behalf; at least one of those annuities has been cancelled. As a result of cancelling the annuity or withdrawing funds from the annuities, Victim #9 lost at least $35,000 in surrender charges, taxes, and other fees.

70.     During conversations with Victims #8 and #9, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, Victims #8 and #9. FLAHERTY, among other things, misrepresented the rate of returns Victims #8 and #9 could make through the investments he recommended, and he misrepresented

the rate of returns Victims #8 and #9 were in fact earning with the investments he had obtained for them.

71.    FLAHERTY also told Victims #8 and #9 to write checks to "Infinity," and he falsely represented and actively concealed that he would then invest the funds on their behalf. At FLAHERTY's direction, Victim #8 wrote more than one check to "Infinity." One check Victim #8 wrote to "Infinity" was for $15,000 and dated November 11, 2020. Instead of investing the funds on Victim #8's behalf, FLAHERTY caused the check to be deposited into Infinity Construction's account ending -9503 at Premier Credit Union and used the funds for his own benefit and purposes.

72.    Victim #9 wrote at least one check to "Infinity." He wrote a $15,000 check, dated January 21, 2021, to "Infinity." Instead of investing the funds on Victim #9's behalf, FLAHERTY caused the check to be deposited into Infinity Construction's account ending -9503 at Premier Credit Union and used the funds for his own benefit and purposes.

73.    In the annuity paperwork FLAHERTY completed and caused to be submitted on Victims #8 and #9's behalf, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, the insurance companies. Among other things, FLAHERTY, in Victim #8's application materials submitted to SILAC (Equitable) in or about January 2020, misrepresented that the applied-for annuity was not a replacement, when the applied-for annuity was, in fact, a replacement, and that Victim #8 had signed the materials in Iowa, when Victim #8 signed the materials in

Omaha, Nebraska. FLAHERTY misrepresented in Victim #9's application materials submitted to SILAC (Equitable) in or about May 2020, that the applied-for annuity was not a replacement, when the applied-for annuity was, in fact a replacement, and that Victim #9 had signed the materials in Iowa, when Victim #9 signed the materials in Omaha, Nebraska.

74.     Victim #10. Victim #10 was born in 1939 and resides in the Kansas City, Missouri area. Victim #10 worked with Individual #1 to obtain annuities. At some point during this relationship, Victim #10 began working directly with FLAHERTY.

75.     During conversations with Victim #10, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, Victim #10. Among other things, in or about March 2021, after Victim #10 sold a house, FLAHERTY encouraged Victim #10 to invest the sale proceeds into annuities, falsely represented that Victim #10 could make a greater return on the annuities than the interest rate on her current mortgage, and instructed Victim #10 to write checks to "Infinity." FLAHERTY falsely represented and actively concealed that he would invest the funds on Victim #10's behalf. Based on FLAHERTY's statements, Victim #10 wrote two checks to "Infinity." The checks were dated March 25, 2021, and were for $150,000 and $20,000. Instead of investing those funds on Victim #10's behalf, however, FLAHERTY caused the checks to be deposited into Infinity Construction's account ending -9503 at Premier Credit Union and used the funds for his own benefit and purposes.

76.     Victims #11 and #12. Victim #11 was born in 1939 and is related to Victim #12. Victim #12 was born in 1941. Victims #11 and #12 reside in the Des Moines area.

77.     Victims #11 and #12 met FLAHERTY in approximately 2006. Since that time, FLAHERTY has developed a close relationship with them. Both Victims #11 and #12 refer to FLAHERTY as their "son" and to FLAHERTY's children as their grandchildren. FLAHERTY, likewise, calls Victim #11 "dad" and says that he loves Victims #11 and #12. Among other things, on April 9, 2022, FLAHERTY texted Victim #11, "you're my best friend and my dad I wish I could spend more time with you and I'm going to start doing that I promise." FLAHERTY is not biologically related to Victims #11 and #12.

78.     FLAHERTY assisted Victims #11 and #12 in obtaining wills. In those wills, upon the death of both Victims #11 and #12, FLAHERTY is entitled to receive the couple's home and $100,000.

79.     From 2006 to approximately 2018, FLAHERTY obtained at least eleven annuities on behalf of Victims #11 and #12, all of which were surrendered by 2018.

80.     Victims #11 and #12 considered FLAHERTY their financial advisor. During this time, FLAHERTY made materially false and fraudulent pretenses, misrepresentations, and promises to, and omitted and actively concealed material information from, Victims #11 and #12. Among other things, after the last of the couple's annuity policies with FLAHERTY was cancelled in 2018, FLAHERTY misrepresented to Victims #11 and #12 that they had at least one investment account

with him, that the account contained hundreds of thousands of dollars, and that the couple was entitled to interest payments from the account. For example, based on FLAHERTY's statements, in 2022, Victim #11 requested interest payments from FLAHERTY. FLAHERTY misrepresented to Victim #11 that Victim #11 would receive an interest payment from his investment account. To conceal that no investment account existed, FLAHERTY wrote a $5000 check, dated June 7, 2022, from FLAHERTY's account ending -6322 at Premier Credit Union payable to Victim #11, which Victim #11 believed to be an interest check from his investment account.

## Mailings in Furtherance of the Scheme (Counts 1-3)

81.     On or about the dates listed in the below table, in the Southern District of Iowa and elsewhere, the defendant, ZACHARY JAMES FLAHERTY, for the purpose of executing the scheme and artifice described above, and attempting to do so, did knowingly cause to be delivered by mail or by a private and commercial interstate carrier, as the case may be, according to the direction thereon, various matters, including, but not limited to, the matter described below for each count:

| Count | Approximate Date of Mailing | Description of Item Mailed |
|-------|------------------------------|----------------------------|
| 1 | December 4, 2018 | American Equity annuity policy #1298485 in the name of Victim #7, sent via FedEx Ground from American Equity to FLAHERTY in Windsor Heights, Iowa. |
| 2 | December 5, 2018 | GILICO annuity policy #V18113020 in the name of Victim #6, sent via second-day US Mail from GILICO to Victim #6 in Toledo, Iowa. |
| 3 | December 11, 2018 | American Equity policy #1298461 in the name of Victim #3, sent via FedEx Ground from American Equity to FLAHERTY in Windsor Heights, Iowa. |

Each of the above counts is a violation of Title 18, United States Code, Sections 1341 and 2.

**Wires in Furtherance of the Scheme (Counts 4-17)**

82.     On or about the dates listed in the below table, in the Southern District of Iowa and elsewhere, the defendant, ZACHARY JAMES FLAHERTY, for the purpose of executing the scheme and artifice described above, and attempting to do so, did transmit and caused to be transmitted, by means of wire communications in interstate commerce, certain writings, signs, signals, and sounds, including, but not limited to, the interstate wires described below for each count:

| Count | Approximate Date of Wire | Description |
|---|---|---|
| 4 | July 17, 2018 | Application materials, including suitability paperwork, for Victim #1 to obtain a Clear Spring (Guggenheim) annuity policy transmitted by means of fax transmission from Iowa to Indiana. |
| 5 | September 18, 2018 | Data and information necessary to settle the deposit of a $25,000 check from Victim #1 payable to "Zachary Flaherty" into FLAHERTY and his wife's account ending -9068 at Bank Iowa, which wire communication was routed through the Federal Reserve Bank in Chicago, Illinois. |
| 6 | October 3, 2019 | Surrender materials for Victim #1 to cancel Clear Spring (Guggenheim) policies #0200352759, #0200353863, and #0200353864 transmitted by means of fax transmission from Iowa to Indiana. |
| 7 | January 13, 2020 | Application materials, including suitability paperwork, for Victim #8 to obtain a SILAC (Equitable) annuity policy transmitted by means of fax transmission from Iowa to Utah. |
| 8 | June 17, 2020 | Application materials, including suitability paperwork, for Victim #5 to obtain SILAC (Equitable) annuity policies transmitted by means of fax transmission from Iowa to Utah. |

| Count | Approximate Date of Wire | Description |
|-------|--------------------------|-------------|
| 9 | June 19, 2020 | Data and information necessary to settle the deposit of a $100,000 check from Victim #5 payable to "Infinity" into the Infinity Construction account ending -5478 at Bank Iowa, which wire communication was routed through the Federal Reserve Bank in Chicago, Illinois. |
| 10 | August 21, 2020 | Data and information necessary to settle the deposit of a $20,000 check and a $15,000 check both from Victim #3 payable to "Zach Flaherty" into FLAHERTY and his wife's account ending -9068 at Bank Iowa, which wire communication was routed through the Federal Reserve Bank in Chicago, Illinois. |
| 11 | November 13, 2020 | Data and information necessary to settle the deposit of a $15,000 check from Victim #8 payable to "Infinity" into the Infinity Construction account ending -9503 at Premier Credit Union, which wire communication was routed through a check-processing center in Massachusetts. |
| 12 | November 24, 2020 | Surrender materials for Victim #1 to cancel SILAC (Equitable) policy #TB00004126 transmitted by means of fax transmission from Iowa to Utah. |
| 13 | December 18, 2020 | Data and information necessary to settle the deposit of a $200,000 check from Victim #1 payable to "Zachary Flaherty" into FLAHERTY's account ending -6322 at Premier Credit Union, which wire communication was routed through a check-processing center in Massachusetts. |
| 14 | January 22, 2021 | Data and information necessary to settle the deposit of a $15,000 check from Victim #9 payable to "Infinity" into Infinity Construction's account ending -9503 at Premier Credit Union, which wire communication was routed through a check-processing center in Massachusetts. |
| 15 | March 26, 2021 | Data and information necessary to settle the deposit of a $150,000 check and a $20,000 check both from Victim #10 payable to "Infinity" into Infinity Construction's account ending -9503 at Premier Credit Union, which wire communication was routed through a check-processing center in Massachusetts. |

| Count | Approximate Date of Wire | Description |
|-------|--------------------------|-------------|
| 16 | October 21, 2021 | Data and information necessary to settle the deposit of a $10,000 check from Victim #2 payable to "Infinity" into Infinity Construction's account ending -9503 at Premier Credit Union, which wire communication was routed through a check-processing center in Massachusetts. |
| 17 | June 8, 2022 | Data and information necessary to settle the deposit of a $5000 check from FLAHERTY payable to Victim #11 into Victim #11 and Victim #12's account at West Bank, which wire communication was routed through a check-processing center in Nebraska. |

Each of the above counts is a violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 18
### (Conspiracy to Commit Mail/Wire Fraud)

83. Paragraphs 1 through 82 of this Indictment are realleged and incorporated as if set forth fully herein.

84. Beginning on a date unknown, but no later than in or about September 2015, and continuing to a date unknown, but until at least in or about January 2021, in the Southern District of Iowa and elsewhere, the defendant, ZACHARY JAMES FLAHERTY, and a coconspirator known to the grand jury, Individual #1, did knowingly and willfully combine, conspire, confederate, and agree with each other to commit the following offenses against the United States:

A. To knowingly execute and attempt to execute a scheme and artifice to defraud elderly individuals, primarily individuals in the areas surrounding Kansas City, Kansas and Kansas City, Missouri, and insurance companies, and to obtain money and property by means of materially false and

fraudulent pretenses, representations, and promises, and by means of material omissions and active concealment, using and causing to be used the mails and private and commercial carriers in furtherance of, and in an attempt to, carry out an essential step of the scheme, in violation of Title 18, United States Code, Section 1341.

B.　　To knowingly execute and attempt to execute a scheme and artifice to defraud elderly individuals, primarily individuals in the areas surrounding Kansas City, Kansas and Kansas City, Missouri, and insurance companies, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions and active concealment, using and caused the use of interstate wire transmissions in furtherance of, and in an attempt to, carry out an essential step in the scheme, in violation of Title 18, United States Code, Section 1343.

85.　　FLAHERTY and Individual #1's scheme and artifice to defraud affected several individuals, including, but not limited to, Victims #10, #13, and #14.

86.　　The manner and means by which the conspiracy was to be accomplished by FLAHERTY and Individual #1 included, but were not limited to the following:

A.　　It was part of the conspiracy that Individual #1 would identify potential clients, primarily elderly individuals in or near Kansas City, Kansas and Kansas City, Missouri, for he and FLAHERTY to pitch investments.

B.　　It was further part of the conspiracy that Individual #1 and FLAHERTY made materially false and fraudulent pretenses, representations,

and promises to, and omitted and actively concealed material information from, potential clients and clients. Among other things, Individual #1 and FLAHERTY misrepresented the returns clients could expect to receive by investing with them, misrepresented the losses clients could suffer by investing with them, concealed that clients would be penalized for making withdrawals or cancelling contracts, and misrepresented that clients would make up any losses they suffered as a result of withdrawing money or cancelling withdrawals by investing in another annuity.

C. It was further part of the conspiracy that Individual #1 assisted individuals in completing annuity paperwork; Individual #1 then sent the paperwork to FLAHERTY, who then submitted the paperwork to insurance companies.

D. It was further part of the conspiracy that FLAHERTY, in the annuity paperwork he submitted, made materially false and fraudulent pretenses, representations, and promises to, and omitted and actively concealed material information from, insurance companies. Among other things, FLAHERTY misrepresented that he was the insurance agent who had assisted the policyholder with completing annuity paperwork; he actively concealed the fact that it was Individual #1 who assisted the policyholder with the paperwork; and he forged policyholders' signatures.

This is a violation of Title 18, United States Code, Section 1349.

## COUNT 19
### (Money Laundering Over $10,000)

87.    Paragraphs 1 through 82 of this Indictment are realleged and incorporated as if set forth fully herein.

88.    On or about June 22, 2020, in the Southern District of Iowa, the defendant, ZACHARY JAMES FLAHERTY, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, FLAHERTY transferred $25,000 from Infinity Construction's account ending -5478 at Bank Iowa (the deposits of which were insured by the Federal Deposit Insurance Corporation) to FLAHERTY and his wife's account ending -9068 at Bank Iowa which he then used to purchase a 2017 Crownline Boat, Manufacturer's I.D. No. KIS83565L617, said $25,000 being proceeds from a specified unlawful activity, that is, Wire Fraud as described in Count 9 of this Indictment.

This is a violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT 20
### (Money Laundering Over $10,000)

89.     Paragraphs 1 through 82 of this Indictment are realleged and incorporated as if set forth fully herein.

90.     On or about August 28, 2020, in the Southern District of Iowa, the defendant, ZACHARY JAMES FLAHERTY, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, FLAHERTY obtained a $30,025 loan from Premier Credit Union (the deposits of which were insured by the National Credit Union Administration) which was secured, in part, by FLAHERTY's interest in a 2017 Crownline Boat, Manufacturer's I.D. No. KIS83565L617, said 2017 Crownline Boat being proceeds from a specified unlawful activity, that is, Wire Fraud as described in Count 9 of this Indictment.

This is a violation of Title 18, United States Code, Sections 1957 and 2.

**THE GRAND JURY FINDS:**

## NOTICE OF FORFEITURE

1.  Upon conviction of the offenses in violation of 18 U.S.C. § § 1341, 1343, and 1349, as set out in Counts 1-18 of this Indictment, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to said offenses.

2.  Upon conviction of the offenses in violation of 18 U.S.C. § 1957, as set out in Counts 19-20 of this Indictment, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property involved in said offenses and any property traceable to such property.

3.  The property to be forfeited includes, but is not limited to:

    (a) the residence located at 16761 Aurora Court, Clive, Iowa 50325;

    (b) a 2017 Crownline Boat, Manufacturer's I.D. No. KIS83565L617;

    (c) a 2014 Mercedes-Benz G63 AMG, VIN #WDCYC7DF9EX223812;

    (d) a 2015 Land Rover Range Rover EVD,
    VIN #SALVT2BG4FH074950;

    (e) a 2016 Chevrolet Silverado K1500 LTZ, VIN
    3GCUKSEC9GG166999; and

    (f) a sum of money equal to the total amount of gross proceeds
    obtained as a result of these offenses, Counts 1-20, with such
    amount to be at least $1.5 million.

4.     If any of the property described above, as a result of any act or omission of any defendant cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

**A TRUE BILL.**

FOREPERSON

Richard D. Westphal
United States Attorney

By: _____
Kyle J. Essley
Assistant United States Attorney