IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | No. 4:23-cr-061 |
| v. | ) ) | UNITED STATES' |
| ZACHARY JAMES FLAHERTY, | ) ) | SENTENCING MEMORANDUM |
| Defendant. | ) ) ) |  |

## INTRODUCTION

Defendant's conduct is unprecedented in terms of its scope, harm, and ruthlessness, and in his total unwillingness to accept responsibility. For the entire seventeen years Defendant worked as an insurance salesperson, he befriended elderly individuals throughout the Midwest, gained their trust, and defrauded over thirty individuals of their life savings, millions of dollars which enriched himself, his family, and his businesses. He targeted elderly and retired military veterans, small-business owners, a police officer, a nurse, and farmers, people who in their working years carried multiple jobs to provide for their families. He preyed on elderly widows and couples who were estranged from their children. His oldest known victim was 93 years old when she met Defendant.

Defendant's scheme was simple: he lied to victims to persuade them to give him access to their funds. Once he had the victims' money, he continued lying to them and to insurance companies and either:

(a) Put the victims' money into his bank accounts, at which point, Defendant spent the money for their own benefit; or

1

(b) Invested the victims' money in annuities which were inappropriate for his victims' financial situations and resulted in his victims suffering substantial losses. (During his scheme, Defendant also defrauded insurance companies and received roughly $1.3 million in commissions from those companies).

Defendant didn't just defraud his elderly victims—he groomed and exploited them, often over the course of several years. Defendant inserted himself in his victims' lives and manipulated them. He helped them with household tasks, visited them often, and told them he loved and cared for them. He called some victims, (including one couple estranged from their children) "mom" and "dad."

Defendant gained his victims' complete trust. Defendant even convinced several victims to add him to their estate documents. Victims they viewed Defendant as their "son," "second son," and "best friend":

- C.R.: "When I first met you, you were like a son to us. We trusted you wholeheartedly. You would stop by just to visit us and eat cookies that I had baked." "I truly cared about you a lot." (Gov. Sent. Ex. 9).

- Victim #10 (P.K.): "I always thought Zac[h] was a really nice guy. He would come to my house and spend time with me. I trusted him and his family." "He would walk in my house and give me a big hug all while betraying me and stealing my money." (Gov. Sent. Ex. 7, at 1-2).

Defendant's entire life was funded by his victims' hard work. As victims entrusted Defendant with their life savings, Defendant used the funds to pay for his million-dollar home, luxury vehicles, a boat, and vacations, including one to Fiji.

Defendant's actions inflicted substantial harm on his victims. Some victims have no savings left; others cannot afford medical or assisted-living care; some are unable to buy gifts for relatives; and at least one victim has been forced to return to work. As several victims explain:

- Victim #10 (P.K.): "[Defendant] has stopped me from being able to afford to give my grandkids gifts and money. I can't buy new furniture or other things. He took my life savings." (Gov. Sent. Ex. 7, at 1).

- Victim #14 (R.K.): "I can't buy Christmas gifts for my kids because I am afraid to spend any money." "I am not able to do things in retirement because I have been so afraid to spend any money because the defendant took so much money from me." (Gov. Sent. Ex. 8, at 1-2).

- B.K. and G.K.: "[Defendant] is a true con artist. He took from us the long term care coverage that guaranteed us $55,000 per year. That is money we thought we would be able to depend on. This has caused me so much worry. I don't know how I will take care of my husband if something happens. He had a heart attack on July 16, 2019. It really hit me that I am in this alone." (Gov. Sent. Ex. 6, at 2).

Once Defendant had defrauded a victim, he hid his wrongdoing. Defendant blamed several victims for their money problems, gaslighting them and telling them that they had spent all their savings. With other victims, Defendant simply never mentioned that they no longer had savings. Defendant's tactics were so effective that when investigators told victims that their money was gone, multiple victims repeatedly claimed that they had hundreds of thousands of dollars invested with Defendant and that Defendant would never take their money.

Defendant did everything to keep his crime going. Over the years, victims and regulators confronted Defendant about his conduct. Each time, Defendant lied, forged documents, suggested victims could not understand their investments, and/or delivered platitudes about working from the heart and putting people first.

Being charged with federal crimes has not stopped Defendant's lies and deception. While facing federal criminal charges, Defendant has continued to commit more crimes. He lies to his family and friends, claiming falsely that, among other

things, (i) he is facing only unfounded tax charges, (ii) his victims remain supportive, and (iii) a judge from this Court chastised the government that the government had no business prosecuting him. After pleading guilty, Defendant obstructed justice: he violated this Court's orders, failed to comply with the terms of his Plea Agreement, and lied to this Court, the probation office, and the United States Attorney's Office.

Yet, according to Defendant, he has done nothing wrong. His crimes are "not real stuff, not real crimes." (Gov. Sent. Ex. 31). As Defendant spins it, he "earn[ed]" the money he extracted from his victims and "[p]robably took less than [he] should have." (*Id.*). Defendant and his wife agreed that at least one of the couples he victimized are victims only because investigators contacted them, not because Defendant took all their savings. (*Id.*).

Sentencing is set for Wednesday, June 12, 2024, 1:30 p.m. This Court should sentence Defendant to between 210 and 240 months in prison, a sentence at the top of, or just above, the advisory guidelines range.

## **TABLE OF CONTENTS**

Introduction ....................................................................................................... 1

I.      Procedural Background ..................................................................................... 5

II.     Defendant's Objections to the Final PSR's Factual Allegations
        Concerning His Misconduct Should Be Denied ................................................ 8

III.    This Court Should Adopt the Final PSR's Loss Calculation ............................ 9

IV.     The Two-Level Enhancement Under USSG §2B1.1(b)(17)(A) Applies
        Because Defendant Received Over $1 Million from Insurance Companies ... 11

V.      Defendant Has Obstructed Justice in Regard to His Sentencing, and the
        Two-Level Enhancement Under §3C1.1 Should Be Imposed.......................... 16

VI.     Defendant Is Not Entitled to a Reduction for Acceptance of Responsibility .. 19

VII.    The Final PSR's Restitution Amounts Should Be Awarded, and the
        United States Is No Longer Seeking Forfeiture ............................................. 23

VIII.   The 18 U.S.C. § 3553(a) Factors Support a Term of Imprisonment of
        Between 210 and 240 Months ......................................................................... 23

        Conclusion ...................................................................................................... 42

# I.      PROCEDURAL BACKGROUND

On April 19, 2023, a twenty-count Indictment was issued against Defendant.

(Dkt. No. 2). The Indictment charged Defendant with committing a vast scheme to

defraud elderly individuals and insurance companies, specifically:

- Counts 1 to 3, Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 2;

- Counts 4 to 17, Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2;

- Count 18, Conspiracy to Commit Mail/Wire Fraud, in violation of 18 U.S.C.
  § 1349; and

- Counts 19 to 20, Money Laundering Over $10,000, in violation of 18 U.S.C.
  § 1957.

(*Id.*). The Indictment also included a Notice of Forfeiture, requiring Defendant, upon

conviction, to forfeit "any property, real or personal, which constitutes or is derived

from proceeds traceable to the" Mail and Wire Fraud counts, including a residence in

Clive, Iowa, a boat, three vehicles, and a sum of money equal to the gross proceeds of

those offenses in an amount of at least $1.5 million. (*Id.*).

Shortly after Defendant's arraignment, this Court issued multiple orders

governing Defendant's behavior while on pretrial release. This Court prohibited

5

Defendant from having any contact, direct or indirect, with the victims of his offenses. (Dkt. Nos. 15, 16, 21). In a separate Post-Indictment Protective Order, this Court forbade Defendant from taking certain actions regarding the property subject to forfeiture. (Dkt. Nos. 8, 23). The Order barred Defendant from alienating any of the assets, required Defendant to keep current on all debt obligations on the assets, and set conditions regarding Defendant's use of the assets. (Dkt. No. 23).

In November 2023, Defendant entered a Plea Agreement. He agreed to plead guilty to Count 15 of the Indictment (Wire Fraud in relation to Victim #10 (P.K.)); in exchange, the government would dismiss the remaining counts at sentencing. (Dkt. No. 31). The parties agreed to stipulate as a recommendation to this Court that several sentencing enhancements should apply or not apply, while all other sentencing matters would be taken up at sentencing. (*Id.* at 5-6, 8, ¶¶ 11, 15).

A change-of-plea hearing was held. There, a United States Magistrate Judge (i) recommended that Defendant's guilty plea be accepted and that Defendant be adjudged guilty, and (ii) advised Defendant of the forfeiture of certain property. (Dkt. Nos. 35, 37). This Court later adopted the recommendation. (Dkt. No. 41).

After Defendant pleaded guilty, it was discovered that he had been violating this Court's orders, communicating with victims through family members, and submitting false sworn statements to this Court and the United States Attorney's Office. (Dkt. No. 50, 52). He was arrested on February 9, 2024. (Dkt. No. 57). Defendant waived the right to a revocation and detention hearing, and this Court, consequently, ordered Defendant detained pending sentencing. (Dkt. Nos. 63, 65).

On April 29, 2024, this Court ordered that Defendant show cause why he should not be held in criminal contempt for violating this Court's Order Restraining Dissipation of Assets Under the All-Writs Act entered on February 15, 2024, and as modified on February 22, 2024. (Dkt. No. 80; *see* Dkt. Nos. 66, 69). The show-cause order was based on Defendant's conduct in late March and April 2024. (*See* Dkt. No. 79). A bench trial is set for June 13, 2024, to resolve the criminal contempt charge.[1]

A draft presentence investigation report (PSR) was filed on February 20, 2024. (Dkt. No. 68). Both parties filed objections to the draft PSR. (Dkt. Nos. 72, 78). A final PSR was filed on May 30, 2024. (Dkt. No. 96, hereinafter the "Final PSR"). The Final PSR calculates Defendant's advisory guidelines range as follows:

| | |
|---|---|
| Base Offense Level (USSG §2B1.1(a)(1)) | +7 |
| Loss Greater than $1.5 million (§2B1.1(b)(1)(I)) | 16 |
| Five or More Victims Suffered Substantial Financial Hardship (§2B1.1(b)(2)(B)) | +4 |
| Gross Receipts from One or More Financial Institutions Exceeding $1.0 Million (§2B1.1(b)(17)(A)) | +2 |
| Vulnerable Victim (§3A1.1(b)(1)) | +2 |
| Abuse of a Position of Public/Private Trust, or Use of a Special Skill (§3B1.3) | +2 |
| Obstruction of Justice (§3C1.1) | +2 |
| Total Offense Level | 35 |
| Criminal History Category | I |
| Advisory Guidelines Range | 168 to 210 months |

(Final PSR 44-45, 57, ¶¶ 184-97, 268).

---

[1] As of the date of this filing, Defendant has not entered a guilty plea to the charge of criminal contempt. As a result, the government, at the sentencing hearing and in this Sentencing Memorandum, does not intend to discuss Defendant's actions in March and April 2024 which underlie the charge.

Sentencing is set for Wednesday, June 12, at 1:30 p.m. This Court must resolve numerous of Defendant's factual objections to the Final PSR and several disputed guidelines issues. In addition, this Court will need to award restitution and determine Defendant's ultimate sentence.

## II.   DEFENDANT'S OBJECTIONS TO THE FINAL PSR'S FACTUAL ALLEGATIONS CONCERNING HIS MISCONDUCT SHOULD BE DENIED

Defendant submits forty-two objections to the draft PSR, many of which concern the report's factual allegations. Although the objections have no effect on the applicable advisory guidelines range, many objections go to the heart of Defendant's criminal activity, background, and character, and the government addresses these objections to clarify the record for purposes of this Court considering the information pursuant to 18 U.S.C. §§ 3553(a) and 3661. The government's responses to Defendant's objections are contained in Attachment A. The government also submits several exhibits, all of which are identified in the attached exhibit list.

One note regarding the facts on which this Court may rely in sentencing Defendant and on which the government relies in responding to Defendant's factual objections: Due to the length of the government's Offense Conduct Statement and exhibits, the United States Probation Office elected to draft the offense conduct section of the PSR such that the section would, mostly, include only information which was "relevant to guideline computation." (Final PSR 7, ¶ 12 n.3). Nonetheless, the Probation Office concluded that all information in the government's Offense Conduct Statement and exhibits was accurate and should be considered by this Court

"for sentencing purposes." (*Id.*). The Probation Office instructed Defendant's counsel that if Defendant took issue with the information in the government's Offense Conduct Statement and exhibits, it was Defendant's duty to "object to the material." (Gov. Sent. Exs. 11, 11A). Defendant did not object to any of the government's Offense Conduct Statement or exhibits; thus, they should be considered undisputed.

## III.   THIS   COURT   SHOULD   ADOPT   THE   FINAL   PSR'S LOSS CALCULATION

Defendant claims that taxes and market-value adjustments victims suffered as a result of his fraud in relation to their annuities should not be included in his loss calculation. (Dkt. No. 78, at 3, ¶ 18). But this argument is meritless.[2]

To determine Defendant's advisory guidelines range under USSG §2B1.1, this Court must "make a reasonable estimate of loss." USSG §2B1.1, comment. (n.3(C)); *accord United States v. Cornelsen*, 893 F.3d 1086, 1089-90 (8th Cir. 2018). In this case, the loss calculation must incorporate all "Actual Loss," *i.e.*, all "reasonably foreseeable pecuniary harm" resulting from Defendant's relevant conduct. USSG §2B1.1, comment. (n.3)(A). "Pecuniary Harm" is "harm that is monetary or otherwise readily measurable in money." *Id.* "Reasonably Foreseeable Pecuniary Harm" is "pecuniary harm that the defendant knew" or "reasonably should have known, was a potential result of the offense." *Id.*

Applying the relevant definitions in USSG §2B1.1, the taxes and adjustments are appropriately considered "Actual Loss." For seventeen years, Defendant was an

---

[2] Defendant concedes that the resolution of this issue will have no impact on the applicable advisory guidelines range. (Dkt. No. 78, at 3, ¶ 18). It will, however, affect this Court's restitution order and the amount of restitution owed to each victim.

9

insurance producer. (Final PSR 8-9 12, ¶¶ 18, 29-30, 45-48). He held insurance-producer licenses in multiple states, and he received hundreds of hours of training to become licensed and to maintain his licensure. (*Id.*). Defendant, likewise, completed numerous trainings to become affiliated with various insurance companies. (*Id.* at 8, 12, ¶¶ 18, 45-48; *see id.* at 69-72, ¶¶ 32-36). As a result, Defendant understood that his victims were going to incur surrender penalties, taxes, adjustments, and other costs when he fraudulently caused his victims to withdraw monies from, or surrender, their annuities. (*Id.* at 8, 12, ¶¶ 18, 45-48; *see id.* at 69-72, ¶¶ 32-36). He knew that if he surrendered and replaced his victims' annuities incorrectly, by failing to execute a tax-free rollover, tax authorities would require his victims to pay even more in taxes. (*Id.* at 8, 12, ¶¶ 18, 45-48; *see id.* at 69-72, ¶¶ 32-36).

As the insurance producer on nearly all his victims' annuities, he also had firsthand knowledge about the monetary penalties his victims would suffer because of his fraudulent actions. Furthermore, the numerous complaints from clients and insurance companies filed against Defendant from 2012 to 2021 put Defendant on notice about the losses his conduct was causing his clients to suffer. (*See* Final PSR 7, ¶ 14; *id.* at 73-78, ¶¶ 37-47). More specifically, in 2022, Defendant assisted Victims #3 and 4 (J.S. and M.S.) with tax issues they confronted due to the annuity withdrawals Defendant encouraged them to complete. (*Id.* at 111-12, ¶ 211).

Defendant knew or reasonably should have known, as a "professional" insurance producer, that his fraud would result in victims losing money in the form of taxes and market-value adjustments. *See, e.g.*, *United States v. Gonzalez*, 611 F. App'x 619, 628-29 (11th Cir. 2015) (per curiam) (unpublished) (upholding tax-related

loss amounts as actual losses because the defendants, "professional tax preparers," knew or reasonably should have known that the tax-related losses would be suffered); *United States v. Schroeder*, 500 F. App'x 426, 438-39 (6th Cir. 2012) (unpublished) (holding that tax loss "was reasonably foreseeable consequence of Defendant's conspiracy" and properly counted as loss). Those amounts are appropriately categorized as "Actual Loss," and this Court should adopt the loss (and restitution) calculation contained in the Final PSR.

## IV.   THE TWO-LEVEL ENHANCEMENT UNDER USSG §2B1.1(b)(17)(A) APPLIES BECAUSE DEFENDANT RECEIVED OVER $1 MILLION FROM INSURANCE COMPANIES

Pursuant to USSG §2B1.1(b)(17)(A), a two-level enhancement applies where "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions." "[I]nsurance compan[ies]" and "investment compan[ies]" are "financial institutions" for purposes of the guideline. USSG §2B1.1, comment. (n.1). "Gross receipts from the offense" "includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of the offense." USSG §2B1.1, comment. (n.13(A)); *see, e.g., United States v. Gharbi*, 510 F.3d 550, 555 (5th Cir. 2007) (stating that "gross receipts" is the "entire amount" the defendant received from financial institutions, "less nothing"); *cf. United States v. Parker*, 267 F.3d 839, 847 (8th Cir. 2001) (noting that undefined language in the guidelines is given its ordinary meaning). The enhancement should be imposed in this case.

Defendant does not dispute that the insurance companies which paid him commissions are "financial institution[s]" under USSG §2B1.1. He, similarly, does not object to the allegations in the Final PSR detailing insurance companies awarding

Defendant over $1 million in "total gross commissions." (Final PSR 37, ¶ 173 n.22; *id.* at 81, ¶ 64 (noting that Defendant received "over $1.3 million" in gross commission payments and "net commission payments of roughly $1.193 million")).

Those concessions satisfy the unambiguous requirements of USSG §2B1.1(b)(17)(A). The insurance companies who paid Defendant commissions were financial institutions, and Defendant derived from those companies as part of his offense more than $1 million. Thus, this Court should enforce the enhancement.

Despite the foregoing, Defendant raises two arguments for why the enhancement should not apply. (Dkt. No. 99). Both arguments should be rejected.

Defendant, first, contends that the enhancement is inappropriate because the insurance companies "were not the source of the original investment monies," which belonged to the "individual victim-investors." (*Id.*). But this argument ignores entirely that the insurance companies paid Defendant over $1 million in commissions. The companies had "dominion and control" over the funds they issued to Defendant and had "unrestrained discretion to alienate the funds." *United States v. Capps*, 977 F.3d 250, 259 (3d Cir. 2020) (quoting *United States v. Stinson*, 734 F.3d 180, 186 (3d Cir. 2013)) (holding that investment company was a source of the investor-victims' funds which Defendant received from the company). And the funds "flowed directly . . . from the possession or control of the [companies] to [Defendant." *United States v. Muho*, 978 F.3d 1212, 1221-24 (11th Cir. 2020) (affirming enhancement and concluding a bank was the "source" of the funds "derived").

Defendant's second argument—that the enhancement cannot apply because the insurance companies "were not victimized by the Defendant's conduct,"

(Dkt. No. 99)—is equally flawed. To start, there is nothing in USSG §2B1.1(b)(17) suggesting that the "financial institutions" from which a defendant derives "more than $1,000,000 in gross receipts" must also be a "victim" of Defendant's offense who suffered a "loss." Section 2B1.1(b)(17), does not employ terms like "victim," "loss," or other words associated with being victimized by a defendant's conduct, and which the drafters of the United States Sentencing Guidelines and specifically §2B1.1 are intimately familiar. *See, e.g.*, USSG §2B1.1(b)(2), (7) (discussing "victims" and "loss"). The drafters' decision not to use the words "victim," "loss," or the like demonstrates that the "financial institutions" discussed in §2B1.1(b)(17) need not be a "victim" of Defendant's offense for the enhancement to apply. *Cf. Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018) (noting that courts "generally presume differences in language convey differences in meaning" (quotation omitted) (cleaned up)). At least one circuit has adopted an approach to the enhancement which does not require proof that the financial institution was victimized by the defendant. *See, e.g.*, *Capps*, 977 F.3d at 258-60 (remanding for findings regarding whether defendant had received more than $1 million from an investment company, but concluding that the company satisfied the remainder of §2B1.1(b)(17)'s requirements because it had a "possessory property interest" in the funds defendant had obtained, even though those funds were ultimately the property of the company's "account holders").

To Defendant's credit, the Eighth Circuit does not appear to have commented on the foregoing analysis, and multiple circuit courts have held on the facts they confronted, that the §2B1.1(b)(17) enhancement applies only if the offense conduct victimized the financial institution. (Notably, none of those courts seem to have

grappled with the language of the guideline.) The Eleventh Circuit, for example, held that "at least in a case involving property held by a financial institution for a depositor, the financial institution (1) must be the *source* of the property, which we interpret as having property rights in the property, and (2) must have been *victimized* by the offense conduct." *Muho*, 978 F.3d 1212, 1221 (11th Cir. 2020); *see, e.g.*, *United States v. Huggins*, 844 F.3d 118, 122 (2d Cir. 2016) (requiring financial institution(s) to "suffer[] some type of loss or liability in providing [defendant with] the requisite funds"). *But see Capps*, 977 F.3d at 259-60; *Stinson*, 734 F.3d at 184-87.

Nonetheless, in this case, the insurance companies were victims of Defendant's conduct who suffered "loss." Defendant agreed with all the following allegations:

- Defendant "from no later than 2006 to at least March 2023, had engaged in a scheme to defraud . . . insurance companies out of commission payments," (Final PSR 8, ¶ 18), and as a result of this scheme, insurance companies awarded Defendant "total gross commissions" of over $1.3 million, (*id.* at 37 ¶ 173 n.22).

- He knowingly submitted annuity documents to the insurance companies which contained "numerous misrepresentations" in hopes of obtaining said commission payments. (*Id.* at 21, ¶¶ 99; *see, e.g.*, *id.* at 75, 88, 107-110, 129, 138-39, 169-70, 176-79, 181, 184-86, 192, ¶¶ 41, 108, 201, 279, 333-35, 473, 476, 521, 527-30, 541, 567, 593).

- Insurance producers who, like Defendant, engage in fraudulent practices like "churning and twisting," do so to "generate commissions for themselves to the detriment of their clients." (*Id.* at 12, ¶ 43).

Defendant's scheme to defraud the insurance companies caused the companies some "loss," although the exact amount of said "loss" is "difficult, if not impossible," to quantify. (Final PSR 81, ¶ 65). Representatives for several companies told agents that they would not have issued some of the policies Defendant obtained for victims had the companies known the truth and Defendant had not included false statements

14

in the annuity materials. (*See* Gov. Sent. Exs. 36, 37, 38 (reports summarizing examples of said statements from company representatives)). A few victims, moreover, confronted insurance companies about their annuities, at which point, the companies cancelled the policies, refunded the victims' money, and lost any "profit" they had earned. (*See* Dkt. No. 99); Final PSR 37, ¶ 174 n.23; *id.* at 96-97, ¶ 142).

In some ways, Defendant's conduct is similar to what the Eleventh Circuit confronted in *Muho*. There, the defendant fraudulently convinced a bank to execute payments from the third-party victim's account to accounts he controlled. The court held that the bank had been victimized, even though it wasn't out any of its own money, because the defendant had deceived the bank. *Muho*, 978 F.3d at 1216, 1224.[3]

Again, it is undisputed that, based on their reliance on Defendant's fraudulent misrepresentations and omissions, the insurance companies issued over $1 million in commissions (*i.e.*, "gross receipts") to Defendant. The insurance companies parted with their own money to pay Defendant; they did not merely institute a wire or transfer on behalf of the investor-victims. *See Muho*, 978 F.3d at 1224-26 (stating

---

[3] *Muho* itself shows that there is good reason for following the unambiguous language of USSG §2B1.1(b)(17)(A) which does not require a "victim." Imagine that a fraudster committed the same crime as Defendant, except the fraudster lied only to his clients about the nature of the investments he was obtaining for them; the fraudster made only true statements in the materials he submitted to insurance companies, and the companies paid him over $1 million in commissions and profited from the issued annuities. In that scenario, the companies would not be "victims" for purposes of the guidelines since they were not defrauded by the fraudster. But §2B1.1(b)(17) still would rightly apply. *See Muho*, 978 F.3d at 1216, 1224 (applying the enhancement on somewhat similar facts); *cf. United States v. Price*, 2023 WL 2447446, at *1-*2 (5th Cir. March 10, 2023) (affirming the enhancement as not plainly erroneous where a bank issued defendant a loan which was forgiven by the Small Business Administration and thus was arguably not a victim).

15

that the "victimization" element is "easily met when the financial institution's own property has been 'derived' by a thief or fraudster"). Defendant defrauded the companies into paying him those commissions. This conduct is exactly why the enhancement in USSG §2B1.1(b)(17)(A) exists. Because the unobjected-to portions of the Final PSR satisfy §2B1.1(b)(17)(A)'s requirements regardless of the applicable standard, this Court should apply the two-level enhancement.

## V.   DEFENDANT HAS OBSTRUCTED JUSTICE IN REGARD TO HIS SENTENCING, AND THE TWO-LEVEL ENHANCEMENT UNDER USSG §3C1.1 SHOULD BE IMPOSED

In the Plea Agreement, the government agreed not to recommend the obstruction-of-justice enhancement based on the conduct known to the government at that time in the investigation. (Dkt. No. 31, at 6, ¶ 11(*i*)). Notwithstanding Defendant's failure to honor the entirety of the Plea Agreement (as described below), the government has kept its end of the bargain, and it will not seek the enhancement for pre-plea conduct. (*See* Final PSR 41-42, ¶ 175 (noting pre-plea conduct)).

But consistent with the Plea Agreement, the government asks this Court to impose the two-level obstruction-of-justice enhancement under USSG §3C1.1 based on Defendant's post-plea misconduct. (Final PSR 42, ¶¶ 176-79; *id.* at 240-50, ¶¶ 1-50 (discussing Defendant's post-plea misconduct)). The enhancement applies where a defendant willfully obstructs or impedes, or attempts to obstruct or impede, the administration of justice with respect to his sentencing, and the obstructive conduct relates to the defendant's relevant conduct. USSG §3C1.1.

Since pleading guilty, Defendant has obstructed justice in multiple ways. Most glaringly, Defendant violated this Court's Post-Indictment Protective Order issued pursuant to 21 U.S.C. § 853(e). (Dkt. Nos. 8, 23). The Order required Defendant:

- Not to sell or attempt to sell the house he and his wife own in Clive, Iowa;

- To pay all loans and costs associated with the Clive residence, a 2017 Crownline Boat, a 2015 Land Rover Range Rover, a 2016 Chevrolet Silverado, and a 2014 Mercedes-Benz G63 AMG; and

- To store the Mercedes-Benz "in a garage while this action is pending."

Despite knowing of the Order's requirements, Defendant did exactly none of those things. (*See, e.g.*, Final PSR 243, ¶ 15). In February 2024, Defendant and his wife listed their home for sale. (*Id.* at 243-44, ¶ 16). Even after Defendant was arrested, in part, because he and his wife had listed their home for sale, Defendant was adamant the sale proceed. On February 11, 2024, two days after he was taken into custody, Defendant told his wife he "doesn't care what they get out of the house, just get out of it," (*Id.* at 247, ¶ 35), or "get the hell out of it." (Gov. Sent. Ex. 32).

On top of that, instead of storing the Mercedes-Benz G63 AMG "in a garage," Defendant permitted his college-aged daughter to drive it. (Final PSR 243-44, ¶ 16). Defendant failed to pay the loans on his residence, boat, and vehicles, resulting in the boat and vehicles being repossessed and the residence being threatened with foreclosure. (*Id.*; *see also* Final PSR 54-55, ¶¶ 257-58).

Defendant's "failing to comply with [this Court's] restraining order . . . issued pursuant to 21 U.S.C. § 853(e)" is, standing alone, sufficient to support the imposition of the obstruction-of-justice enhancement. USSG §3C1.1, comment. (n.4(J)); *accord United States v. Jefferson*, 612 F. App'x 676, 678-79 (4th Cir. 2015) (per curiam)

17

(unpublished); 21 U.S.C. § 853(e)(4)(B) (stating that failure to comply with such an order can "result in an enhancement of the sentence of the defendant under the obstruction of justice provision of the Federal Sentencing Guidelines").

This Court could end its analysis there. But there is more supporting the obstruction-of-justice enhancement. In addition, following his guilty plea, Defendant:

- "[P]rovid[ed] materially false information to a judge or magistrate judge" when he submitted a financial affidavit to this Court which misrepresented his income and omitted assets, USSG §3C1.1, comment. (n.4(F)); (Final PSR 42, ¶ 177; *see also id.* at 240-41 Dkt. No. 47);

- "[P]rovid[ed] materially false information to a probation officer in respect to a presentence or other investigation for th[is] [C]ourt" by providing the United States Probation Office with a financial statement that omitted or misrepresented his net worth and assets, USSG §3C1.1, comment. (n.4(H)); (*see, e.g.*, Final PSR 43, 52-53, 55, ¶¶ 182, 249 n.30, 252, 258; *id.* at 242, ¶ 8);

- "[P]roduc[ed] . . . a false . . . document or record during an official investigation" when he provided a sworn financial statement to the United States Attorney's Office which Defendant knew to be materially false, thus failing to satisfy his obligation under the Plea Agreement, (Dkt. No. 31, at 11, ¶ 24), and inhibiting the government from identifying assets which could be seized for purposes of forfeiture and/or restitution, USSG §3C1.1, comment. (n.4(C)); (Final PSR 42-43, ¶¶ 176, 180; *id.* at 241, ¶¶ 5-7);

- Violated his pretrial release conditions, refused to tell probation officers his wife's new address—the location where he had been staying in violation of his pretrial release conditions—and lied to probation officers about his whereabouts on February 9, 2024, (Final PSR 43, ¶ 181; *id.* at 245, ¶¶ 22, 24);

- Liquidated, concealed, and attempted to liquidate and conceal assets which Defendant knew could be used to satisfy a money judgment, including Defendant's restitution obligation which he agreed in the Plea Agreement to pay to the victims, (Dkt. No. 31, at 10-11, ¶ 23; Final PSR 42-44, ¶¶ 176-77, 180, 182-83; *id.* at 241, 247-48, ¶¶ 5-7, 35); and

- "[U]nlawfully influenc[ed]," or attempted to unlawfully influence, Victims #11 and 12 (E.H. and M.H.), by communicating through family members with the couple in violation of this Court's no-contact order; it took Victims #11 and 12 roughly a year to come to terms with the fact that Defendant had defrauded them, and Defendant's continued contact likely will result in those victims not

participating at sentencing (the couple told the government they do not plan to attend or submit a victim-impact statement), USSG §3C1.1, comment. (n.4(A)); (Final PSR 42, ¶ 178; *see id.* at 242, ¶¶ 11, 12; Dkt. Nos. 15, 16, 21).[4]

These actions are, themselves, individually and independently, enough to support the §3C1.1 enhancement. Defendant's "'attempts to minimize and conceal his assets' during 'the presentence investigation for purposes of determining the defendant's ability to pay fines or restitution'" justify the enhancement. *United States v. Dufresne*, 698 F.3d 663, 666 (8th Cir. 2012)" (quoting *United States v. Anderson*, 68 F.3d 1050, 1056 (8th Cir. 1995) (cleaned up)). As does his efforts to influence two victims "prior to [their] allocution" and request for restitution. *See, e.g.*, *United States v. Davis*, 801 F. App'x 80, 88-89 (per curiam) (4th Cir. 2020) (unpublished) (affirming enhancement based on defendant emailing a victim before sentencing); *United States v. McHenry*, 849 F.3d 699, 707 (8th Cir. 2017) (similar where defendant's communication with victim may have caused the victim to forego restitution).

## VI. DEFENDANT IS NOT ENTITLED TO A REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY

For many of the same reasons, Defendant should not be awarded a reduction for acceptance of responsibility under USSG §3E1.1(a). That guideline allows for a two-level reduction where a defendant "clearly demonstrates acceptance of responsibility for his offense" and proves that by a preponderance of the evidence. *United States v. Reyna Rodriguez*, 810 F. App'x 470, 474 (8th Cir. 2020) (per curiam)

---

[4] To avoid doubt, the government reiterates that, although Defendant has now been charged with criminal contempt based on his violations of this Court's Order Restraining Dissipation of Assets Under the All-Writs Act in March and April 2024, the government will not discuss the events from March and April 2024 at sentencing or rely on those facts for purposes of the guidelines unless circumstances change.

(unpublished). A defendant's guilty plea is typically "significant evidence" in favor of the reduction. USSG §3E1.1, comment. (n.3). But a defendant who pleads guilty "is not entitled to an adjustment" for acceptance of responsibility "as a matter of right"— a Defendant's guilty plea, instead, "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id.*

Where a defendant's conduct merits the obstruction-of-justice enhancement, moreover, only in "extraordinary cases" should he also be awarded the acceptance-of-responsibility reduction. USSG §3E1.1, comment. (n.4); *accord McHenry*, 849 F.3d at 707-08. Such cases are "extremely rare and highly exceptional" and will generally occur where the obstruction was an isolated incident early in the investigation, where the defendant voluntarily terminated his obstruction, or where he admitted and recanted the obstruction. *United States v. Sandoval*, 74 F.4th 918, 923 (8th Cir. 2023).

Here, if anything, Defendant's case is extraordinary "because of the magnitude of his obstruction" and his repeated express denials of acceptance, "not his penitence." *Id.* Defendant knew when he signed his Plea Agreement that if he "obstruct[ed] justice" or "fail[ed] to cooperate fully and truthfully with the United States Probation Office," he could be disqualified from receiving the USSG §3E1.1 reduction. (Dkt. No. 31, at 7). Yet, Defendant did both of those things. He violated at least three court orders. (Final PSR 6, 42-43, ¶¶ 11, 176-82). He lied to the government in a sworn financial statement and to the Court in a sworn affidavit. (*Id.*). And he "intentionally failed to provide financial information that a United States Probation Officer expressly requested during the presentence investigation." *Anderson*, 68 F.3d at 1055-56 (affirming application of §3C1.1 enhancement and denial of §3E1.1

reduction); *see, e.g.*, *United States v. Hogue*, 66 F.4th 756, 763-64 (8th Cir. 2023) (upholding rejection of §3E1.1 reduction based on defendant providing fraudulent information to probation officer after pleading guilty but prior to sentencing).

The foregoing misconduct was not an "isolated incident," and it was not "early" in the case. Defendant did not voluntarily end his obstructive conduct; it ended only when the government had exhausted countless resources to put it to an end. Nor has Defendant admitted and recanted his obstruction. Rather, in his factual objections to the draft PSR, he frivolously maintains that he never intentionally misrepresented information to the government and Court and that he never had indirect contact with victims. (Dkt. No. 78, at 4, ¶¶ 20-21, 24). Neither of those claims are true, with the latter claim being refuted by Defendant's own statements on recorded jail calls. (*See* Attachment A, at 12-13, 17-18; Gov. Sent. Ex. 34); *see United States v. Zeaiter*, 891 F.3d 1114, 1123-24 (8th Cir. 2018) (affirming denial of §3E1.1 reduction based on defendant's false and frivolous objections to presentence report).

As if that were not enough, Defendant's repeated lies to others about this Court, government agents, and his charges leave no doubt that he has not accepted responsibility. *See, e.g.*, *United States v. Graham*, 630 F. App'x 712, 715 (9th Cir. 2015) (unpublished memorandum) (affirming denial of §3E1.1 reduction where defendant "lied repeatedly to law enforcement and, even after confessing [to murder], told friends she had been exonerated by multiple polygraph tests"); *United States v. Miller*, 343 F.3d 888, 890-91 (7th Cir. 2003) (same where Defendant was minimizing his crimes "trying to save face with his family"). Defendant has misrepresented:

- This Court's views on the charges against him—Defendant told one person that a judge had chastised prosecutors for charging him with crimes. (Final PSR 246-47, ¶ 32).

- The conduct of federal agents—Defendant stated that a team of agents arrested him in February 2024, when really the arrest was effectuated by two probation officers; he told one person that agents kicked in the door of his home and interrogated his daughter about his relationship with his girlfriend. (*Id.*).

- The victims, claiming that victims remain his friends and supportive. (*Id.*).

- His charges, stating that they were "tax" related, and that he pleaded guilty to only one charge and the others were dismissed as not "true." (*Id.*).

Defendant's misrepresentations establish that he has failed to accept responsibility.

So, too, does the fact that Defendant, after pleading guilty, continued his fraud and "supporting himself and his family with somebody else's money." *United States v. DeCecco*, 467 F. App'x 85, 87 (2d Cir. 2012) (unpublished summary order). Until at least December 2023, Defendant was embezzling Tribe Athletics' money to fund personal expenditures. (Final PSR 42, at ¶ 176(a); Gov. Sent. Ex. 39).

Defendant's own words show that he lacks any acceptance of responsibility. Defendant does not even think his crimes are "real crimes." (Gov. Sent. Ex. 31). He thinks he should have taken more money from victims, and he believes some victims are not victims at all. (*Id.*). As Defendant told his wife on a recorded jail call:

| DEFENDANT: | Wire fraud, like, not real stuff, not real crimes. Did I take the money? Well, yeah, I took the money. Did I earn the money? Probably took less than I should have. . . . Now [Victims #11 and 12 (E.H. and M.H.)] are victims because they're out of money. |
|---|---|
| J.F. | No. [Victims #11 and 12] are victims because the FBI won't leave them alone. |

(*Id.*; Final PSR 43, ¶ 183; *id.* at 250, ¶ 51).

## VII.   THE FINAL PSR'S RESTITUTION AMOUNTS SHOULD BE AWARDED, AND THE GOVERNMENT IS NO LONGER SEEKING FORFEITURE

In his Plea Agreement, Defendant agreed to pay restitution in an amount to be determined by this Court "for all victims for all relevant conduct." (Dkt. No. 31, at 10-11, ¶ 23). As discussed above, Defendant objects to the Final PSR's loss and restitution calculations, but this Court should overrule and deny his objections. (*See* Section III *supra*). This Court should award restitution to the victims of Defendant's conduct in the amounts set forth in the Final PSR, paragraph 174.[5]

The forfeiture in the Indictment and Plea Agreement is now moot, largely given Defendant's failure to pay debt obligations on assets and lenders repossessing many of those assets. Although the government could seek a forfeiture money judgment in excess of $1.5 million, it elects not to do so. Instead, the government contemplates using the remedies set forth in the Federal Debt Collections Procedures Act, 28 U.S.C. § 3001, *et seq.*, to pursue Defendant's assets and have them applied for purposes of satisfying this Court's restitution order and judgment.

## VIII.   THE 18 U.S.C. § 3553(a) FACTORS SUPPORT A TERM OF IMPRISONMENT BETWEEN 210 AND 240 MONTHS

Based on the sentencing factors set forth in 18 U.S.C. § 3553(a), a sentence of between 210 and 240 months in prison is "sufficient but not greater than necessary."

---

[5] Where the Final PSR notes that a victim should receive "at least" a certain amount, this Court should reward the victim that amount. For instance, victim R.F. is entitled to "At least $200,000." R.F. suffered losses greater than $200,000. But given the lack of information available regarding Defendant's conduct with R.F., a "reasonable estimate of loss" is $200,000, so that amount should be awarded. USSG §2B1.1, comment. (n.3(C)). The same goes for all similarly situated victims.

Defendant is one of the most dangerous white-collar criminals to appear in this Court. He is manipulative, calculating, and he is willing to do anything to get ahead.

**Defendant's scheme was to defraud vulnerable individuals, take as much of their money as possible, and earn commissions in the process**.

Defendant's crimes were not a one-time lapse in judgment, a mistake. He did not commit his crimes on accident or by happenstance. Defendant, day-in-and-day-out for over fifteen years, made a conscious and calculated decision to defraud elderly individuals and insurance companies out of millions of dollars. Completing that fraud was neither a fluke nor an easy task; it required deliberation, caution, and an extreme callousness toward others. Defendant had to convince scores of victims and insurance companies to give him their money and do it without getting caught.

Defendant targeted vulnerable, elderly individuals. His victims ranged in age from their early sixties to their nineties. (Final PSR 35-36, ¶ 172). Victims largely were unsophisticated and had little financial wherewithal, and they told Defendant that. One couple said that they had "zero" financial experience, that it's like "dumb and dumber." (Final PSR 101-02, ¶ `53, 171). Few victims understood what annuities were. One couple had even been defrauded previously by another con man. (Final PSR 30, ¶ 144).

Some victims had little family support or lived alone. Other victims suffered from poor health or chronic conditions. One victim had been legally blind for his entire adult life; another was legally disabled. (Final PSR 95, 197 ¶¶ 133, 622).

Many of Defendant's victims were former blue-collar workers with limited education. Among Defendant's victims were three military veterans, a couple who

24

previously operated a cleaning business, the former owner of a pest-control company, and a school employee. Defendant's victims were normal people who worked their entire careers earning and saving money to provide their families with better lives:

- Victim #14 (R.K.): "I worked several jobs at one time because I did not have a high school education. I worked to take care of my family. I had a rough childhood and worked hard to take care of my family." (Gov. Sent. Ex. 8, at 2).

- C.R.: "My husband worked a lot of off duty time as a police officer so we could save up money. He worked hard and that was time away from our family all so that he could do his best to make sure we had what we needed in our later years in life. You stole all of that money from us that he worked so hard to earn. He put his life on the line as an officer to earn that money you stole." (Gov. Sent. Ex. 9, at 1).

Defendant fraudulently extracted assets from at least six victims soon after they lost their husband, wife, or partner. (Final PSR 14, 18, 25, ¶¶ 55-61, 79-83; *id.* at 131, 187-89, ¶¶ 291, 571-74). Usually, Defendant would visit the widowed victim more often immediately after their spouse had died, thereby catching the victim in a vulnerable state. (*See* Final PSR 167, ¶ 459). Defendant told two widowed victims that he had promised their spouse that "he would take care of" them. (*Id.* at 25, ¶ 115; Gov. Sent. Ex. 13, at 14). As the widowed victims grieved, Defendant convinced them to give him money, which he used to benefit himself, his family, and his businesses. Defendant even persuaded two widowed victims to include him in their wills; one victim agreed to leave Defendant her entire estate. (Final PSR 18, 26, ¶¶ 83, 125-27).

Defendant knew his victims were susceptible to his fraud. His "repeated targeting" of financially illiterate elderly individuals and widows shows that he marketed his fraudulent services to these individuals precisely because they were

particularly vulnerable. *See, e.g.*, *United States v. Walbey*, 634 F. App'x 767, 769 (11th Cir. 2015) (per curiam) (unpublished).

Once Defendant had identified potential targets, he went to great lengths to gain their trust, insert himself in their personal lives, and groom them. Defendant had relationships with some victims which lasted over a decade. Defendant would spend time with victims, buy them or their relatives gifts, take them out to lunch, perform tasks around their house—anything to get in their good graces. He had his construction company, Infinity Construction, perform projects at victims' homes, often telling victims that the projects were free or at a substantially reduced cost. Defendant called his victims "mom" or "dad" or "best friend." He would tell them he loved them and recite cliches like "the 3 most important things in life are GOD FAMILY & TRUST." (Gov. Sent. Ex. 1, at 2).

Defendant's grooming tactics with the following victims are emblematic of his approach:

-   Victim #1 (L.M.): Defendant referred to L.M., a 75-year-old woman as his "best friend." Following the death of L.M.'s husband in 2017 until early 2022, Defendant engaged in a concerted effort to grow close to L.M. He gave her guitar lessons, sometimes went to lunch with her weekly, texted and communicated with her often, and helped with tasks and projects at her house. He bought L.M. gifts and gave $600 of gift cards to one of L.M.'s adolescent granddaughters. (Final PSR 18-19, ¶¶ 84, 86).

-   Victims #3 and 4 (J.S. and M.S.): After meeting this couple through their relative, Defendant developed a seven- or eight-year relationship with the couple. During that time, Defendant regularly visited the couple's home for dinner, to chat, or to help around the house with mowing, shoveling snow, or other tasks. He texted the wife regularly and was "very joking" and "real fun to be around," and at one point, he gave the husband an electric guitar and amplifier. (*Id.* at 101-02, ¶¶ 165-67).

- Victims #11 and 12 (E.H. and M.H.): Defendant met this couple in 2006 at an investment seminar he hosted, and he maintained a relationship with them until roughly December 2023. During that seventeen-year period, Defendant checked in on the couple "pretty much every day either by physically coming [to their house] or by phone call." Defendant referred to the couple, who were estranged from their children, as "mom" and "dad." In one glowing text to the husband, Defendant stated: "[T]hank you so much for all your kind words and all your support at the time through all these years you're my best friend and my dad and I wish I could spend more time with you and I'm going to start doing that I promise." (*Id.* at 146-48, ¶¶ 365-69).

Over time, through his persistent efforts, Defendant became a trusted confidant for many of his victims. Multiple victims referred to Defendant as their "son" or a "second son" and included him in their estate documents. Victims cooked him dinner, baked him cookies, and bought him and his family gifts. (*E.g.*, Final PSR 101, ¶ 166; Gov. Sent. Ex. 9). Some victims thought the world of Defendant even after they learned he had defrauded them. (Final PSR 30, ¶¶ 145-46).

Defendant's victims viewed Defendant so highly that he even used his victims to identify new targets. Take just three examples.

- Victim #1 (L.M.) referred Defendant to her daughter (Victim #2 (H.I.)), her best friend (Victim #5 (D.M.)), and her daughter-in-law's father (D.H.). (Final PSR 23, ¶ 106; *id.* at 95, 97, ¶¶ 134, 146).

- Victim D.C. referred Defendant to his romantic partner (K.W.) and his partner's 93-year-old mother (Victim #6 (L.C.)), brother, and sister-in-law (Victim #7 (Z.C.) and T.C.). (*Id.* at 125, ¶ 262).

- R.F. and his late wife, A.F., worked with Defendant "to find new clients," appeared in one of his "brochures," and gave "testimonials at all [Defendant's] seminars." (Gov. Sent. Ex. 1, at 1).

After Defendant earned his victims' trust, his goal was simple: To extract as much money as possible from, and through, the victims. Defendant's scheme generally proceeded as follows:

1) Defendant pitched his victims on investing with him, lying to them about the return they could expect, the penalties involved, the risk associated, the nature of the investment, basically anything and everything to get them to invest with him or write checks to him personally or to one of his businesses.

2) Defendant told victims that, when they wrote him checks, he would invest that money on their behalf. But Defendant didn't do that. Instead, he deposited the checks into his accounts. At that point, Defendant and his family spent the victims' money. During his fraudulent scheme, Defendant received well over $1 million in checks from his victims.

3) He also used his victims' funds to obtain annuities on their behalf. He would prepare, sign, and submit the relevant paperwork to the insurance companies, and usually, he would include forged signatures for his victims and numerous misrepresentations in the documents to ensure that the annuity was issued. Each time he made misrepresentations in victims' annuity documents and obtained an annuity on their behalf, he received a commission payment. Over the course of his fraudulent scheme, he received over $1.3 million in commissions from insurance companies.

Defendant lied to his victims about the downsides of annuities, telling them that they were not being penalized for withdrawing funds or cancelling policies. Defendant, in fact, told his victims that they could make even more money by cancelling their policies and buying a new annuity. Based on Defendant's misrepresentations, victims regularly pulled money out of their investments and cancelled their policies altogether, at which point, Defendant "twisted" their money into a new annuity, thereby earning another commission. Each time Defendant executed a "twist" on his victims, his victims incurred significant penalties, taxes, and fees. In all, Defendant's victims lost far more than $1 million in penalties, fees, and taxes associated with their annuities.

After Defendant had defrauded a victim, he continued lying and deceiving. Take victim R.F. Defendant first lied to R.F. that R.F. had enough money "to live until he was 104 years old." (Final PSR 168, ¶ 469). Then, after Defendant extracted well

28

over $200,000 from R.F., Defendant claimed that R.F. was "broke" and "had spent all [his and his deceased wife's] life savings." (Gov. Sent. Ex. 1, at 1). "But out of the goodness of his heart, Defendant and his wife . . . were committed to caring for [R.F.] until" his death. (Final PSR 169, ¶ 470).

Defendant was equally charitable to other victims. When Defendant had taken all of Victims #11 and 12 (E.H. and M.H.)'s savings, he continued to tell them that they had hundreds of thousands of dollars invested with him. Once or twice per year, E.H. asked Defendant for interest payments from these "investments," at which point, Defendant would stall for months and then write E.H. a check for a few thousand dollars. (Final PSR 31-32, ¶¶ 150-54).

Defendant engaged in similar conduct with Victims #3 and 4 (J.S. and M.S.). In 2022, Defendant told J.S. that she had over $400,000 invested with him. But in October 2022, J.S. received a document from an insurance company indicating she had only $33,844 left. J.S. asked Defendant about the discrepancy, and he lied to J.S., telling her that there was $440,000 that was "all good for [her] account!" "No one can touch it.! Or we will get them . . . ." (Final PSR 112, ¶ 211).

**A sentence of 210 to 240 months is needed to deter Defendant from additional criminal conduct and to protect the public**.

Defendant "poses a unique danger to the public" because he is intelligent, articulate, and extremely manipulative. *United States v. Fiorito*, 640 F.3d 338, 343, 353 (8th Cir. 2011) (quoting sentencing court) (affirming 270-month sentence, a 35-month upward variance, where defendant defrauded unsophisticated, vulnerable homeowners). He is a serial liar. But what truly exemplifies the danger Defendant

29

presents to others and the need to deter him from committing future crimes is that Defendant knew his conduct was legally and morally reprehensible and did it anyway.

In contrast to his victims, who were vulnerable and unsophisticated, Defendant was well versed in annuities and related products. Defendant had received hundreds of hours of training to become a licensed insurance producer in multiple states, taking classes like "Ethics" and "Long Term Care Partnership." (Final PSR 12, ¶ 45). He completed even more training to become certified to sell annuities on behalf of at least six insurance companies, and he was "regularly reminded of the relevant terms and provisions in the annuities he could offer to customers." (*Id.* at 12, ¶¶ 46-48; *id.* at 70, ¶ 36). Defendant, therefore, understood that annuities are long-term investments, that he had to be honest in submitting annuity documents, that his clients would incur penalties if they withdrew money from their annuities, and that his clients would suffer huge surrender fees if they cancelled their annuity before the term had expired. (*Id.* at 9-12, ¶¶ 31-44 (explaining basics of annuities)).

Defendant also had first-hand knowledge about his victims' finances and annuities. When first meeting with a potential customer, Defendant completed a Needs Analysis, during which he learned all about the customer's assets, expenses, and financial goals and needs. (Final PSR 8, ¶ 22). Defendant personally filled out and signed the victims' annuity paperwork, indicating he read the paperwork and knew the specifications of the annuity he was obtaining for his victims.

Armed with that information, Defendant still chose to perpetrate a significant and far-reaching fraud, to invest his victims into annuities, and to lie to victims,

insurance companies, and others. When his clients needed money out of their annuities to live on, Defendant withdrew the money without hesitation, misleading them about the penalties they were suffering, all in hopes of swindling more money from the victims and getting more commission payments.

Not only did Defendant know that his conduct was wrongful; he understood that his conduct was harming real-life people. From 2012 to 2021, Defendant received numerous complaints from customers and insurance companies about his conduct. One company, in 2012, criticized Defendant's practice of "twisting" his clients' annuities—Defendant had obtained thirty-five annuities for clients which, on average, were in place for only twenty-eight months. The company stated that Defendant's approach was not "in the best interests of the customer." (Final PSR 73, ¶ 38). Another company terminated Defendant's right to sell annuities on the company's behalf in 2015 after Defendant made misrepresentations in annuity documents. (*Id.* at 75, ¶ 41).

Customers filed similar complaints. In 2012, a customer, who was recently widowed and had suffered a stroke, complained that Defendant had "tricked and swindled" her into changing annuities at a loss. (Final PSR 73-74, ¶ 39). Others said Defendant had "high-pressured" them and "deceived" them to acquire annuities. (*Id.* at 74-77, ¶¶ 40, 42). One woman, in 2017, said, "We are senior citizens and feel that what Zach did to us was reprehensible and abusive to us. We trusted him and feel that he completely took advantage of us to earn a commission." (*Id.*).

Defendant received copies of all these complaints shortly after they were filed. (*Id.* at 9, ¶ 26). Yet, he did not falter; he did all he could to conceal his fraud.

Defendant lied to the insurance regulators and companies tasked with reviewing and investigating the complaints. Even though Defendant knew that he had never described to victims the investments he was obtaining for them, he lied, stating that he had gone over the relevant information multiple times. He made excuses for the misrepresentations he included in annuity documents he submitted to companies. He accused victims of making false statements about him and blamed victims for the behavior that was losing them money. (*E.g.*, *id.* at 122-23, 193, ¶¶ 247-48, 597-600). At every turn, when confronted by an uncooperative victim, a complaint, an insurance company, regulators, or law enforcement, Defendant doubled down.

Even after law enforcement executed a search warrant at his residence and business in November 2022, thus putting Defendant on stark notice of his criminal conduct, Defendant continued engaging in fraudulent activity, attempted to conceal the fraud, and maintained relationships with some of the victims. (Final PSR 7, ¶ 16). Multiple victims disclosed to Defendant that they had been contacted by law enforcement, and Defendant responded by lying to the victims more.

In January 2023, Victims #3 and 4 (J.S. and M.S.) revealed via text message to Defendant that law enforcement officers had spoken to them. Defendant lied to J.S. and told her that she had $479,000 remaining invested with him—the real number was closer to $30,000. The next night, Defendant visited the couple's home, where he informed the couple that "the Iowa Insurance Division had confiscated his phone and electronics and as a result, Defendant could not tell or show the [couple] where their money was located." But Defendant assured the couple, "Don't worry

about your money, it's safe. Don't worry. If there's anything that needs to be made up, I'll correct it." (Final PSR 104-05, 112, ¶¶ 179-80, 211).

The next month, investigators visited the home of Victims #11 and 12 (E.H. and M.H.). M.H. told the investigators that the couple was pleased with their financial advisor, their "son," Defendant. Of course, Defendant is in no way related to E.H. and M.H. As investigators finished their conversation with the couple, Defendant arrived at the home, said he was checking on the couple, and left abruptly. Defendant continued to have contact with the couple "pretty much every day" for the next few months. (Final PSR 34, ¶¶ 164-65).

Even after Defendant was charged with federal crimes, he has continued to demonstrate exactly who he is: a fraudster who will break any rule and tell any lie. Defendant has displayed an unwillingness to comply with any rules applicable to him.

- This Court issued a Post-Indictment Protective Order; Defendant violated it multiple times over.

- This Court issued a no-contact order prohibiting Defendant from communicating with victims directly or indirectly; Defendant had his family members communicate with victims.

- This Court issued its conditions for Defendant's pretrial release; Defendant broke several of those rules.

- Defendant, in his Plea Agreement, agreed to pay restitution to victims and to provide the government with an accurate sworn financial statement; Defendant dissipated meaningful assets and gave the government a sworn statement full of misrepresentations.

- After he was detained, Defendant was subject to the Polk County Jail's rules and regulations; he violated some of those rules within days of entering the facility.

(*E.g.*, Final PSR 6, 42-43, ¶¶ 11, 179-81; Attachment A, at 3-4).

33

Some of Defendant's lies and fabrications go to the very integrity of this Court and this proceeding. Defendant has falsely claimed that a judge of this Court has been critical of the charges against him and that he had emails from this Court "saying he could sell my house, my cars, all my stuff." (Gov. Sent. Ex. 33; Final PSR 246-47, ¶ 32). He has inaccurately stated that his crimes are "tax" related and unfounded, and that his victims stand behind him. (Final PSR 246-47, ¶ 32). And he has lied that a team of federal agents damaged his home and interrogated his daughter. (*Id.*). Defendant's repeated lies to family members, friends, and business partners have eviscerated whatever sentencing value the letters in support he submitted to this Court may have had. (*See* Dkt. No. 102).

Finally, after being charged with federal crimes, Defendant has continued to defraud others. He used his company, Infinity Construction, to enter into agreements with at least four homeowners, by which he received over $100,000 in up-front payments on the promise that the company would repair the homeowners' residence. Defendant pocketed the money, ghosted the homeowners, and never completed the work. (Final PSR 45-46, ¶¶ 198-205); Gov. Sent. Exs. 24, 25, 26, 27). In 2023, it is estimated he wrongly embezzled over $100,000 from his business Tribe Athletics which he then used for personal expenditures. (Gov. Sent. Ex. 39, at 1; Final PSR 42, ¶ 176(a)).

In short, for just over fifteen years, Defendant has given no indication whatsoever that he is willing to follow the law, comply with Court orders, or tell the truth. His sentence should reflect the extreme danger he presents and encourage him to stop engaging in unlawful conduct.

34

**A 210- to 240-month sentence adequately accounts for the need for general deterrence**.

Several aspects of white-collar crimes like Defendant's make general deterrence a particularly important factor in this case.

"[T]he deterrence of white-collar crime" has long been a "central concern to Congress." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006). Fraud crimes suffer from "detection, investigative and litigative problems which permit fraud to go unaddressed." *See, e.g.*, False Claims Amendment Act of 1986, S. Rep. No. 99-345, at 7 (1986). On top of that, "perhaps the most serious problem plaguing effective enforcement is a lack of [law enforcement] resources" to address fraud crimes at all. *Id.* In addition, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quotation omitted)); *see, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

The need for general deterrence is especially acute in frauds involving the elderly. "Financial fraud of older adults is rarely handled through the criminal justice system," because "[o]lder victims are unlikely to report the incident to the police." Rachel E. Morgan, Susannah N. Tapp, *Examining Financial Fraud Against Older Adults*, Nat'l Inst. of Justice (March 20, 2024),

35

https://nij.ojp.gov/topics/articles/examining-financial-fraud-against-older-adults#8-0.

"[S]eniors are less likely to report fraud because they do not know to whom to report it, are too ashamed at having been defrauded, or do not know they have been defrauded." Johnny Parker, *Company Liability for a Life Insurance Agent's Financial Abuse of an Elderly Client*, 2007 Mich. St. L. Rev. 683, 685 (2007) (dubbing "the elderly" as "prime targets" and "victims of choice for con men"). Frauds against such susceptible individuals "are easier to pull off and less likely to be detected and punished." *United States v. Grimes*, 173 F.3d 634, 638 (7th Cir. 1999).

> **A 210- to 240-month term of imprisonment is a just sentence which promotes respect for the law and is consistent with sentences imposed against similarly situated fraudsters**.

As Victim #5 (D.M.) explains, Defendant "is cruel. He preyed on vulnerable people and would still be doing it if he could." (Gov.  Sent. Ex. 10, at 4). The only thing that stopped Defendant from engaging in fraud was being taken into custody.

Defendant's victims understand that Defendant has no respect for them or for the law; they have requested that Defendant receive a substantial sentence:

- Victim #1 (L.M.): "I would rather see him incarcerated for the maximum number of years for the crimes he committed." (Gov. Sent. Ex. 5, at 2).

- Victim #5 (D.M.): "He is such a liar. He has hurt me and should go away for as long as the law allows." (Gov. Sent. Ex. 10, at 4).

- Victim #10 (P.K.): "I would like to get my money back from him and him in prison for the rest of his life." (Gov. Sent. Ex. 7, at 1).

- Victim #14 (R.K.): "I would also like him to serve at least 35 years but no amount of time is enough." (Gov. Sent. Ex. 8, at 2).

- Family of R.F.: "Please put him in jail for a lengthy term to prevent other families from suffering like ours." (Gov. Sent. Ex. 1, at 2).

(*See, e.g.*, Gov. Sent. Ex. 1, at 2; Gov. Sent. Ex. 3, at 1; Gov. Sent. Ex. 6, at 2; Gov. Sent. Ex. 9, at 1).

In cases involving similar facts, courts have imposed sentences like the one requested. *See, e.g.*, *Fiorito*, 640 F.3d at 343, 353 (270-month sentence); *United States v. George*, 804 F. App'x 358, 360, 363-64 (6th Cir. 2020) (unpublished) (upholding 240-month sentence, an upward variance of 72 months, where defendant committed a three-year fraud, earning himself roughly $3 million from roughly 35 victims and engaged in obstructive conduct); *United States v. Moskop*, 499 F. App'x 592, 593, 597 (7th Cir. 2013) (unpublished order) (affirming a 240month sentence, an upward variance of 72 months, where defendant committed a two-decade fraud, stealing $1.4 million from 26 victims"); *United States v. McKuhn*, 518 F. App'x 375, 377-79 (6th Cir. 2013) (unpublished) (affirming as substantively reasonable a 210-month sentence for defendant defrauding "debt-ridden" individuals and churches out of $3.1 million). This Court should do the same.

### The applicable advisory guidelines range does not fully account for physical, psychological, and emotional harm victims have suffered or other factors.

The victims of Defendant's crimes lost all or significant portions of their life savings, suffering an extreme financial hardship. Victim #1 (L.M.) lost nearly $1 million. (Final PSR 35-36, ¶ 172). Other victims lost hundreds of thousands of dollars. (*Id.*). Victim #10 (P.K.) gave Defendant the proceeds from the sale of the home she owned for over two decades with her late husband, and Defendant put most of those funds into his family bank account, where he depleted the funds.

(Final PSR 14-15, ¶¶ 57-62). In all, the Final PSR concludes that Defendant's conduct resulted in victims losing over $3 million. (Final PSR 35-36, ¶ 172).

But that amount does not adequately capture the full scope of the monetary harm Defendant has wrought. For example:

- There are individuals who are now deceased, in poor health, or otherwise unable to be located, and thus not able to communicate about what Defendant did to them. That includes victim D.C., who died in April 2021, and who suffered losses as a result of Defendant's conduct, and other individuals who complained about Defendant's conduct. (Final PSR 125, 134, ¶¶ 262-63, 308-10; *id.* at 73-78, ¶¶ 37-47 (detailing complaints against Defendant from victims who are not otherwise involved in the proceeding)).

- Multiple victims, including R.F., M.P., and others, who Defendant defrauded years ago no longer have the information needed to establish all their losses. As R.F.'s family explains, "To this day unfortunately we do not know how much cash our parents gave Zach to invest." (Gov. Sent. Ex. 1, at 2).

- Several victims have faced substantial tax liabilities, the extent of which is not currently known, as a result of Defendant's conduct. (*See, e.g.*, Final PSR 112, ¶ 214; Gov. Sent. Ex. 4, at 1 (referencing a $18,000 tax bill)).

- Four homeowners suffered more than $100,000 in losses when they paid Defendant for construction projects that were never completed. (Final PSR 45-46, ¶¶ 198-205).

- Defendant is believed to have embezzled over $100,000 in 2023 alone from Tribe Athletics, including a $7000 check he wrote to himself out of the company's bank account. (Final PSR 42, ¶ 176(a); Gov. Sent. Ex. 39, at 1).

Defendant's conduct has "robbed" victims of their futures. (Dkt. No. 3, at 1). One victim has had to return to work so that she and her husband could "make ends meet." (Final PSR 112, ¶ 215). Another couple lost their long-term healthcare coverage which would have given them $55,000 per year. (Final PSR 190, 192, ¶¶ 278, 593; Dkt. No. 6, at 2). Still another victim had to move out of an assisted-living facility because she could no longer afford to live there. (Gov. Sent. Ex. 4, at 1). And multiple

victims have only enough funds to survive a few more years at their current level of comfort, with many victims now afraid to spend money on things like travel or gifts. (*See, e.g.*, Gov. Sent. Ex. 18, at 53, 168; Gov. Sent. Ex. 1, at 2; Gov. Sent. Ex. 7, at 1; Gov. Sent. Ex. 8, at 2).

But Defendant's crime did not just result in his victims losing money. They lost much more than that, and the applicable guidelines range does not account for the damage Defendant did to his victims' psyches, to their ability to live productive lives going forward. The sentencing guidelines do, however, contemplate an upward departure or variance where "the offense caused physical harm, psychological harm, or severe emotional trauma." USSG §2B1.1, comment. (n.21)(A)(i), (ii). That guidance is apt here.

Defendant betrayed his victims. He abused a position of trust—trust Defendant carefully cultivated with most of the victims over years of serving as their de facto investment advisor. Defendant "pat[ted] [victims] on the back with one hand while stabbing [them] in the back with the other." (Gov. Sent. Ex. 8, at 2). Defendant's treachery has left his victims and their families broken, trying to live their lives despite the constant stress, worry, and shame:

- Family of R.F.: "What [Defendant] took from all of us is immeasurable. Not only did [Defendant] take their money, but [Defendant] destroyed our Dad's faith in people and robbed his self-confidence. He is a broken man after losing all of his money that he worked a lifetime for." (Gov. Sent. Ex. 1, at 2).

- Victim #5 (D.M.): "I felt all alone. I couldn't sleep and I got very depressed." "I just couldn't believe a person look me in the eye and smile while they were lying, cheating, and stealing from me." Defendant "destroyed my peace of mind and damaged my health, physically and emotionally." (Gov. Sent. Ex. 10, at 3-4).

- Victim #10 (P.K.): "This have [sic] affected me mentally and physically. Took my trust away and I am confused a lot." "My kids worry about me and I have to rely on them a lot more now. The stress from this crime has caused my health to decline. I worry about paying for in home healthcare and other things." (Gov. Sent. Ex. 7, at 2).

- Victim #14 (R.K.): "This crime made my heart condition worse. The stress of all of this has been very hard on me." "I trusted both Zack and his dad. I ended up having to have heart surgery after all of this." "I am so angry I have to worry about these things." (Gov. Sent. Ex. 8, at 1).

Defendant's actions also resulted in several victims losing relationships with friends and loved ones, harm which is not addressed in the guidelines. Defendant's conduct with Victim #1 (L.M.), by way of example, caused L.M. to end relationships with her sister, her best friend (Victim #5 (D.M.)), and others, and her relationships with her son and daughter-and-law grew strained. (Final PSR 19, ¶¶ 88-90; Gov. Sent. Ex. 5, at 2; Attachment A, at 11-12).

Defendant intentionally attempted to discredit victims' friends to prolong his fraud and create a rift between his victims and their support systems.

- It was Defendant's comments which put a halt to L.M. and D.M's sixty-year relationship. After D.M. filed a complaint against him with the Iowa Insurance Division, Defendant told L.M. that D.M. is "crazy, she's causing a lot of problems, she doesn't understand things, just a lot of negative comments." Defendant also told L.M. that D.M. was "bad mouthing" L.M. and making derogatory comments about L.M. L.M. believed Defendant, confronted D.M., and warned D.M. that she could be sued for defamation for commenting about Defendant. (Final PSR 23, ¶ 106).

- Defendant did the same thing when victim D.H.'s daughter, H.S., told Defendant that she received financial advice from a friend which differed from Defendant's advice. Defendant grew "very angry." He told H.S. that her friend "doesn't know what she's talking about. She's been out of the business for too long." (Gov. Sent. Ex. 14, at 14-17, 19; Final PSR 98, 100, ¶¶ 153, 159).

The applicable advisory guidelines range fails to account for any of the foregoing items. A 210- to 240-month sentence does.

**Defendant's extravagant lifestyle was founded on years of hard work by his victims, yet he continues to demonstrate a complete lack of acceptance of responsibility**.

Defendant, "his family, and his businesses benefitted greatly from the scheme." (Final PSR 8, ¶ 20). Between the checks he received from victims, which he then deposited into his bank accounts, and the commissions he received from insurance companies, Defendant personally approximately $3 million. He used that money to pay off victims, to pay his taxes, to acquire luxury vehicles and a boat, to go on vacations and hotel stays, and to fund his businesses. The government is unaware of Defendant having substantial legitimate income during the relevant period—Defendant's life was built on fraud and his victims' money.

Now, given that Defendant made all that money, what is left for the victims to recover and their "need" for restitution? 18 U.S.C. § 3553(a)(7). Not much. Defendant has been dissipating assets. He's told others that he had hoped to sell his house without listing it, doing so by way of a quick sale or another form of non-listed sale, and thus preventing the government from accessing the proceeds. (Final PSR 243, 247, ¶¶ 16, 34). He transferred his interest in Tribe Athletics to his wife, apparently hoping that the government will not be able to seize that interest on behalf of victims. (*Id.*; Gov. Sent. Ex. 12; Gov. Sent. Ex. 39, at 2). He's disposed, and attempted to dispose, of assets which could be used to repay victims. (Gov. Sent. Ex. 247, at 35). In the end, victims will recover only pennies on the dollars they lost.

Defendant's conduct is unsurprising when you consider that he believes he "earn[ed] the money" he took from victims, and that he "[p]robably took less than [he]

41

should have." (Gov. Sent. Ex. 31; Final PSR 43, ¶ 183). Defendant has shown zero remorse up to this point, no acceptance of responsibility or sympathy for his victims.

## CONCLUSION

The nature and circumstances of Defendant's offense are unprecedented. His history and characteristics are aggravating factors which favor a severe sentence. A stiff sentence is needed to promote respect for the law, to deter Defendant and others from wrongdoing, and to remind others that crimes directed at some of society's weakest members will be punished harshly. The government respectfully requests that this Court sentence Defendant to between 210 and 240 months in prison and grant the victims restitution as set forth above and in the Final PSR.

Respectfully submitted,

Richard D. Westphal
United States Attorney

By: _/s/ Kyle J. Essley_
Kyle J. Essley
Assistant United States Attorney
Neal Smith Federal Building
210 Walnut Avenue, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: Kyle.Essley@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2024, I
electronically filed the foregoing with the
Clerk of Court using the CM ECF system.  I hereby
certify that a copy of this document was served
on the parties or attorneys of record by:

     U.S. Mail       Fax      Hand Delivery

 X   ECF/Electronic filing     Other means

UNITED STATES ATTORNEY

By: /s/ *Alisha Rankin*
     Paralegal Specialist