IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                           :
      Plaintiff,           :        Case No. 4:23-cr-061
                           :
vs.                        :        PLEA AND SENTENCING
                           :        HEARING TRANSCRIPT
ZACHARY JAMES FLAHERTY,    :
                           :
      Defendant.           :
- - - - - - - - - - - - X

                              Courtroom, Second Floor
                              U.S. Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa
                              Wednesday, June 12, 2024
                              1:39 p.m.

BEFORE:  THE HONORABLE REBECCA GOODGAME EBINGER

APPEARANCES:

For the Plaintiff:        KYLE ESSLEY, ESQ.
                          United States Attorney's Office
                          210 Walnut Street, Suite 455
                          Des Moines, Iowa  50309

For the Defendant:        F. MONTGOMERY BROWN, ESQ.
                          F.M. Brown Law Firm, PLLC
                          1001 Office Park Road, Suite 108
                          West Des Moines, Iowa  50265

                    KARLA M. RAY, CSR, RDR, CRR
                     United States Courthouse
                  123 East Walnut Street, Room 189
                     Des Moines, Iowa 50309

1                      P R O C E E D I N G S

2          (In open court, with the defendant present.)

3          THE COURT:  Thank you.  Please be seated.  We are here

4    in the matter of the United States of America vs. Zachary James

5    Flaherty.  This is Case Number 4:23-cr-061.  This is the time

6    and date set for a plea hearing on a contempt charge and a

7    sentencing hearing on a charge of wire fraud.  My name, as you

8    know, is Rebecca Goodgame Ebinger, and I am the District Judge

9    presiding.

10        Counsel would please identify themselves for purposes of

11   the record.

12         MR. ESSLEY:  Kyle Essley on behalf of the United

13   States.

14         MR. BROWN:  F. Montgomery Brown for the defendant, Your

15   Honor.

16         THE COURT:  Thank you.  And we have with us from the

17   United States Probation Office U.S. Probation Officer Pam

18   Nelson, and the defendant, of course, is personally present.

19        I received communication yesterday from the parties

20   indicating that Mr. Flaherty intended to enter a plea of guilty

21   to the criminal contempt charge that was filed by way of a show

22   cause order on the docket at Docket Number 80.  I received a

23   Rule 11 letter combined with the local rules and the Federal

24   Rules of Criminal Procedure setting forth the Government's

25   position as to the proceedings.

My understanding is that the desire of the defense is to proceed with that plea hearing, waive any additional presentence investigation report, and proceed to sentencing on that matter today.  Is that right, Mr. Brown?

MR. BROWN:  Yes, Your Honor.

THE COURT:  Any objection to filing the Rule 11 letter on the docket, Mr. Essley?

MR. ESSLEY:  No, Your Honor.  I did want to bring one thing to your attention.  There's some individuals in the back reporting that they're not able to hear the communications.

THE COURT:  The communications or the Court speaking?

MR. ESSLEY:  The -- the Court speaking.  I'm not sure if that also includes the parties but I know the Court speaking.

THE COURT:  So first I'll remind the attorneys to make sure you stand and address the Court while speaking into the microphones.  If anyone has hearing difficulties and would benefit from an amplification device, the Court does have that opportunity if the direct use of the microphones is not sufficient for hearing.  We do have a large gallery.  Every seat is filled.  Is there anyone who, as I'm speaking this way, still cannot hear the Court?  I see no one indicating as such.

Thank you, Mr. Essley.  I'll ask both attorneys to make sure that you continue to rise, but adjust the microphones so that they're more proximate to you as you speak.

I went over the trial briefs for what was to be a bench

1  trial on the contempt yesterday, and I reviewed the memorandum

2  here today.

3      Mr. Essley, is your intent and the agreement of the parties

4  that the defendant is admitting the entirety of the allegations

5  included in the motion to show cause and the supplement to it

6  that were filed at Document 79 and then also Document 91?

7          MR. ESSLEY:  That is my understanding, Your Honor.

8          THE COURT:  Is that correct, Mr. Brown?

9          MR. BROWN:  Yes, Your Honor.

10         THE COURT:  Okay.  I also received a plethora of

11 proposed exhibits for what was to be the bench trial that was to

12 be separately heard by the Court.  Is the Government relying

13 upon those exhibits as part of this plea hearing, or are you

14 relying upon the admissions of the defendant simply to those

15 charged in those documents?

16         MR. ESSLEY:  At this point, Your Honor, the Government

17 would entire rely on admissions of the defendant.  And then for

18 purposes of sentencing, the Government does not intend to offer

19 any of the exhibits that were initially intended for the

20 contempt hearing for the Court's consideration at sentencing.

21         THE COURT:  I'm glad to hear that because I thought

22 that would be your approach, and I have not reviewed those

23 documents.  There were plenty of other documents the Court has

24 reviewed, and I have reviewed all of the other proposed exhibits

25 that were specifically intended for sentencing.  I have not

reviewed and will not rely upon those documents that were

identified as exhibits for the bench trial that had been

provided to the Court.

Okay. With that, Mr. Flaherty, we've been talking about

the plea hearing today on a contempt that was filed at Document

Number 80 in the Court's docket in terms of an order to show

cause. My understanding, from your attorney, is that it's your

intent to plead guilty to that charge today; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: At this time I'm going to have you placed

under oath and ask you a series of questions. If you'd please

raise your right hand and prepare to be sworn.

(Defendant sworn.)

THE COURT: Thank you, sir. So you're now under oath.

If you lie or knowingly make a false statement, you could be

subject to additional crimes such as perjury or making a false

statement, and if convicted of those offenses, subject to

additional terms of imprisonment and fines. Do you understand

that?

THE DEFENDANT: Yes.

THE COURT: Okay. So in this instance, the charge to

which you are pleading guilty is included in an Order to Show

Cause that was filed by this Court at Document 80 in this case

number: 4:23-cr-061. That document responded to a motion from

the Government asking for you to be held in criminal contempt

based upon allegations that you attempted to and sold personal
property including guitars and other musical instruments and
equipment in violation of this Court's prior order.  Do you
understand that, sir?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  You had an initial appearance in front of
me some time ago on that charge and had intended to proceed to a
bench trial which was scheduled for --

        THE DEFENDANT:  Tomorrow.

        THE COURT:  -- tomorrow.  Do you recall that, sir?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  At this time my understanding is that you
wish to change your plea and enter a plea of guilty to that
charge of criminal contempt; is that right?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  So that criminal contempt charge is a
violation of Title 18, United States Code, Section 401(3).  I
want to first make sure that you fully understand the nature of
the charges as well as your rights here today.

    Could you please state your full name.

        THE DEFENDANT:  Zachary James Flaherty.

        THE COURT:  And how old are you, sir?

        THE DEFENDANT:  48.

        THE COURT:  And how far did you go in school?

        THE DEFENDANT:  High school.

1          THE COURT:  Is English your native language?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Do you have any difficulty understanding

4     the English language?

5          THE DEFENDANT:  No.

6          THE COURT:  Are you able to read and write in English?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Are you currently under the influence of

9     alcohol?

10         THE DEFENDANT:  No.

11         THE COURT:  Are you under the influence of any illegal

12    substances?

13         THE DEFENDANT:  No.

14         THE COURT:  Are you taking any prescription

15    medications?

16         THE DEFENDANT:  Yes.

17         THE COURT:  The presentence investigation report which

18    was prepared in the underlying criminal case included

19    information about your medications.  Any objection to the Court

20    looking at that information for purposes of the plea hearing?

21         MR. ESSLEY:  No, Your Honor.

22         MR. BROWN:  No, Your Honor.

23         THE COURT:  That is contained in paragraph 236.  Do

24    those medications remain accurate, sir?  They list medications

25    that you're prescribed for medical conditions, both now at the

1  Polk County Jail and prior to being detained.

2          THE DEFENDANT:  Yes, Your Honor.  Metformin, yes.

3          THE COURT:  And are you taking that medication as

4  prescribed?

5          THE DEFENDANT:  I am, yes.

6          THE COURT:  Is there anything about your use of that

7  medication that would negatively affect your ability to

8  understand and participate in today's hearing?

9          THE DEFENDANT:  No, Your Honor.

10          THE COURT:  Are you suffering from any mental or

11  physical illness or ailment that would make it difficult for you

12  to understand and participate in this hearing, sir?

13          THE DEFENDANT:  No.

14          THE COURT:  Do you know of any reason why you might

15  have difficulty understanding these proceedings?

16          THE DEFENDANT:  No, Your Honor.

17          THE COURT:  If at any time during this plea hearing you

18  do not understand something I say or you have a question, would

19  you please stop me and let me know?

20          THE DEFENDANT:  Of course.

21          THE COURT:  The most important thing is that you

22  understand the proceedings.

23      Mr. Brown, do you have any reason to believe your client

24  may not be competent to enter a guilty plea?

25          MR. BROWN:  No, Your Honor.

1          THE COURT:  So by pleading guilty here today, you are

2     waiving or giving up certain rights, and I want to make sure you

3     understand that.  In this case, the Government has bound itself

4     to a maximum potential penalty of six months, which means you

5     would not have the right to a jury trial, but other rights

6     remain.  Do you understand that, sir?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  You would have the right to an attorney at

9     the bench trial.  In this case, Mr. Brown has been appointed to

10    represent you.  He would represent you in that criminal contempt

11    bench trial as well.  Do you understand that, sir?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And he would continue to represent you at

14    public expense for that bench trial.  Do you understand your

15    right to an attorney on the criminal contempt charge, sir?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Are you generally satisfied with the

18    representation you have received from your attorney as to the

19    criminal contempt charge?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Is there anything you have asked your

22    attorney to do in relation to the criminal contempt that he has

23    not done?

24         THE DEFENDANT:  No, Your Honor.

25         THE COURT:  And are there any questions that you've

1 asked him about that he's been unable to answer?

2       THE DEFENDANT:  No, Your Honor.

3       THE COURT:  You would have the right to the benefit of

4 the presumption of innocence at a bench trial.  At trial you

5 would begin that trial presumed innocent, and I would consider

6 only the evidence presented against you at that trial as to your

7 guilt or innocence as to the charge of criminal contempt.  The

8 Government would bear the burden of proving your guilt beyond a

9 reasonable doubt.  Do you understand that, sir?

10       THE DEFENDANT:  Yes, Your Honor.

11       THE COURT:  The Government would be required to call

12 the witnesses against you and to present evidence.  You would

13 then have the opportunity, through your attorney, to confront

14 those witnesses by way of cross-examination.  You would also

15 have the right to present your own defense, and the Government

16 would be required to assist you in procuring those witnesses by

17 way of subpoenas or otherwise.  If you could not afford the cost

18 to have those subpoenas served to get your witnesses to court,

19 the Government would have to pay those costs.

20    Do you understand that by pleading guilty, you're waiving

21 or giving up your right both to have the Government present the

22 case against you as to the criminal contempt and to have your

23 defense to that charge presented to the Court?

24       THE DEFENDANT:  Yes, Your Honor, I do.

25       THE COURT:  You would have the right to remain silent

1  at any bench trial.  Here today you're establishing your guilt

2  through your own statements.  If you proceeded to trial, you

3  would not have to make any statements, and the Court would not

4  hold it against you in any way if you declined to speak as to

5  the charges against you.  Do you understand that by pleading

6  guilty here today, you are waiving or giving up your right to

7  remain silent?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  In fact, you'll be establishing your guilt

10  through your own admissions.  Do you understand that?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  In summary, if you plead guilty to this

13  charge today, you will have no bench trial; you'll be

14  establishing your guilt through your own statements; and all of

15  the other rights I've talked to you about will be waived or

16  given up.  Do you understand that by pleading guilty today, you

17  are waiving or giving up those rights as I just explained it to

18  you?

19           THE DEFENDANT:  Yes, I do.

20           THE COURT:  Is it your intent to waive or give up those

21  rights?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Okay.  I talked with you about the crime to

24  which you have -- you have been charged with, and that's the

25  violation of 18 United States Code Section 401(3).  The

1  Government would have to prove each of the elements of that

2  offense beyond a reasonable doubt if you proceeded to trial.

3  The elements of that offense include that a court order existed

4  that was clear and specific, that you violated that order, and

5  that your violation of that order was willful.  Do you

6  understand that?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Okay.  The Government has told me, both by

9  way of the Rule 11 letter, and your attorney has told me here

10  today, that you admit that you undertook the actions that are

11  described in the two documents setting forth the motion to show

12  cause and the supplement.  Do you understand that, sir?

13          THE DEFENDANT:  Yes, Your Honor, I do.

14          THE COURT:  Those documents are 79 and 91.  They

15  include the fact that you knew the Court's orders restricting

16  your disposition of assets in this case and that you undertook,

17  both directly and indirectly, working with other people.

18  Including your wife, Jessica Flaherty, to engage in conduct to,

19  in fact, dispose of those assets, including a boat hoist and

20  musical instruments.  Do you recall that, sir?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Do you acknowledge each of the allegations

23  in both of those documents are true?

24          MR. BROWN:  Your Honor, it's my understanding that the

25  defendant admits his own actions.  He does not admit

1   specifically utilizing his wife as an aider or abettor.

2          THE COURT:  Well, the actions that he has alleged to

3   do, however you characterize them, involve, for example, on page

4   6 of the motion, photographic evidence of his conversations with

5   his wife, that he was talking with her and that they -- those

6   conversations occurred, including paragraph 16 which specifies

7   the actions that he requested of her and that she did.

8          MR. BROWN:  He admits the nature of the acts that he

9   engaged in.  As to the legal effect of whatever response she

10  engaged in, he doesn't admit.

11         THE COURT:  Yes.  And that's not what I asked him.

12  Thank you for clarifying.  But he's acknowledging each of the

13  allegations as to him are true?

14         MR. BROWN:  Yes, Your Honor.

15         THE COURT:  Okay.  Thank you, Mr. Brown.

16     Do you understand that?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  So in each of these documents, you are

19  alleged to have taken certain actions that caused certain

20  actions, but you are alleged to have taken certain actions.  And

21  you acknowledge and admit that you engaged in those actions;

22  correct?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  And you acknowledge that you, as alleged,

25  knew of the Court's order at the time it was -- you took these

1  actions?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  And that your actions, in violation of

4  those orders, because there were a couple of them that existed,

5  were willful?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Mr. Essley, did I accurately describe the

8  elements of criminal contempt as it applies to this defendant?

9          MR. ESSLEY:  Yes, Your Honor.

10          THE COURT:  Any additional record you'd like to make as

11  to the factual basis for the criminal contempt charge?

12          MR. ESSLEY:  No, Your Honor.

13          THE COURT:  Do you agree the Court has established an

14  adequate factual basis for the guilty plea?

15          MR. ESSLEY:  I do, Your Honor.

16          THE COURT:  Mr. Brown, do you believe that your client

17  understands the elements of the charge of criminal contempt

18  against him?

19          MR. BROWN:  Yes, Your Honor.

20          THE COURT:  Any additional record you'd like to make as

21  to the factual basis for this plea?

22          MR. BROWN:  No.  Thank you, Your Honor.

23          THE COURT:  Have I established an adequate factual

24  basis for the plea?

25          MR. BROWN:  Yes, Your Honor.

1          THE COURT:  Have you had full access to the

2   Government's discovery materials?

3          MR. BROWN:  Yes, Your Honor.

4          THE COURT:  And do the discovery materials also support

5   the factual basis for the defendant's plea of guilty?

6          MR. BROWN:  Yes, Your Honor, as to him.  Yes, Your

7   Honor.

8          THE COURT:  Are you aware of any defenses the defendant

9   would have to the charge of criminal contempt as set forth in

10  these materials other than the general denial?

11         MR. BROWN:  No, Your Honor.

12         THE COURT:  Mr. Flaherty, I talked to you at the

13  beginning of this discussion about the fact that the Government

14  has limited itself to the potential penalty of six months of

15  imprisonment.  That is one of the potential penalties for this

16  offense.  Additionally, you can be fined up to $5,000, and you

17  will be subject to a mandatory $10 special assessment.  Do you

18  understand that, sir?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Those penalties can be imposed

21  consecutively to the penalties imposed in the other criminal

22  matter that's set for sentencing here today, the condition of

23  wire fraud as to Count 15 of the indictment.  Do you understand

24  that?

25         THE DEFENDANT:  Yes, I do.

1           THE COURT:  Do you understand the penalties that may be
2    imposed in this case?
3           THE DEFENDANT:  Yes, Your Honor.
4           THE COURT:  Mr. Brown, the Government set forth what
5    they believed an appropriate guideline calculation was as to
6    this defendant in their sentencing -- excuse me -- in their Rule
7    11 letter.  My understanding is that the defense waives or has
8    given up the right, to the extent there is one, to the
9    preparation of an additional presentence investigation report as
10   to the criminal contempt charge; is that right?
11          MR. BROWN:  That's correct, Your Honor, and I concur
12   with those proposed sentencing guidelines.
13          THE COURT:  So typically, as you know from your
14   experience in the other matter before the Court today, sir, the
15   presentence investigation report on a particular charge is
16   prepared by the probation office, and that includes an advisory
17   guideline range as to a particular charge.  In this case both
18   your attorney and the Government have suggested that the
19   guideline range for this offense is a range of between zero to
20   six months, which is, in fact, the same range as is authorized
21   by the statute.  Do you understand that?
22          THE DEFENDANT:  Yes, Your Honor.
23          THE COURT:  Okay.  Basically, the probation office
24   isn't going to prepare a new report, and they're not doing a new
25   calculation.  But both of the attorneys agree that the Court

should consider, as the guideline range applicable to this
offense, the same term of months that would otherwise be
available under the statute.  Do you understand that?

        THE DEFENDANT:  Yes, I do.

        THE COURT:  Okay.  There's no mandatory minimum
sentence for this offense either, and I'm not aware of any other
collateral consequences to the contempt charge.

  Are you, Mr. Essley?

        MR. ESSLEY:  No, Your Honor.

        THE COURT:  Mr. Brown?

        MR. BROWN:  No, Your Honor.

        THE COURT:  You do have the right to appeal the
sentence that the Court imposes.  Do you understand that you
must appeal this if you believe it's been entered in error?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Okay.  Mr. Flaherty, if you plead guilty
here, you will have no right to withdraw your guilty plea after
the Court accepts it.  Do you understand that?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Has anyone forced or pressured you to plead
guilty here today?

        THE DEFENDANT:  No, Your Honor.

        THE COURT:  Has anyone made any promises to you or
guaranteed to you what your sentence will be as to this criminal
contempt charge?

1          THE DEFENDANT:  No, Your Honor.

2          THE COURT:  Has anyone threatened you in order to get

3  you to plead guilty?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  Do you understand what the word

6  "voluntarily" means, sir?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Can you give -- can you explain that to me,

9  in your own words?

10          THE DEFENDANT:  My own thinking.  My own doing.

11          THE COURT:  Do you understand that the plea in this

12  case must be voluntary or of your own free will?

13          THE DEFENDANT:  Yes.

14          THE COURT:  And, in fact, are you pleading guilty here

15  today voluntarily?

16          THE DEFENDANT:  Yes, I am.

17          THE COURT:  Mr. Brown, do you believe a guilty plea as

18  to the criminal contempt charge would be voluntary?

19          MR. BROWN:  Yes, Your Honor.

20          THE COURT:  Do you know of any legal reason why the

21  plea should not be accepted?

22          MR. BROWN:  No, Your Honor.

23          THE COURT:  Do you know of anything that the Court has

24  omitted in this Rule 11 colloquy as to this charge that would

25  affect the validity of the plea?

1          MR. BROWN:  No, Your Honor.

2          THE COURT:  Mr. Essley, is there anything the Court has

3    omitted that could affect the validity of the plea?

4          MR. ESSLEY:  No, Your Honor.

5          THE COURT:  Do you know of any reason the Court should

6    not accept this guilty plea?

7          MR. ESSLEY:  No, Your Honor.

8          THE COURT:  We've covered a lot of information as to

9    this criminal contempt charge here today, Mr. Flaherty.  Have

10   you been able to understand everything we've talked about?

11         DEFENDANT:  Yes, I have, Your Honor.

12         THE COURT:  Do you have any questions for me?

13         THE DEFENDANT:  No, I don't.

14         THE COURT:  Do you understand that if you plead guilty

15   here today, you'll be sentenced at the conclusion of this

16   hearing at the same time you're sentenced on the wire fraud

17   conviction?

18         THE DEFENDANT:  Yes, Your Honor, I do.

19         THE COURT:  And do you still want to plead guilty to

20   this charge?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Are you doing so because you are, in fact,

23   guilty of the crime of criminal contempt as set forth in the

24   materials we discussed?

25         THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Do you believe it's in your own best

2     interest to enter a guilty plea?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Then formally and for the record, how do

5     you plead to the charge of criminal contempt as set forth in the

6     documents set forth by the Government at Document 79, 91, and in

7     violation of the Court's order as set forth in the Order to Show

8     Cause at Document 80?  Guilty or not guilty?

9          THE DEFENDANT:  Guilty.

10          THE COURT:  The record should reflect that the

11     defendant has pleaded guilty to criminal contempt in violation

12     of -- as set forth in the Order to Show Cause at Document 80.

13     The Court finds that the defendant is competent to enter this

14     plea, that he fully understands the charge against him, there is

15     a factual basis for his plea, and he knows the maximum

16     punishment that can be imparted upon him upon this plea, and

17     that he understands his trial rights and has voluntarily waived

18     those rights.

19          I further find that the defendant's decision to plead

20     guilty was voluntary, knowing, and not the result of any force,

21     pressure, threats, or promises.  I therefore accept the

22     defendant's guilty plea and adjudicate him guilty of a violation

23     of United States Code, Section 401(3) of Title 18.

24          The defendant has waived any presentation of a presentence

25     investigation report and has requested to proceed immediately to

1  sentencing.  That's correct, Mr. Brown?

2          MR. BROWN:  Yes, Your Honor.

3          THE COURT:  So we will then turn our attention to

4  sentencing in this case.

5      Mr. Brown, do you agree the Court may consider the

6  presentence investigation report prepared as to the indictment

7  in this case for purposes of sentencing on the criminal contempt

8  charge?

9          MR. BROWN:  Yes, Your Honor.

10          THE COURT:  Thank you.

11      Any additional record as to the plea before I move forward?

12          MR. ESSLEY:  No, Your Honor.

13          MR. BROWN:  No, Your Honor.

14          THE COURT:  Okay.  So, Mr. Flaherty, we are now going

15  to proceed with sentencing, both on the criminal contempt

16  conviction that's just been entered, as well as your plea of

17  guilty to wire fraud.  Do you recall being charged by way of an

18  indictment filed here in the Southern District of Iowa on April

19  19 of 2023 with 20 counts of financial crimes?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  You initially entered pleas of not guilty

22  to each of the charges against you.  And then on November 23 of

23  last year, you entered a plea of guilty to Count 15, which

24  alleged that you committed the crime of wire fraud, in violation

25  of Title 18, United States Code, Section 1343.  Do you recall

1  that, sir?

2         THE DEFENDANT:  Yes, ma'am, I do.

3         THE COURT:  At the time of your plea, the United States

4  Magistrate Judge there explained to you that the maximum

5  potential penalty associated with that plea is 20 years of

6  imprisonment and a $250,000 fine.  Do you recall that, sir?

7         THE DEFENDANT:  Yes, Your Honor.

8         THE COURT:  Now with this additional conviction, it

9  would be 246 months would be the maximum potential sentence.

10  You understand that?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Okay.  The magistrate judge recommended to

13  me that I accept your plea of guilty and adjudicate you guilty,

14  and I did so on December 28 of last year.  Do you understand,

15  sir, that as part of your plea of guilty, the United States has

16  agreed to dismiss the remainder of those charges against you,

17  the 19 other counts of that indictment?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  And do you understand that you're here

20  today for purposes of being sentenced on that count of wire

21  fraud set forth in Count 15?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  Do you continue to acknowledge that you

24  are, indeed, guilty of the crime charged in Count 15?

25         THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  I have confirmed your ability to

2    participate in the plea hearing.  You have indicated to me that

3    you're not under any influence of substances, you're not

4    suffering from any mental or physical ailments, and that you

5    otherwise are able to participate in a plea hearing.  Are all of

6    those things equally accurate as to the sentencing hearing, sir?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  If at any time during this hearing you do

9    not understand anything I say or you have a question, would you

10   please stop me and let me know?

11         THE DEFENDANT:  Yes, I will.

12         THE COURT:  Again, the most important thing is that you

13   understand the proceedings.

14       In anticipation of this hearing, the United States

15   Probation Office prepared a presentence investigation report.

16   In this case, the report also incorporated by reference the

17   Government's offense conduct statement.  I have reviewed both of

18   those documents.  I have reviewed the materials related to the

19   plea and the docket as a whole including the defendant's

20   performance on pretrial supervision.  I have reviewed the

21   proposed exhibits from the parties.  In this case, the defense

22   proposed Exhibit A, and then the Government indicated that the

23   first seven of those pages have been withdrawn.

24       Is that correct, Mr. Brown?

25         MR. BROWN:  Yes, Your Honor.

1          THE COURT:  So the Court will admit Exhibit A and not

2   consider the first seven pages of that.

3       Any objection to "A" as set forth?

4          MR. ESSLEY:  No, Your Honor.

5          THE COURT:  I have also considered the Government's

6   proposed sentencing exhibits.  I noted previously that I have

7   not considered and will not consider the proposed exhibits that

8   would have applied to the bench trial.

9       The Government has set forth the most recent exhibit list

10  at Document 120.  It includes Exhibits 1 through 39 with

11  Exhibits 10A and 10B as well.  I have reviewed all of those

12  documents.  I received victim impact statements as well.

13      Mr. Essley, were any of the victim impact statements not

14  otherwise marked as exhibits?

15          MR. ESSLEY:  No, Your Honor, although there will be

16  victim impact statements given today that are not included in

17  Exhibits 1 through 10, 10A, 10B, just because the Government has

18  not received them to date.

19          THE COURT:  Okay.  So statements given orally in court?

20          MR. ESSLEY:  That's correct, Your Honor.

21          THE COURT:  Thank you.

22      So I have reviewed the victim impact statements, which are

23  otherwise identified as exhibits, and the Government's materials

24  as well.

25      Mr. Brown, any objection to the Government's proposed

1 exhibits?

2          MR. BROWN:  No, Your Honor.

3          THE COURT:  So those are also admitted.

4     Any other materials that need to be brought to my attention

5 at this time, Mr. Essley?

6          MR. ESSLEY:  Your Honor, the Government would rely

7 entirely on those exhibits, but it does want to make one comment

8 about the supplement that was filed yesterday at Docket 115.

9 Given the sensitive nature of the information disclosed in that

10 document, Docket 115, the Government felt obligated, in the

11 interest of transparency, both to this Court and to the defense,

12 to disclose that information.  The Government is not going to

13 call a witness or otherwise provide evidence regarding the

14 information in Docket 115.

15     But the Government would ask the following:  First, the

16 Government would ask this Court not to consider the statements

17 in Docket 115 for purposes of sentencing.

18     Second, the Government would reveal to this Court that it's

19 not seeking any recusal or anything of that nature from this

20 Court and would ask the Court, just for purposes of the record,

21 to state why this Court will not be recusing itself which, in

22 the Government's opinion, is because the statement contained in

23 Docket 115 that the Government received from a witness in

24 preparation for the contempt trial tomorrow is an inaccurate

25 statement that does not affect this Court's ability to preside

1  over the defendant's sentencing or the proceeding more broadly.

2          THE COURT:  Thank you.

3      Mr. Brown, have you had the opportunity to review the

4  Government's filing at 115?

5          MR. BROWN:  Yes, Your Honor.

6          THE COURT:  Does the defense contest the statements

7  that are set forth in those, meaning that they weren't made or

8  they were inaccurately reported by others?

9          MR. BROWN:  The defendant doesn't contest that he was

10  recorded making those statements, Your Honor.

11          THE COURT:  Okay.  Do you have any reason to believe

12  that this Court has any reason to be recused from this case,

13  Mr. Brown?

14          MR. BROWN:  No, Your Honor.  We don't believe the

15  statements, if they were made as depicted, are true.

16          THE COURT:  Thank you.  So the Court's already taken

17  action on the first statement made in the supplement in terms of

18  not considering pages 1 through 7 of Exhibit A.

19      The second set of statements included a suggestion that

20  there was some connection with this judge or this court.  I have

21  no idea what that's in reference to.  I don't have any knowledge

22  of this defendant or this case other than what I have obtained

23  through presiding over this case, and the materials I have

24  previously indicated are the only materials that I know of.  I

25  have no personal knowledge of Mr. Flaherty and have no inkling

1    of what any suggestion would be.  And the Court -- I don't know

2    that any additional record is necessary in that regard.  But I

3    have no idea what that is, if anything, and certainly there's

4    nothing about the fact that the defendant asserted some

5    connection with the Court that would cause this Court to have to

6    recuse.

7         Mr. Essley, any additional record?

8              MR. ESSLEY:  No, Your Honor.

9              THE COURT:  Mr. Brown?

10             MR. BROWN:  No, Your Honor.

11             THE COURT:  Certainly the fact that that statement was

12   made and reported to the Court will have no bearing on the

13   Court's consideration of the ultimate sentence to be imposed in

14   this case.

15        Thank you, Mr. Essley, for reminding the Court of that

16   issue.  I think that I stopped by asking Mr. Essley if there was

17   anything else he needed to bring to my attention.

18        I'll ask you the same question, Mr. Brown.  Any other

19   materials that I need to be made aware of or that I haven't

20   indicated I have considered as part of the sentencing that

21   you're aware of?

22             MR. BROWN:  Just the sentencing memorandum, Your Honor.

23             THE COURT:  Oh.  If I didn't indicate that, I

24   apologize.  Both parties filed a sentencing memorandum.  I think

25   that there were -- obviously, the exhibits I previously noted,

1  but I have considered the sentencing memoranda filed by the

2  parties as well.

3      I think the United States had a supplement to their

4  sentencing memorandum, but I believe that was just addressed by

5  the Court in terms of 115.  The other document was 106 and 107

6  that were the memorandum and then the Attachment A to the

7  memorandum of the Government, and then the defense memorandum,

8  which was filed at Docket 105.  And I have reviewed all of those

9  documents as well.  Thank you for mentioning that, Mr. Brown.

10     Okay.  So with that landscape, let's talk about the

11  presentence investigation report.  In this case, there was a

12  presentence investigation report.  That presentence

13  investigation report incorporates by reference the Government's

14  offense conduct statement, which also included exhibits as part

15  of that offense conduct statement.

16     Has the Government had the opportunity to review the

17  presentence investigation report?

18          MR. ESSLEY:  Yes, Your Honor, it has.

19          THE COURT:  And my understanding is that you do not

20  have any factual objections or corrections to the report; is

21  that correct?

22          MR. ESSLEY:  Only one factual correction, Your Honor --

23  and the parties have addressed this with the probation office as

24  well -- but one minor typo in paragraph 182.  That paragraph

25  begins, "As noted in paragraph 123."  And that cross-reference

1  should actually be to paragraph 258.

2          THE COURT:  123 should be 258?

3          MR. ESSLEY:  That's correct.  And that's paragraph 182.

4          THE COURT:  Okay.  I'll ask you about some other

5  corrections that the Court believes are appropriate.  We can --

6  and I'll address those with Mr. Brown as well.

7      First at paragraph 72, there was a defense objection to

8  retirement investments being listed there because it involved

9  the sale of a property.  I read the evidence on that in the

10 materials.  Does the Government object to simply omitting, by

11 way of a notation in the judgment, the parenthetical phrase of

12 her retirement investments and simply having that sentence read,

13 "The individual suffered substantial losses totaling $220,026.92

14 as a result of"?

15         MR. ESSLEY:  No objection to that, Your Honor.

16         THE COURT:  Does that resolve your concerns, Mr. Brown?

17         MR. BROWN:  Yes, Your Honor.

18         THE COURT:  The next one is paragraph 80.  The

19 sentence -- the first sentence in that paragraph includes the

20 descriptor "immediately."  The Court went back and read all of

21 the materials.  There's no question that this occurred shortly

22 after, but the opening clause says, "Following the individual's

23 death."  It would be my suggestion that we simply strike the

24 word "immediately" from paragraph 80.

25         MR. ESSLEY:  No objection, Your Honor.

1          THE COURT:  Does that alleviate your concerns,

2    Mr. Brown?

3          MR. BROWN:  Acceptable.  Thank you, Your Honor.

4          THE COURT:  And then 81, there is a discussion of

5    surrender forms in that paragraph.  I think the Government

6    acknowledged in its materials that there were not surrender

7    forms because this was after a death, and so it would be --

8    correctly be indicated "death forms".  Nothing in that paragraph

9    suggests any surrender fees, which I noted because the last

10   sentence says that they were -- the values of the policies were

11   equal to the policies surrendered which would mean there had

12   been no fees taken out; right, Mr. Essley?

13         MR. ESSLEY:  That's my understanding, Your Honor, that

14   there were no surrender fees as a result of the death claim

15   being filed.

16         THE COURT:  Okay.  So the Court's suggestion would be

17   to say that the -- omitting the word "surrender" from that first

18   sentence that says "just six days after death, forms were

19   completed."  Any objection to that from the Government?

20         MR. ESSLEY:  No, Your Honor.

21         THE COURT:  Mr. Brown?

22         MR. BROWN:  No, Your Honor.

23         THE COURT:  Okay.  So the Court will make those

24   corrections to those acknowledged errors -- or not acknowledged

25   errors, but facts that the Court has found were not sufficiently

1   supported and are more accurately framed in the way that we

2   framed it now.  So 72, 80, and 81 are corrected in the manner I

3   stated with the agreement of the parties as well.

4        Mr. Brown, do you agree that that cross-reference was

5   incorrect?

6            MR. BROWN:  I do, Your Honor.

7            THE COURT:  Okay.  All right.  Thank you.

8        Mr. Brown, have you had the opportunity to review the

9   presentence investigation report and its incorporation of the

10  offense conduct statement and its attached exhibits?

11           MR. BROWN:  Yes, Your Honor.  The actual chronology is

12  that Federal Defender Mackenzi Nash met with the defendant,

13  reviewed the draft PSR.  The two of them formulated the

14  objections.  I was subsequently then appointed.  I met with the

15  defendant again in the jail, reviewed the draft PSR, discussed

16  the objections, made sure that those were the objections that he

17  wanted to levy at the time.  Then I reviewed with him the final

18  PSR as it came through in May, Your Honor.

19           THE COURT:  I have reviewed the sentencing memorandum

20  that you provided which set forth what you maintain as factual

21  objections to the presentence investigation report.  At page 3

22  you have identified a series of paragraphs that you believe

23  there are facts incorrect on; is that right?

24           MR. BROWN:  That's correct, Your Honor.

25           THE COURT:  And by my review, those were largely

1  consistent with those objections that were originally posed by

2  prior counsel.

3          MR. BROWN:  I was attempting to be consistent with

4  prior counsel.  I have identified several we are willing to

5  withdraw as nonsubstantive or noneffective at this time.

6          THE COURT:  That's fine if you would like to do that.

7  I have addressed paragraphs 72, 80, and 81 already.  So those

8  objections, I assume, are withdrawn based upon your agreement to

9  those corrections; correct?

10         MR. BROWN:  Correct, Your Honor.

11         THE COURT:  Are there additional paragraphs that you

12  have previously asserted factual objections to that you wish to

13  withdraw?

14         MR. BROWN:  There is a number, so it would perhaps be

15  easier if I just stated which ones the defendant remains [*sic*]

16  in effect.

17         THE COURT:  Thank you.

18         MR. BROWN:  Your Honor, the defendant maintains in

19  effect paragraphs 25, 77, 78, 99, 116, 175, 176, 177.

20         THE COURT:  Wait a sec.  You just listed some

21  paragraphs that aren't identified on page 3 as ones that you're

22  maintaining.  So --

23         MR. BROWN:  Just -- could you remind me which one I

24  indicated or overlooked, Your Honor?

25         THE COURT:  So you said, the ones I don't have on that

1    page include 99 and then 175 and 176 and 177.

2              MR. BROWN:  Well, I believe that -- I believe I

3    intended to object to pre-offense conduct as insufficient for

4    obstruction of justice.  Isn't that my position in the

5    sentencing memorandum?

6              THE COURT:  Yes.  I'm sorry.  I'm just -- because I

7    am -- I was just looking at the factual objections that are

8    listed as the outstanding issues for the presentence report.

9    You certainly have included there in the materials that you

10   object to that, but I didn't have that specific paragraph noted.

11   But I see that.  So you said 175, 176, and 177?

12             MR. BROWN:  Yes, Your --

13             THE COURT:  And those all involve the obstruction of

14   justice?

15             MR. BROWN:  Yes, Your Honor.

16             THE COURT:  Okay.  Any additional ones that are

17   outstanding?

18             MR. BROWN:  And then I believe that -- we have

19   remaining 182 denies willfulness of false information.

20             THE COURT:  Okay.  Thank you.

21             MR. BROWN:  191 repeats the obstruction for pre-plea

22   conduct.  And finally, 268, the ultimate guideline calculations,

23   and 283, the Government requests for an upward variance.  The

24   remainder, I believe, had been resolved by the Court, we

25   withdraw as nonsubstantive.

1          THE COURT:  Okay.  Thank you.  I note that that

2    includes the prior objections to the loss amount calculation;

3    correct?

4          MR. BROWN:  That's correct, Your Honor.

5          THE COURT:  Thank you.  So I'm going to categorize

6    these as two separate groups of facts.  The first are facts such

7    as paragraph 25 that are related to conduct that the defendant

8    denies that are generally part of the scheme.  And then the

9    other facts are facts that you're objecting to that result in

10   adjustments that you're contesting; is that right?

11         MR. BROWN:  That's correct, Your Honor.

12         THE COURT:  Okay.  Thank you.

13      Mr. Flaherty, Mr. Brown just explained to me how you went

14   about reviewing this document together -- one moment.

15      Mr. Brown, there's been materials submitted to the Court,

16   both in the Government's exhibits and then in the memorandum,

17   that discuss the fact that the footnote references to the

18   offense conduct statement were incorporated and that there were

19   no specific objections filed to those additional paragraphs.  Do

20   you agree that that's the manner in which this has proceeded?

21         MR. BROWN:  Yes, Your Honor.

22         THE COURT:  And you have no objection to me considering

23   those incorporations, and the objections that you have now

24   indicated are only the objections that you have?

25         MR. BROWN:  That's correct, Your Honor.

1          THE COURT:  Okay.  Thank you for making that clear.

2      Mr. Flaherty, we've been talking about the presentence

3  investigation report in this case.  Mr. Brown explained to me

4  how both he and your prior counsel went over this document with

5  you.  Do you recall going over the presentence investigation

6  report and the documents associated with that with both your

7  prior counsel and with Mr. Brown?

8          THE DEFENDANT:  Yes, I do.

9          THE COURT:  Have you had a full and fair opportunity to

10 review the material contained in the presentence investigation

11 report?

12         THE DEFENDANT:  Yes, I have.

13         THE COURT:  After that review, Mr. Brown has indicated

14 that there are some facts that are contained in the report that

15 you believe are incorrect or wrong.  Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  There are other facts that previously have

18 been brought to the Court's attention which now Mr. Brown has

19 indicated you have no objection to.  Do you understand that?

20         THE DEFENDANT:  Yes, that's correct.

21         THE COURT:  Do you agree with those representations?

22         THE DEFENDANT:  I do, yes.

23         THE COURT:  And other than those paragraphs that

24 Mr. Brown has specifically objected here to on your behalf, do

25 you agree the report and its attachments are factually accurate

1  or correct?

2         THE DEFENDANT:  Yes, I do.

3         THE COURT:  Thank you.  Based upon that record, the

4  Court will rely upon the unobjected-to factual statements

5  contained in the presentence investigation report for purposes

6  of determining the appropriate sentence to impose in this case.

7      I have previously resolved, by way of my conversation with

8  the attorneys, some of the facts that I believe need to be

9  corrected based upon my review of the record.  There are now

10 some additional facts that Mr. Brown has maintained objections

11 to on behalf of Mr. Flaherty.  I have reviewed all of the

12 evidence submitted on those issues and the entirety of the

13 3553(a) factors.

14     Mr. Essley, was there additional evidence you wanted to

15 submit specifically on those objections?

16        MR. ESSLEY:  No, Your Honor.  If I understood Mr. Brown

17 correctly, the Government would rest in responding to all of the

18 persisting factual objections by reference to Attachment A to

19 our sentencing memorandum which --

20        THE COURT:  I --

21        MR. ESSLEY:  Go ahead, Your Honor.

22        THE COURT:  Go ahead and finish.

23        MR. ESSLEY:  -- which the Government believes

24 adequately supports all of the paragraphs that Mr. Brown

25 specified as concerning factual objections.

1          THE COURT:  Thank you.

2      Mr. Brown, did you want to present any evidence on those

3  objections, understanding that the Government bears the burden

4  of establishing the facts by a preponderance of the evidence

5  that the Court considers in the offense conduct statement and in

6  support of the guideline adjustments?

7          MR. BROWN:  No evidence, Your Honor.

8          THE COURT:  Thank you.

9      So the Court, as I indicated by my corrections to some of

10  the paragraphs at the outset of the hearing, has reviewed in

11  detail all of the evidence submitted and all of the objections

12  previously made including those that have now been withdrawn.  I

13  appreciated the Government's Attachment A, which set forth each

14  of the responses to the paragraphs that were objected to by the

15  defense at that time in marshaling the evidence that supported

16  those facts.

17      Final paragraph -- presentence investigation report,

18  paragraph 25, the objection that was made is about forgery of

19  signatures by the defendant.  There is a plethora of evidence as

20  to those forgeries, testified to by multiple individuals,

21  reflected in investigative reports and otherwise.  The Court has

22  reviewed the evidence that the Government highlighted on page 5

23  of its Attachment A.

24      The Court finds that to the extent that those are hearsay

25  statements, they are sufficiently reliable, and the Court finds

1  that there is more than enough material in the record to support

2  by a preponderance that numerous signatures were forged by the

3  defendant as part of this scheme, including Government's

4  Exhibits 20 and 21; deposition testimony at Exhibit 19; grand

5  jury testimony at Exhibit 13; and all of the materials that were

6  highlighted by the Government in response to that objection.  So

7  the objection to paragraph 25 is overruled.  The same applies to

8  paragraphs 77 and 78.  The evidence in the record overwhelmingly

9  supports those two paragraphs as well.

10     Paragraph 116.  The Court has reviewed the documents that

11  were supported -- support -- supporting -- excuse me -- that

12  paragraph as to that victim.  And the Court finds those

13  documents are sufficiently reliable to consider and that the

14  information contained in paragraph 116 has been proven by a

15  preponderance of the evidence.  The Government's Attachment A,

16  again, lists all of the materials -- or some of the materials it

17  believes responds to that objection.  The Court has reviewed

18  each and every one of those pieces of evidence and concurs that

19  those objections -- the objection to paragraph 116 should be

20  overruled.

21     The remainder of the objections go to the calculation of

22  the guidelines, and the Court will consider those as we talk

23  about the guideline calculations.  But I believe that resolves

24  all of the offense conduct objections; is that correct,

25  Mr. Brown?

1          MR. BROWN:  Yes, Your Honor.

2          THE COURT:  Okay.  So the Court, with the corrections

3    I've noted to the paragraphs previously identified, will

4    consider the material in the offense conduct statement in the

5    presentence report and the incorporated offense conduct

6    statement from the Government and the attachments in determining

7    the appropriate sentence to impose in this case.

8          That brings us to a discussion of the advisory guideline

9    calculation.  In this case, the guideline calculation is set

10   forth in the presentence investigation report at page 43,

11   beginning on paragraph 185.  I understand there's some

12   objections to the calculation, and we'll talk about those.

13         Here the base offense level, as set forth in paragraph 185,

14   is a 7, based upon the offense and conviction of wire fraud.

15   There is a 16-level upward adjustment because the amount of loss

16   as calculated exceeds $1.5 million but is less than $3.5

17   million.

18         There is a four-level upward adjustment because five or

19   more victims suffered substantial financial hardship as a result

20   of the defendant's conduct.  There is a two-level upward

21   adjustment because the defendant received more than $1 million

22   in gross receipts from a financial institution.  There is a

23   two-level upward adjustment for vulnerable victims.  There is a

24   two-level upward adjustment for abuse of a position of private

25   trust.  There is a two-level upward adjustment scored for

1  obstruction of justice which results in a -- with no other

2  adjustments, a total offense level of 35.

3      The defendant is a criminal history category I.  With that

4  calculation, the advisory guideline range in terms of custodial

5  imprisonment is between 168 to 210 months.  Supervised release

6  is recommended between one and three years.  Probation is not

7  recommended by the guidelines, although it is authorized by the

8  statute.  Sorry.  And the fine is recommended between $40,000

9  and $250,000.

10      Does the Government have any objection to those

11  calculations?

12          MR. ESSLEY:  No, Your Honor.

13          THE COURT:  I understand the defense is maintaining

14  some objections to those calculations; correct?

15          MR. BROWN:  Yes, Your Honor.  Effectively after the

16  plea, there's only one left.

17          THE COURT:  And that is the adjustment for the more

18  than $1 million derived from financial institutions?

19          MR. BROWN:  That's correct, Your Honor.

20          THE COURT:  All other objections are withdrawn?

21          MR. BROWN:  Yes, Your Honor.  The contempt plea would

22  eliminate my objection to obstruction of justice, Your Honor.  I

23  prepared this memorandum pre-plea, of course.

24          THE COURT:  Yeah, that's fine.  So you acknowledge that

25  the -- at least the conduct that -- for which the defendant

1  pleaded guilty in terms of obstruction of justice just prior to

2  this hearing would warrant the adjustment set forth in paragraph

3  191?

4  MR. BROWN:  That's correct, Your Honor.

5  THE COURT:  And that would consistent with the Eighth

6  Circuit case law be inconsistent with the scoring of a reduction

7  for acceptance of responsibility?

8  MR. BROWN:  That's correct, Your Honor.

9  THE COURT:  So the only guideline adjustment that you

10  believe the Court needs to make a finding on is the adjustment

11  for the specific offense characteristic from 2B1.1(b)(17)(A) as

12  set forth in your memorandum?

13  MR. BROWN:  That's correct, Your Honor.

14  THE COURT:  Okay.

15  Mr. Essley, do you agree that that's the only adjustment

16  that remains at issue for the Court?

17  MR. ESSLEY:  Given Mr. Brown's statements, I do, Your

18  Honor.

19  THE COURT:  Would you like the Court to make factual

20  findings about the other objections that were previously raised

21  to the paragraphs involving the conduct?  I know you're not

22  pursuing a pre-plea contempt or obstruction adjustment based

23  upon the plea agreement which, of course, doesn't limit this

24  Court's consideration of that, but the Government's not seeking

25  that.  Would you like me to make any findings in regards to

1  those other aspects of the presentence report that Mr. Brown

2  objected to that I didn't rule on at that time?

3       MR. ESSLEY:  I would, Your Honor, request that this

4  Court make findings regarding additional post-plea obstructive

5  conduct that would support, other than the contempt violation,

6  that was both the obstruction of justice enhancement and support

7  the denial of the acceptance of responsibility reduction, Your

8  Honor.

9       THE COURT:  Thank you.  And those are the paragraphs

10 Mr. Brown previously noted in regards to the objections as to

11 both the pre-plea conduct and the post-plea conduct and the

12 obstructive -- the resulting obstruction of justice enhancement

13 and the denial of acceptance of responsibility.  I don't know

14 that I need to speak to the denial of acceptance of

15 responsibility with the acknowledgment that that occurs based

16 upon the plea to contempt, regardless.  But I will find -- make

17 the finding that the Government has supported and the facts set

18 forth in the presentence investigation report are otherwise

19 sufficient for a finding of obstruction of justice and an

20 application of that enhancement, and the Court overrules the

21 objections to those paragraphs by the defense as well.

22      I also note that while the parties agreed that they would

23 not seek a pre-plea obstructive -- obstruction of justice

24 enhancement, the Court isn't bound by that agreement, and the

25 Court notes there is a pattern of continuous contemptuous or

1  obstructive behavior throughout the course of these proceedings,

2  all of which support at least the two-level adjustment for

3  obstruction of justice.  And the facts in the presentence report

4  are well supported in the evidence presented by the Government

5  for that obstruction of justice enhancement and the

6  corresponding denial of acceptance of responsibility.

7       Any additional record in that regard from the Government?

8            MR. ESSLEY:  No, Your Honor.

9            THE COURT:  From the defense?

10           MR. BROWN:  No, Your Honor.

11           THE COURT:  Okay.  So I think that that draws our

12  attention to the issue of this guideline adjustment.  Both of

13  the parties acknowledge that this is not an adjustment that the

14  Eighth Circuit has addressed.  You pointed my attention to

15  persuasive authority from other jurisdictions.  I have reviewed

16  that authority.  The Government bears the burden of establishing

17  the obstruction of justice -- no.  Excuse me.  Sorry.  I'm just

18  going through the -- one moment.  I shouldn't do two things at

19  once.  One moment.

20      So I have reviewed the materials included in the report to

21  the other paragraphs that were specifically brought to the

22  Court's attention as to objections by the defense, and each of

23  those paragraphs is sufficiently supported for the objection to

24  be overruled.

25      So objections to 175, 176, 177, and 182 are overruled.  The

1 obstruction of justice objection to paragraph 191 was withdrawn.

2 And the Court has not yet ruled on the other outstanding

3 guideline issues, so the objections to 268 and 283 remain

4 outstanding.

5 Okay. I've read the cases. I have read the arguments

6 presented in the thoughtful briefs of the parties. Would you

7 like to be further heard on the issue as to the adjustment?

8 MR. ESSLEY: No, Your Honor. I would just state that

9 the Government believes that under the unambiguous language of

10 the guideline and also under the interpretation proffered by

11 defendant from other circuit case law, the guideline enhancement

12 should apply.

13 THE COURT: Mr. Brown?

14 MR. BROWN: May it please the Court. Your Honor, we

15 believe that the state of the record, even viewed in the light

16 most favorable to the Government or by a preponderance, the

17 Government has the preponderance of sufficient evidence to show

18 that there was any financial loss to the institution from their

19 own monies versus the monies that were deposited or invested

20 from the victims itself. Therefore, we believe that the

21 adjustment for 2B1.1(b)(17)(A), over $1 million of gross

22 proceeds from insurance entities or otherwise quality financial

23 institutions, doesn't apply.

24 THE COURT: Thank you.

25 So in this case, the issue here is whether under sentencing

1  guideline adjustment 2B1.1(b)(17)(A) a two-level adjustment

2  applies because the defendant received more than $1 million of

3  gross receipts from financial institutions.

4      The Court pays particular note to Application Note 13,

5  which requires the adjustment to be applied when the monies --

6  or the gross receipts are obtained as a result of the offense.

7  The Court has reviewed the cases highlighted from the Eleventh

8  Circuit and the Second Circuit, *Muho, Huggins;* and *Capps* from

9  the Third Circuit; as well as *Stinson*, also from the Third.

10     Of course, each of those opinions is applying the plain

11 language of the adjustment.  And here the language of the

12 adjustment is to apply a two-level adjustment if the defendant

13 derived more than $1 million in gross receipts from one or more

14 financial institution as a result of the offense.  Application

15 Note 13 instructs that gross receipts from the offense includes

16 all property which is obtained directly or indirectly as a

17 result of such offense.

18     This offense is a scheme to defraud that resulted in the

19 payment from insurance companies of more than a million dollars

20 in terms of commissions and other payments.  The cases that the

21 parties have highlighted talk about whether or not a financial

22 institution is a victim or whether or not the financial

23 institution controlled the funds or owned the funds.

24     The facts here support the finding that the defendant

25 derived more than a million dollars from financial institutions

1   in the form of insurance companies because the payments that he

2   received were a result of his offense.  He would not have

3   received those commissions but for the fact that he was, for

4   example, churning annuities.  He would not have received those

5   commissions, those funds, those payments, if he had been

6   truthful in the applications for annuities in terms of the

7   materials that were required to be submitted that the

8   Government's exhibits show included false statements, both in

9   terms of the fact that many of these were rollover or

10  replacement annuities after an annuity had previously been

11  surrendered and that wasn't disclosed to the new insurance,

12  company, or because the assets and information as to the

13  applicant was not correctly reflected.

14       There's no dispute between the parties that these insurance

15  companies qualify as financial institutions.  There is no

16  dispute between the parties that the defendant received over a

17  million dollars from them.  The only question is whether or not

18  these were derived from the offense.  Notably, the idea that the

19  banks were victims is not included in the plain language of the

20  guideline, nor is loss included in the plain language of the

21  guideline.

22       That being said, there certainly is sufficient evidence in

23  this record that the defendant -- the defendant's actions did

24  cause harm to these financial institutions and the insurance

25  companies; for example, in those instances where they had to

1   repay individuals who complained to them as to their annuities.

2       While the Eighth Circuit hasn't specifically spoken to the

3   interpretation of this guideline, the Court finds that the

4   guideline is appropriately applied in this case, where the

5   defendant's actions resulted in him obtaining over a million

6   dollars from financial institutions as a result of the offense,

7   and the funds that he received were received because of his

8   conduct related to this offense.

9       Any additional record in that regard from the Government?

10          MR. ESSLEY:  No, Your Honor.

11          THE COURT:  From the defense?

12          MR. BROWN:  No, Your Honor.

13          THE COURT:  One exhibit that I found particularly

14  instructive was Exhibit 37 where that insurance company, where

15  there was a complaint made, ended up having to return -- to

16  cancel and refund from the annuity contract, and a settlement

17  was made between the insurance company and the victim.  That

18  certainly suggests that these insurance companies were victims,

19  although the plain language of the statute does not -- excuse

20  me -- the plain language of the guideline does not require that.

21      Okay.  So the objection to the guideline calculation is

22  overruled.  The objection to the paragraphs containing the

23  guideline calculation is overruled for the reasons that I

24  previously stated.  And the Court will look to the range, as

25  I've articulated, as one factor to consider in determining the

1   appropriate guideline range.

2      The presentence investigation report noted some grounds for

3   departure.  I note that neither party sought a traditional

4   departure, although the Government has sought an upward

5   variance, and the defense has sought a downward variance.  I

6   assume the Government is not relying on traditional departures

7   but instead the various arguments raised in the memorandum?

8      MR. ESSLEY:  That is correct, Your Honor.  The

9   Government during argument later in the proceeding may reference

10  some of those guidelines, but it is not seeking any traditional

11  departure.

12      THE COURT:  Mr. Brown, no traditional departures?

13      MR. BROWN:  No traditional departures, Your Honor.

14      THE COURT:  So that brings us to the ultimate question

15  in the case which is the appropriate disposition.  I've noted

16  I've read the exhibits that were previously admitted.  Any

17  additional evidence at this time from the Government?

18      MR. ESSLEY:  Only victim impact statements, Your Honor.

19      THE COURT:  Any additional evidence from the defense?

20      MR. BROWN:  No, Your Honor.

21      THE COURT:  At this time we will hear from victims in

22  this case.  This is a case where victims have the right to be

23  heard.  I have read all of the victim impact statements that

24  were provided to the Court in advance, and I appreciate having

25  the opportunity to read those.  Victims also have the right to

1 be heard orally in open court.

2      Mr. Essley, do you have victims that wish to be heard here

3 today?

4           MR. ESSLEY:  We do, Your Honor, several victims.  I

5 will go ahead -- Ms. Kovacs and I are going to read on behalf of

6 victims who were not able to attend today's hearing four impact

7 statements that those victims have requested be read in open

8 court, and we'll start first with Linda Matson.

9           THE COURT:  Let's -- let me understand first the scope

10 of what we're doing here today.  You said you're going to read

11 four victim impact statements that have previously been

12 provided; is that correct?

13           MR. ESSLEY:  That is correct, Your Honor.

14           THE COURT:  In addition to those statements, you

15 anticipate how many victims to speak?

16           MR. ESSLEY:  I believe ten in addition to the four that

17 Ms. Kovacs and I will read.

18           THE COURT:  Okay.  So thank you for letting me

19 understand that.

20      In this case, the victims can proceed as they choose.

21 Victims can either stand at the podium.  If mobility is

22 difficult or they prefer to sit, they may sit in the witness

23 chair.  I'd just simply ask that the victims identify themselves

24 and then proceed in that way.  If you have written statements

25 that you can provide to the court reporter prior to someone

1  speaking orally, that would be appreciated.  If you do not,

2  we'll proceed without.

3      Mr. Essley, the first victim impact statement?

4      MR. ESSLEY:  The first victim impact statement will

5  come from Linda Matson, and I do have copies of the submitted

6  statements for the court reporter.

7      THE COURT:  We can -- we have those.

8      I would ask that everyone approaches -- as you approach the

9  witness stand, you do not engage with any other people in the

10  courtroom.  You may sit down, Ms. Matson.

11      MS. MATSON:  Okay.

12      THE COURT:  The record should reflect -- you may be

13  seated -- the record should reflect it appeared that Ms. Matson

14  made some interaction with Mr. Flaherty.  Any record, Mr. Brown?

15      MR. BROWN:  Excuse me?

16      THE COURT:  I said the record should reflect that

17  Ms. Matson made some interaction with Mr. Flaherty as she

18  approached the stand.  Any record, Mr. Brown?

19      MR. BROWN:  No further record, Your Honor.

20      THE COURT:  Thank you.

21      Ms. Matson, you may proceed.

22      MS. MATSON:  Okay.  Good afternoon, Your Honor.  My

23  name is Linda Matson.  I am 76 years old.  I was born and raised

24  here in Des Moines.  I've always been an optimistic and trusting

25  person.

In 2014, Zachary Flaherty walked into my life.  He approached my husband and I, wanting us to move our investments into fixed annuities that he sold.  My husband was 83 years old, and he made all of the financial decisions and decided to do business with Zach.  I had very little to do with Zach at that time.

In September of 2017, my husband died suddenly of a brain bleed.  It was a sad and confusing time for me and my family.  I didn't know what I needed to do.  Zach showed up to help me with the paperwork.  I did not call or ask for his help.  He just came over almost immediately to help me.

I was very grateful for his help.  He told me my husband had said to him, "Please take care of Linda if anything happens."  That was reassuring, and we eventually became good friends, or so I thought.

He texted me all the time asking how I was.  He told me I was his best friend, which I thought was a little odd.  He always greeted me with a big hug.  He gave me birthday presents, Christmas presents, concert tickets.  He gave me weekly guitar lessons on Tuesday in my home, took me out to lunch.  I thought it was interesting how he always tipped the waiter with a $100 bill.

He took care of my household repairs and never charged me for anything.  He gave my granddaughter Ella a $500 Lululemon gift certificate many times.  And he supposedly set up a

1  $200,000 account for a college fund for her when she became of

2  age.

3      As far as updating me on my fixed annuities, Zach would

4  come over to my house with his laptop and show me a complicated

5  spreadsheet of my investments.  He assured me my funds were

6  growing, even making 18 to 20 percent at times.  He knew I

7  didn't understand the spreadsheet, but he knew I trusted him and

8  believed what he said.  I felt financially secure.  Nothing was

9  printed.

10     That all changed in December of 2021.  I got a call from

11  David Sullivan from the Iowa Insurance Division wanting me to

12  come in and talk about Zachary Flaherty.  I was greeted by a

13  group of friendly professionals explaining what Zach had done

14  with my investments.

15     I was shocked.  I was overwhelmed.  I was in a state of

16  confusion and panic.  I was so convinced that Zach was the

17  nicest and most giving person I had ever met.  My husband had a

18  motorcycle he valued at $15,000 that Zach said he would sell for

19  me.  I was so grateful for all his help, and Zach told me how

20  much he loved that cycle, that I gave it to him.

21     To find out the truth was heartbreaking, the unthinkable

22  had happened to me.  At the Iowa Insurance Division, I just sat

23  there and listened to what they had to say.  David, Russ, and

24  Amanda showed me page after page of applications with my forged

25  signature at least 30 times.  There were suitability forms with

fictitious figures, all with my forged signature.  They
explained the crimes Zach had committed against me at many
meetings.  It was gut-wrenching and depressing to learn how Zach
had deceived me and stole my money.

Then I was deposed by Zach's lawyer, Adam Zenor.  That was
humiliating and upsetting.  I was appalled by the personal
questions on my spending habits and other things that had no
relevance to the case.  He was badgering me.  After five hours I
broke down in tears, and Mr. Zenor ended the deposition.  Zach
was also seated at the table.

Eventually the federal government became involved with
Zach's case, and you know the rest of the story.  The impact of
Zach's criminal actions on my family was horrendous.  My son and
daughter-in-law did not like him, did not trust him, and tried
to warn me against him.  I wouldn't hear of it.  And that
created a problem between us.  My sister, who I was very close
to, would tell me Zach sounded suspicious, that he was too good
to be true, and got upset with me, and we became estranged.

My friend from junior high, Diana Moore, who is here today,
decided to talk to Zach about her investments.  Zach tried
everything he could to keep Diana and I from talking to each
other.  She had discovered he was a fraud, but I didn't believe
her.  We argued back and forth over this.

The criminal actions of Zach have taken a huge toll on me.
Besides a shocking betrayal, I was devastated by my financial

1  loss.  My husband was a veterinarian for 40 years here in Des

2  Moines, and I had a retail shop for 25 years.  All of our

3  savings came from our hard work.  The actual figure of loss for

4  me was $936,000.  I am haunted every day by what Zach did to me.

5        I worry about my future expenses.  I'm 76.  I hope he is

6  ordered to pay restitution.  I wanted to get an apology from

7  him, but I realized a narcissist would never give me an honest

8  apology.  I would rather see him incarcerated for the maximum

9  number of years for the crimes he has committed.

10        I feel like I've been living in a nightmare.  I am trying

11  to -- I am trying to let go of my anger towards Zach and move on

12  with my life.  I have been waiting for this day for a long time.

13  Thank you, Your Honor, for this opportunity to tell you how

14  Zachary Flaherty affected my life.

15        THE COURT:  Thank you, Ms. Matson.

16        MS. MATSON:  You bet.

17        THE COURT:  Ms. Kovacs, if you'll walk on this side of

18  the podium from now on.

19        MR. FRYE:  I'm here to represent my parents, Rudy and

20  Angela Frye.  Their journey started when Mom started working at

21  the phone company, and when Dad got out of the service --

22        THE COURT:  Sir?  Thank you for being here today.

23        MR. FRYE:  Yes.

24        THE COURT:  What is your name, sir?

25        MR. FRYE:  Oh.  My name is Steve Frye.  I'm sorry.

1    THE COURT:  Would you speak into the microphone?

2    MR. FRYE:  My name is Steve Frye.

3    THE COURT:  And, Mr. Frye, I want to be able to

4  understand you, and I want the record to accurately reflect what

5  you say.  So if you could just take a deep breath and speak

6  slowly into the microphone, I would appreciate it.

7    MR. FRYE:  Okay.  I will try and do that.

8    THE COURT:  Thank you, sir.

9    MR. FRYE:  Okay.  My parents' life journey started with

10  Mom working at the phone company and Dad got out of the service.

11  They started a family, and Dad was a -- delivered milk, and Mom

12  was a homemaker.  Dad always wanted to be his own boss, so he

13  pursued a job at *The Des Moines Register* in Des Moines being a

14  Register Manager.  And he got that job, so we moved there.

15    Then after a few years passed, he -- they wanted to be

16  closer to our family, so they bought the cleaning franchise and

17  moved back to Marshalltown in 1971 where all of us children, my

18  siblings and me, worked very hard for 25 years to make that

19  business a success.

20    Mom and Dad were very careful and smart with their money.

21  Part of their retirement plan was to purchase rental properties,

22  and they eventually ended up with seven of them, two lakefront

23  properties.  And they wanted this for their financial success,

24  for their nest egg for when they retired.

25    When my parents were ready to start selling them to invest

1  their money, they attended a luncheon seminar is when Zach came

2  into their life, unfortunately.  Before long he became a big

3  influence in their lives, both personally and financially.  Mom

4  and Dad did start a small annuity with him.  And before you know

5  it, they were giving testimonials for his so-called investment

6  company, and he was on their fliers.  He promised them

7  phenomenal returns with no penalties and no fees attached.

8      So when I heard that -- because they were so excited about

9  this meeting -- that I said, "No, he can't be trusted because

10 that's not possible."  We saw him emotionally manipulate our

11 parents.  I did not trust his investments, neither did anyone in

12 our family.  We raised our concerns, but every time we did, Mom

13 and Dad would say, "No, Zach's got our best interests at heart."

14 Well, he would also meet every single month with Mom and Dad and

15 take them to the Maidrite, and he would always -- Dad thought

16 this was awesome -- buy everybody's meal, probably with their

17 money.

18     After Mom's sudden death in 2011, all of a sudden they quit

19 giving financial statements.  So the girls called Zach.  He came

20 over with some bogus Excel spreadsheet he made himself, and the

21 monies were in what was called an R&Z account, a Rudy & Zach

22 account.  The sheet had their combined net worth that he was

23 managing after Mom's death and conveniently -- anyway, Mom took

24 care of all the finances.  Dad did not.  So conveniently when

25 Mom passed, all of a sudden Dad didn't have any money left.  My

1  family was devastated.  If you can imagine how my dad felt when

2  his great buddy Zach told him he didn't have any money left, and

3  Dad said, "Zach, you told me we had enough money to last till I

4  was 104 years old."  Zach tells my dad, "Rudy, you will be fine.

5  I love you."

6      To this day, unfortunately, we do not know how much cash

7  our parents gave in your scheme.  You told them you were

8  investing it for them.  How do you do this to elderly people and

9  sleep at night?  We know that they gave you cash from seven

10  rental properties, two lake properties, and a franchise

11  business.

12      Our loving parents worked hard and entrusted their life

13  savings to one person, you.  They worked a lifetime for the

14  American dream.  What you took from them and all of us is

15  immeasurable.  Not only did you take their money, but you

16  destroyed Dad's faith in people and robbed him of his

17  self-confidence.  He is a broken man after losing all his money

18  that he worked a lifetime for.  91 years old, sits at the vets

19  home in his chair, penniless.

20      Remember what you -- you didn't tell me because you knew I

21  never liked you -- remember what you told my family, the three

22  most important things in life:  God, family, and trust.  What a

23  hypocrite.  You stole our parents' life savings in the worst

24  possible way, by using their good nature, belief in people to

25  emotionally manipulate them into trusting you.  Our family's

1  financial future our parents worked their entire lives to create

2  is now gone because of you, one evil criminal with no conscience

3  and no morals.  We hope that you are put in jail for a lengthy

4  term to prevent other families from suffering like our family

5  has.  Our hope is that you lose everything you stole from our

6  family and others like ours.

7          THE COURT:  Thank you, sir.

8          MR. ESSLEY:  And, Your Honor, I will read the next

9  victim impact statement.  And that victim impact statement comes

10 from Susan Sweers, and it is available at Government's

11 Sentencing Exhibit 3.

12 "Victim statement from Susan Sweers.  Thank you for letting

13 me address the financial and emotional outcome of Zachary

14 Flaherty stealing money from me.  I had Zachary as my financial

15 guidance person for over six years.  I treated him with respect

16 and trusted his advice in keeping my retirement money safe and

17 available to me.  He invested money for me and attended to my

18 financial questions.  Little did I know that he was lying to my

19 face and jeopardizing my financial retirement plans and future.

20 He moved me from one annuity to another just to create a new

21 policy that he would financially gain from the policy.  This

22 costs me thousands.  He told me this was common practice and

23 that I would gain financially from moving money.

24 "This trust caused me the loss of enough money to have paid

25 off my home.  I also now do not have an income that he suggested

1  that I would have when I wanted it.  I drive a 10-year-old car

2  and do not have any funds to upgrade to a newer vehicle.  Maybe

3  a new vehicle would have been possible, but Zachary always had

4  the best that he could afford; afford being a word he does not

5  understand, as he afforded his lavish lifestyle on other

6  people's money; his big vacations, cars for the family, and a

7  million-dollar house.  His actions robbed me of my hard work and

8  savings for a great retirement future.  He is one smooth talker

9  with the only goal in life to better himself.

10  "He also destroyed my trust in people.  I don't trust

11  anyone now.  His actions made me lose faith in people.  The

12  thought that someone would look me in the eye and it was nothing

13  but a lying tale to line his pockets with money never crossed my

14  mind.  I see less good in people and fear that everyone is out

15  to get what they can from me.

16  "I am identified as a victim, but I am a survivor.  His two

17  girls are the victims of parents that taught them that it is

18  okay to take what you want from anyone to achieve your personal

19  goals.  What a great example.  I hope that you, Zachary, can

20  deal with this fact the rest of your life.  What do your

21  daughters think of you now?  Was it worth it?

22  "I am writing this to let the Court know that I hope

23  Zachary Flaherty receives a sentence that will prevent him from

24  doing this to anyone else.  He also needs to repay all of the

25  stolen money to all of the victims.  He deserves the full extent

1   of the law for his actions."

2           THE COURT:  Thank you, Mr. Essley.  Additional victim

3   impact statements?

4           MS. KOVACS:  Your Honor, I will read a statement on

5   behalf of Barbara and Gerald Kern.  "I received a card for a

6   free meal while they talked about their product.  We decided to

7   go a couple of different times to listen.  The defendant was

8   very nice.  They were out to reel us in.  They talked a good

9   talk.  I now know they can't walk that walk.  They presented it

10  as if it was the end all, do all.

11          "It was reprehensible abuse of the elderly, and I don't

12  even consider myself elderly.  We felt dumb, stupid, ignorant,

13  and taken advantage of for our lack of knowledge.

14          "He came to our house as a friend.  We asked questions

15  about our long-term policy.  He was quick to flip through the

16  papers and tell us everything was replacement value and looked

17  good.  We have now lost the long-term care.  We lost it because

18  he lied.

19          "While grieving the loss of my mother, the defendant

20  pressured me to give him the $40,000 I got from the inheritance

21  for him to invest for me.  I felt so pressured.  I was in tears,

22  but I complied, thinking it was a true investment.  I did get

23  back that -- I did get that back, but it shows he didn't care

24  what it took to get what he wanted.  Stealing from elderly is

25  how he made his living.

1    "He took peace of mind and trust and our abilities to take
2  care of ourselves.  He is a true con artist.  He took from us
3  the long-term care coverage that guaranteed us $55,000 per year.
4  That is money we thought we would be able to spend on -- thought
5  we would be able to depend on.
6    "This has caused me so much worry.  I don't know how I will
7  take care of my husband if something happens.  He had a heart
8  attack on July 16, 2019.  It really hit me that I am in this
9  alone.  He talked my husband into cashing in his IBM stock and
10 investing it with him.  We only got a portion of that back.
11   "It is still mind-boggling to me that someone can do this
12 to a human being.  I am not vindictive, but he needs to be sent
13 a clear message and be sent to prison.  He needs no contact with
14 computers or cell phones.  I want him off the streets so he
15 can't hurt people again.  This has been a nightmare.  Barbara
16 Kern and Gerald Kern."
17        THE COURT:  Thank you.
18    Sir, if you could please be seated.  Thank you.
19    Additional victim impact statements?
20        MR. ESSLEY:  Yes, Your Honor.  I will read the next
21 one.  It is from Carol Neill, and it is referenced at Government
22 Sentencing Exhibit 10B.  "One of the first" --
23        THE COURT:  One moment, Mr. Essley.
24        MR. ESSLEY:  "One of the first lessons" --
25        THE COURT:  Mr. Essley, just wait.

1          MR. ESSLEY:  Sorry, Your Honor.

2          THE COURT:  Now, Mr. Essley.

3          MR. ESSLEY:  Thank you, Your Honor.  "One of the first

4   lessons I learned in life was right and wrong.  Did you learn

5   that lesson?  I think not.  The next lesson was to treat others

6   as you would like to be treated.  Did you learn that lesson?  I

7   think not.

8          "The full impact of what you have done cannot be

9   calculated.  There are too many unknowns in life.  As we age, we

10  need more assistance to maintain our lives; more medicine, more

11  doctors, more surgery, et cetera.  The cost of living continues

12  to increase, and our money is spent much faster than it was

13  earned.  We try to make up for these increases with investments.

14         "Everyone just wants enough money to stay warm and cool as

15  needed, to be able to have decent food and medicine as needed.

16  We just want to pay the bills on time without worry where we

17  will get the money.

18         "We are all vulnerable because we are not financially savvy

19  with investing.  I do not know if you do this to all your

20  clients or just old people.  Either way, it's not good.  The

21  impact will be harder on some than others.  However, we will

22  live with the consequences of our trust.  We will continue to

23  live as best we can.  I hope you enjoy the consequences of your

24  actions."

25             THE COURT:  Additional victim impact statements?

1        MS. KOVACS:  Yes, Your Honor.  This statement is from

2   Constance Rowley.  "Zach" --

3        THE COURT:  One moment.  We're trying to catch up.

4      Thank you.  You may proceed.

5        MS. KOVACS:  "Zach -- yes, I'm addressing you as Zach

6   because at one point my husband and I considered you a trusted

7   friend and financial adviser.  I'm heartbroken you took our

8   trust, manipulated, lied, and stole from us.  You are the lowest

9   form of person.  I can't stand before you and judge you.  God

10  will.

11       "When I first met you, you were like a son to us.  We

12  trusted you wholeheartedly.  You would stop by just to visit us

13  and eat cookies that I had baked.  You chatted with my husband

14  about the construction company.  You were just so easy for us to

15  trust and confide in.  I truly cared about you a lot.  When my

16  husband died, you did not even show up to his funeral.  I was

17  hurt by that, and so was my daughter.  That is when I started to

18  see your true colors.

19       "My husband worked a lot of off-duty time as a police

20  officer so we could save up money.  He worked hard, and that was

21  time away from our family, all so that he could do his best to

22  make sure we had what we needed in our later years in life.  You

23  stole all of that money from us that he worked so hard to earn.

24  He put his life on the line as an officer to earn that money

25  that you stole.  You have hurt me so very much.  To think that

1  you have done this to so many others that are my age is just

2  sickening.  I never wanted to have to depend on our children

3  financially, but this is the position you have put me in.

4      "As sad as I am that my husband is gone now, I'm thankful

5  he isn't alive to realize the deceptive con artist you are.  He

6  used to joke with you about, 'Don't ever steal from me, Zach.'

7  Did you leave our house and laugh?  What fools the Rowleys were?

8  All while you lined your pockets and purchased expensive things

9  for your family; the house, cars, guitars, boats, and who knows

10  what else you spent my hard-earned money on, money I can't make

11  back in my elder lifetime.

12      "You started The Tribe with ill-gotten money but are

13  somehow getting away with this.  I only hope that the people

14  investigating this have the best forensic accountants.  That way

15  they can find all the sleazy things you have truly done to

16  everyone you have defrauded.  I hope they can trace The Tribe,

17  your construction company, and everything back to money you have

18  embezzled.

19      "This impacts how I live the remainder of my elder years.

20  I won't be able to travel to see my youngest grandson anymore.

21  So thank you for robbing me of that.  I hope they throw the book

22  at you and you don't get to see your two girls grow up.

23  Constance Rowley."

24          THE COURT:  Additional victim impact statements,

25  Mr. Essley?

1    MR. ESSLEY:  Yes, Your Honor.

2    THE COURT:  Ms. Kovacs?

3    MS. KOVACS:  Yes.

4    THE COURT:  If it would be more convenient for your

5  next victim to speak next to the probation officer, that's

6  acceptable to the Court.

7    Ma'am?  Ma'am?

8    MS. KIRK:  Okay.

9    THE COURT:  Good afternoon.  I see you have something

10  you'd like to read.  You can do so if you just face this way,

11  make sure that microphone is in front of her, Ms. Kovacs, and

12  speak slowly so that I can hear you and the record can

13  accurately state what you say.

14    MS. KIRK:  Okay.  This shouldn't be that dis- -- hard

15  to do.

16    THE COURT:  No.  It's new to everyone, so that's fine.

17  Just take your time, ma'am.

18    MS. KIRK:  Okay.  I knew Zach a long time --

19    THE COURT:  Ma'am -- Ms. Kovacs, maybe you can help me

20  so I can know who we're hearing from.

21    MS. KOVACS:  This is a statement from Patricia Kirk,

22  Your Honor.

23    THE COURT:  Thank you.

24    Thank you, Ms. Kirk.  You may proceed.

25    MS. KIRK:  Okay.  I knew Zach a long time through his

1  dad before he became my agent.  I also thought Zach was a really

2  nice guy.  His dad bragged about him being a millionaire.  He

3  would come to my house and spend time with me.  I trusted him

4  and his family.

5      When I bought my house -- or when I sold my house when I

6  became a widow, then the money from that went to Zach.  He lied

7  to me and said it would make more money than putting it in a

8  trust.  He took it all.  I trusted him.  When I thought he took

9  all my money, I am very, very angry.  I feel stupid for trusting

10 him.

11     I have always made fairly good decisions in life, and now

12 he took that away from me.  It shook me up.  He has stopped me

13 from being able to afford to give my grandkids gifts and money

14 that I'd like to give them.  I can't buy new furniture that I

15 really need, or other things.  He took my life savings.

16     I would like to get my money back from him and see him in

17 prison for the rest of his life.  I have never wanted to hurt

18 someone and see them lose everything, but he makes me feel this

19 way.  I never thought he would ever do something like this.

20     This has affected my mental and physical ability, took my

21 trust away, and I am confused a lot.  I can't drive anymore.  My

22 kids worry about me, and I have to rely on them a lot more now.

23 The stress from this crime has caused my health to decline.

24     I worry about paying for my health -- home health care and

25 other things.  It is degrading to me that I had a friend treat

1   me this way.  He would walk in my house and give me a big hug,

2   all while betraying me and stealing my money.  I just can't

3   believe he is that kind of person.

4           THE COURT:  Thank you, Ms. Kirk.

5       Mr. Essley, additional victim impact statements?

6           MR. ESSLEY:  Yes, Your Honor.

7           MS. BLANCHARD:  This is on behalf of Marie Pierson.

8           THE COURT:  Thank you.

9           MS. BLANCHARD:  "Where do we even start?  My husband

10  and I trusted Zach with our finances.  After my husband passed

11  away, Zach told me he promised my husband he would look after me

12  and my son.  As someone who was in charge of our finances, Zach

13  sold some acres of land and gave me a portion of it.  It was my

14  understanding that Zach was using the money from the sale of the

15  land to pay the bills at the farm and my son's legal fees.  Then

16  Zach would tell me he needs a certain amount of money or my son

17  would go to jail.  I felt like I had no choice but to give him

18  more money because I didn't want my son to be arrested.  I left

19  those meetings crying because I didn't know what was going to

20  happen.  There were times I couldn't sleep because Zach would

21  cancel meetings, and I would worry about what was going to take

22  place.

23      "I thought I had to keep Zach around because I thought

24  something would happen to my son if I didn't.  He would tell me

25  my son would be arrested.  My son didn't trust Zach.  But from

my understanding, Zach was keeping him out of jail, so I
couldn't stop that relationship.  My husband trusted Zach, so I
had no reason to not trust him.  Zach was a fast talker and
charismatic.  Although I was often confused, Zach made me
comfortable and assured me he was taking care of us.

"When I would meet with Zach, he would have a stack of
papers for me to sign.  Unbeknownst to me, he changed my will.
He changed my will to himself receiving everything.  I do
believe he was just waiting for me to die.

"Since this all has came to light, my health has improved.
I haven't had a stroke in two years.  Prior to that I've had
three.  The first one was in 2018.  This was around the time my
farm was sold.  I was having some money issues, and I was
stressed about my son's well-being.

"I didn't know what all he had done.  He kept me confused.
He needs to go to jail and pay back restitution.  He lied to us,
and I don't want to ever see him again."

THE COURT:  Additional victim impact statements?

MR. ESSLEY:  Yes, Your Honor.  I believe the next
victim impact statement will be on behalf of Paula Logan, and it
will be read by her daughter, Kelly McKellips.  And that victim
impact statement is referenced on the Government's final exhibit
list as Exhibit Number 4.

MS. McKELLIPS:  Hi.  My name is Kelly McKellips, and
I'm here representing, actually, my mother, Paula Logan, and my

1  father, Gordon Logan.  My case is a little different.  I don't

2  know Zachary Flaherty.  We dealt with his father, Kevin

3  Flaherty, who I feel should be sitting right there in that chair

4  right next to him.  He also -- when my father passed away, he

5  started making unannounced visits at my mother's house.  And I

6  would ask her, Why is he stopping?  Oh, he's just checking in on

7  me, and we're talking about our grandkids and our

8  great-grandkids.

9       We also are still paying the IRS $200 a month out of Social

10 Security they are garnishing because of withdrawals they say she

11 received.  Taking out of Forethought -- Kevin talked her out of

12 closing her Forethought account and then turning it into

13 American Equity with his son.  He was supposed to roll that

14 over, but he didn't.  72 days went by, and the money was never

15 placed into an account.  So my mother was charged $18,000 taxes.

16 Not only did she not get her money, she is still paying $200 a

17 month from her Social Security check.

18      She had spent a year in a skilled nursing facility because

19 she broke her neck.  She had no money to pay that $9,600 a month

20 for her skilled nursing facility.  So my husband and I paid that

21 for over a year.  So we lost our savings also besides her.  Now

22 she's in an assisted living.  And she can't afford to pay it, so

23 we pay it.

24      We are not retiring.  We are continuing to work to pay her

25 assisted living bill.  And I think that you should spend the

1  rest of your life in jail also, and maybe your family will lose

2  what they've had given to them.  And that's all I have to say.

3          THE COURT:  Thank you, ma'am.

4          MS. McKELLIPS:  Thank you.

5          THE COURT:  Mr. Essley, additional victim impact

6  statements?

7          MR. ESSLEY:  Yes, Your Honor.  The next victim impact

8  statement will come from Robert Kempf.

9          THE COURT:  Thank you.

10          MS. KOVACS:  Your Honor, he has asked that I read it

11  for him.

12          THE COURT:  That's fine.  Thank you.  Thank you.

13  Mr. Kempf.

14          MS. KOVACS:  Robert Kempf.

15          THE COURT:  And I have this as not one that's been

16  previously been provided, or is this number -- Exhibit 8?

17          MR. ESSLEY:  It is Exhibit 8, Your Honor.

18          THE COURT:  Thank you.

19          MS. KOVACS:  So his statement is a form letter.  It

20  says, "Mark the words or phrases that best describe your

21  feelings and reactions to this crime."  He has marked "anger,

22  appetite change, guilt, anxiety, sad, scared, tense, confused,

23  no trust in anyone, and family stress."

24      When asked the question, "What would you like the judge to

25  know about you and the impact of this crime?"  It says, "This

1  crime made my heart condition worse.  The stress of all of this

2  has been very hard on me.  I really trusted the defendant's

3  father.  I spoke with the defendant on the phone, and he said

4  whatever my dad says, you can believe it.  You are going to make

5  money.  I trusted both Zach and his dad.

6      "I ended up having to have heart surgery after all of this.

7  My wife died, and it's so hard because we had plans to travel

8  and camp.  I'm not able to do things in retirement because I

9  have been so afraid to spend any money because of the defendant

10  took so much money from me.  I'm so angry.  I have to worry

11  about these things."

12      Please describe below how members of your family have been

13  affected by the crime.  "The amount of money I leave my kids

14  when I die will depend on what I have, and that is a lot less

15  now because of the crime.  I don't buy Christmas gifts for my

16  kids because I am afraid to spend any money.  My daughter helps

17  and is in charge of my finances.  She is concerned about me long

18  term."

19      "Have you or members of your family received counseling or

20  therapy?"  "No."

21      "What would you like to see happen to the person who

22  committed the crime against you?"  "I would like for me and

23  others to get the money back.  I would also like to see him

24  serve at least 35 years, but no amount of time is enough.  His

25  dad deserves to go to prison, too."

1     Is there anything else you would like the judge before the

2  defendant is -- like to tell the judge before the defendant is

3  sentenced?"  He would pat me on the back with one hand while

4  stabbing me in the back with the other.

5     "I feel conflicted as a Christian.  I want to forgive, but

6  I worked so hard for the money I saved.  I worked several jobs

7  at one time because I did not even have a high school education.

8  I worked to take care of my family.  I had a rough childhood and

9  worked hard to take care of my family."

10          THE COURT:  Thank you, Mr. Kempf.

11          MR. KEMPF:  Well, in the meantime --

12          THE COURT:  You may step forward.

13          MR. KEMPF:  In the meantime, I had a heart valve

14  replaced, and I had to sell two cars and my camper after all

15  this, this last year.  And so I lost at least about $75,000.

16     But the whole idea is when my wife, before she passed away,

17  her mom passed away and left us the inheritance of $100,000.

18  Kevin Flaherty talked me into putting it into an account.

19  That's what we did.  So he told me his son was worth a million

20  dollars.  I had never met Zach.  It was always his dad and him

21  making decisions -- situations.  And so I know everything is up

22  here about Zach, but his dad has done the same thing.  Because

23  he told me he had been working for a company, and he said Zach

24  started a business.  And he quit that company and went to work

25  for his son, Zach.  So it's, like, two peas in a pod.

1        THE COURT:  Thank you, sir.

2      Additional victim impact statements from the Government?

3        MR. ESSLEY:  Yes, Your Honor.  The next statement will

4   be given by Diana Moore.  And her statement is referenced on the

5   exhibit list as Exhibit 10.

6        MS. MOORE:  I'm Diana Moore.

7        THE COURT:  Thank you, ma'am.

8        MS. MOORE:  I am 75 years old, and I'll be 76 tomorrow.

9   I'm not a rich person.  I always worked to support myself and

10  saved money so I would be financially okay when I retired.

11      Six years ago I moved back to Des Moines where I was born

12  and raised.  My mother, who I took care of, had passed away, and

13  coming back here felt like a good and safe move.

14      I had not been here long when I started hearing about

15  Flaherty through my best friend, Linda, who I have known since

16  childhood.  Linda had just lost her husband, and Flaherty had

17  been taking over managing her finances.  She constantly raved

18  how smart he was, a "genius," a money manager.  She was so very

19  grateful he had taken such a personal interest in her life.  He

20  sounded like a good guy.

21      I asked Linda if he would be my financial adviser.  He said

22  yes.  He said all the right things, how he was going to grow my

23  money and how I would be secure in my retirement.  So I gave him

24  my money to invest.

25      I started doubting him when he was just so unprofessional.

1   When I told Linda about my concerns, she thought I was crazy and

2  stupid.  I felt all alone.  I couldn't sleep.  I got very

3  depressed.  I saw a doctor for medication and my high blood

4  pressure.  I just couldn't believe a person would look me in the

5  eye and smile, and they were lying, cheating, and stealing from

6  me.

7     Fortunately, I got referred to the Iowa Insurance

8  Commission, but he had already destroyed my peace of mind and

9  damaged my health, physically and emotionally.  He is cruel.  He

10  preys on the vulnerable people and would still be doing it if he

11  could.  He did it so well.

12     I'm not sure if he has even had a legal job.  He is such a

13  liar.  He has hurt me, and he should go away for as long as the

14  law allows.  So thank you for this opportunity.

15     THE COURT:  Thank you, Ms. Moore.

16     MR. ESSLEY:  The next victim impact statement will be

17  on behalf of David Clark.

18     MS. LUCAS:  Hi.

19     THE COURT:  Thank you, ma'am.

20     MS. LUCAS:  My name is Hillary Lucas and my brother and

21  I are here on behalf of our dad, David Clark.  Zach, you called

22  our dad a friend.  He worked very hard for 38 years at the

23  railroad.  He saved his money throughout those years, and he

24  gave it to you because you told him you could triple his money.

25  He trusted you.  He died three years ago, believing he was

1  leaving us well off with the money he had trusted you with.

2          THE COURT:  Ma'am?

3          MS. LUCAS:  Yes.

4          THE COURT:  I know this is a lot.

5          MS. LUCAS:  Slow down?

6          THE COURT:  Take a deep breath and slow down so I can

7  understand and so that the record can reflect clearly what you

8  say here today.

9          MS. LUCAS:  Dad came to you at one point wanting money

10  to buy a '57 Chevy.  You told him he didn't need it.  And then

11  the next time you came to Marshalltown, you showed up in your

12  brand-new car.  That should have been red flags to Dad, that you

13  weren't to be trusted.  Just like all these people here, they

14  worked hard for their money just like Dad.  Dad trusted you so

15  much that he gave you cash.

16      Dad and all these people didn't work hard so you could live

17  high on the hog with their money.  As much as you jerked us

18  around after Dad died, even setting up an appointment that you

19  didn't even bother to show up for, we hope that the judge gives

20  you the maximum penalty allowed by the law.

21      Thank you, Your Honor.

22          THE COURT:  Thank you, ma'am.

23      Mr. Essley?

24          MR. ESSLEY:  Yes, Your Honor.  The next victim impact

25  statement will come from Gerald Griggs.  And this does not

1  correspond with the exhibit list.

2       MR. GRIGGS:  My name -- excuse me -- my name is Gerald

3  Griggs.  And I first came in contact -- my wife and I did --

4  with Kevin, actually, Zach's son -- or dad, rather.  And we --

5  we needed to put some of our money into annuities to protect --

6  hopefully protect it.  That's what we thought, anyway.

7       And they were real friendly, Kevin was.  We -- I mess

8  around with music a little bit, and Kevin was involved with

9  that.  So we became fairly close friends in that way.  And we

10  only saw Zach on a couple of occasions.  One was when he took us

11  out to lunch, my wife and I.  And so that's basically how we got

12  acquainted.  And then I think about two years went by, and Kevin

13  called -- got in touch with us and said we need to change those

14  annuities.  We've got a better deal for you.

15       And I was a little skeptical, but Beth and I, my wife and

16  I, talked about it, and we decided that would be the thing to

17  do.  So I wasn't too concerned, though, because I knew I didn't

18  make any checks out to either Zach or Kevin or whatever.  I only

19  made them out from one company to the next.  But I think where I

20  made my mistake on that was that I should have had -- the

21  company we were in transfer the money directly to the other

22  company, and that would have saved the opportunity for fraud.

23       So what happened in the meantime, my wife and I both lost

24  our vision during this last period of time.  And we both had

25  COVID, and I couldn't take care of her anymore in an apartment.

1  So we had to go to an assisted living facility, which runs us
2  about $9,000 a month right now.  And as far as an investment
3  went, we put in probably most of the money that we had.  We'd
4  always leave some out for emergencies and so forth.
5      But in the meantime, my wife has a disease called myopathy.
6  I think I'm pronouncing that right.  Maybe I'm not.  But she
7  requires more care than I could ever have given her.  So that's
8  why we both ended up in the facility.  And then I had a heart
9  problem myself and passed out in the bathroom and broke my neck
10  over the sink in the lavatory.  And, of course, that cost us
11  more money.
12      And then as time went by, we had to turn our annuities into
13  a stream of income to help us with our living situation.  And at
14  one point that's when I ended up talking with Chris, and he
15  informed us of our loss of money.  What's really sad about all
16  of this is that for all of us that are injured in a financial
17  way and the loss of our loved ones.  But I think when this is
18  all said and done, Zach's going to have some time to think about
19  what he did to people and maybe, hopefully, even why he did it
20  other than greed.
21      No one knows what the judge is going to do, but I've
22  thought some about this myself and what I would -- I think at
23  this point in time he needs to spend a lot of time thinking
24  about what he did, because he's young enough, he has some
25  opportunity in his life.  But he's also destroyed his family in

1 a way he may not even understand yet, because he's not 80-some

2 years of age like my wife and I are.

3 So we're going to run out of money, but that's the way

4 things go. But it wouldn't have been that way if they hadn't

5 have taken money from us, if Zach hadn't done that. I look at

6 my grandson now, and I think, I hope he doesn't turn out like

7 this, because it's a lot easier to love people than to hate

8 them. It is. It takes less energy. So if he learns anything

9 from this, he can still have a better life if he wants it.

10 I don't know what we'll do, but we'll do the best we can

11 like everyone does. And I just thank you, the court system, the

12 judge for listening to us, because we have nowhere else to go.

13 You know, at our age, as you'll notice, we all invest the money

14 we're going to get at the end of our lives. We don't have the

15 opportunity to earn more money. And it's to keep us till we

16 leave this world. So it's just sad. It's sad. Thank you.

17 That's all I have to say.

18 THE COURT: Thank you, Mr. Griggs.

19 Additional victim impact statements?

20 MR. ESSLEY: Yes, Your Honor. I believe this will be

21 the final victim impact statement, and it will come from Jeanie

22 Stickman. And her statement is also not referenced on the

23 exhibit list.

24 MS. STICKMAN: My name's Jeanie.

25 THE COURT: And your last name is Stickman?

1          MS. STICKMAN:  Stickman.

2          THE COURT:  Thank you.

3          MS. STICKMAN:  I feel like I should just say "ditto"

4    times 14.

5        But -- excuse me.  I started out poor in my life.  I worked

6    my way through nursing school and worked multiple jobs, like,

7    double shifts.  I would take my vacation time and work at

8    another hospital because I wanted to save money.  I wanted to be

9    able to retire.  And I always saw the elderly, like, being the

10   greeters at Walmart or something, and I felt so sorry for them.

11   And I thought, I don't want to be that way.

12       So I've never been extravagant in my life.  My car's 20

13   years old.  My husband's truck is 25 years old.  I did get to

14   retire for two years, and then this happened.  And now I'm back

15   to work, like, 35 to 38 hours a week.  I can still do that.  I

16   don't want to, but I can.  But I don't know for how much longer

17   I can do that.

18       So what happened to me is I don't like being called elderly

19   even though I have to face that fact.  I did not like having a

20   surprise visit at my house before 8:00 in the morning by the

21   insurance people, unannounced.  I think that practice needs to

22   be changed.  There's -- you know, I was gone.  My husband was

23   asleep, and they pounded on the door until he answered.  I had

24   to come home.  I wasn't ready to come home, but I did.

25       I felt like I was bullied to come here today because I was

1  told if they saw my emotions, that he would get more time, and I

2  don't agree with that statement.  I don't think that really has

3  much to do with it.

4      And also, he was investigated, the first I heard from you

5  people was at least -- it was over a year ago.  A heads-up might

6  have been nice, so maybe I could have gotten whatever money I

7  had left out of the investment places that I thought I had and

8  might not have lost every single thing, every cent that I had.

9      I spend too much time worrying about what happens when --

10 if Mike or I, my husband, Mike -- if one of us dies, there's no

11 way we could live on one Social Security.  We are fine with

12 both, but there's going to be -- you know, we don't know what

13 tomorrow brings, and we would not be able to survive on one

14 Social Security.

15     We don't even have enough money for a funeral.  Sad fact.

16 We had to borrow money to pay our property taxes last fall from

17 Mike's daughter.  We had to pay money -- we had to get money to

18 pay the IRS because he took out the money and did not take taxes

19 out.  And it was, like, a little over $70,000.  So not only did

20 he take money from us, we paid him to do it.  And I think, in my

21 own opinion, that anybody that had to pay the IRS from the money

22 that he took, that we should get that money back first before

23 any other assets are divvied out.  To me, that sounds like the

24 fair thing to do.

25     I don't know how many other people -- I heard one other

1   person say that. The rest is just, like, all -- I'm on a budget

2   for the first time in my life, and my husband and I, we've been

3   married for 25 years. I was old when I got married. We never

4   fought, and the only fights that we have now are about money.

5       What I want to see happen. I want all my money back, plus

6   interest, plus what I paid to the IRS. I kind of want to know

7   why, you know, and if there is any remorse or, you know, what

8   the end game would have been.

9       Okay. As a critical care nurse, I have seen so much

10  tragedy for over 40 years. This is not a tragedy. This is a

11  travesty. It should not have happened. Nobody got shot.

12  Nobody went blind. Nobody got paralyzed. Nobody lost a limb.

13  Nobody died. When I get my money back -- not if, when -- I

14  fully expect to get money back. I am no longer a victim. The

15  true victims are his family. The time that he is kept away from

16  them, they never get that back. They will be a victim for the

17  rest of their lives. They're the ones who are really paying for

18  his actions, through no fault of their own.

19      Mike and I are in agreement. We don't really want him to

20  get any more prison time. I feel like I have supported him

21  enough, and my tax dollars have better use than continuing to

22  support him in prison. I want him out and working. I'm willing

23  to take payments on a yearly basis. And how can he repay

24  anybody, any of us, if he's sitting in jail? What good does

25  that really do anybody? And I know that's an unpopular opinion,

1 but that's how I feel.

2      I just want my money back, and I just want to tell

3 everybody, holding a grudge is like taking poison and expecting

4 the other person to die.  You have to let it go to be able to

5 live the rest of your life and not have bad thoughts about Zach.

6 There is a lot of people out there that are like that, and you

7 can't let them ruin your life.  You just have to pick yourself

8 up by the bootstraps and go on.  Thank you.

9           THE COURT:  Thank you, ma'am.

10      Additional evidence -- or additional victim impact

11 statements from the Government?

12           MR. ESSLEY:  No, Your Honor.

13           THE COURT:  The Court, then, closes the record.  We

14 will proceed with the arguments, allocution, and the

15 pronouncement of sentence.

16      Mr. Brown, would you like to be heard?

17           MR. BROWN:  Yes, Your Honor.  May it please the Court,

18 counsel.  The victim impact statements were extremely powerful.

19 It's not the first time that I've heard them over my career,

20 both the loss of monies and fraud and also loss of life.

21 Frankly, there's not enough years permitted by statute, 20

22 years, to really encapsulate all a fraudster's lies and the pain

23 and suffering that they inflict upon their victim.

24      I make a plea, nonetheless, for some measure of leniency,

25 not just for him, for his children, and all the principles that

1   are enunciated in Section 3553(a) and (b).  The guidelines in

2   this case, I respectfully suggest, overly emphasize punishment

3   upon him specifically and don't adequately consider the other

4   relevant factors.

5       We live in an age where it seems more and more apparent

6   every day that the acts of a con and a fraud and a cheat and a

7   liar, those aren't virtues.  They have horrible impact on their

8   victims.  The only question for the Court is, then, what is the

9   sufficient, but not greater than necessary, sentence?  What is

10  it that we must impose upon him?  I suggest that a sentence that

11  bears some measure of leniency so he can get back out into the

12  system, get a job, get his fingernails dirty, and start paying

13  these people back, or their heirs, has some value to justice.

14      The guidelines in this case and the sentencing provisions

15  of 3553(a) ask that the Court consider not only punishment.

16  It's easy -- it is easy to punish because they deserve it, fully

17  up to the maximum permitted by law.  But the Court is also

18  supposed to be mindful of other sentencing disparities among

19  like offenders.  Even the guidelines themselves in this case

20  don't yield a sentence that's equal to what the Government

21  recommends, at the upper end.

22      Frankly, it seems to me that a sufficient, but not greater

23  than necessary, sentence that forces him to get to work in a

24  legitimate fashion, without fraud, lies, greed, and pay some

25  measure of that money back to his victims has more value than

1  sentencing him to 20 years flat, 20 years where we pay for it,

2  20 years where he can't pay anybody back.  20 years.

3      How from a specific -- or general deterrence standpoint,

4  that is, to generally deter the public, similar fraudsters who

5  are doing it now or thinking about it.  Is there a single

6  insurance agent fraudster at the moment who thinks if he gets 10

7  or 120 months instead of 240 is going to quit?  No.  Or not

8  engage in that criminal behavior, that con artist fraud?  No.

9      So from a general deterrence, 108 plus 6 months on the

10  contempt is enough.  From a specific deterrence standpoint, if

11  he's not going to learn his lesson after approximately ten

12  years, well, he's not going to learn it.  If his character

13  flaws, such as they are, manifested in this 200-and-some-page

14  presentence investigation, in which I readily admit in my

15  sentencing memorandum, if he's not going to identify those in

16  ten years, then I guess he never is.

17      So for the reasons that I articulated, asking the Court to

18  emphasize all the factors, not merely direct punishment against

19  this offender, I ask the Court to sentence the defendant to 108

20  months plus 6 months for the contempt, Your Honor.  Thank you.

21          THE COURT:  Thank you, Mr. Brown.

22      Mr. Flaherty, now is the time during the hearing where you

23  have the opportunity to speak.  You do not have to say anything,

24  but if you'd like to, the Court will consider it.  Is there

25  anything you'd like to say, sir?

1    THE DEFENDANT:  No.  Thank you, Your Honor.

2    THE COURT:  Thank you, Mr. Flaherty.

3    Mr. Essley, on behalf of the United States?

4    MR. ESSLEY:  Thank you, Your Honor.  As is evident from

5    the presentation of evidence that the Court has seen today, from

6    the review of the documents filed in this case, the defendant's

7    conduct, his criminal conduct, is unprecedented.  It is unlike

8    fraud cases this Court has been confronted with previously.  His

9    obstructive conduct is unprecedented, and his acceptance of

10   responsibility or lack of remorse is equally unprecedented.  And

11   based on those factors, and several of which I'll talk about in

12   just a mo- -- in a moment, the Government requests, as it

13   requested in its sentencing memorandum, a sentence between 210

14   and 240 months on the wire fraud conviction and a consecutive

15   sentence of six months on the charge of criminal contempt.

16   And I'm going to talk primarily today about three different

17   factors.  The first is the danger the defendant presents; the

18   second, the damage the defendant has done; and the third being

19   the need to deter the defendant from engaging in similar conduct

20   and obstructive behavior going forward.

21   And I'll start with the danger.  And I think the thing that

22   best exhibits that is the defendant's criminal conduct and the

23   scope of that conduct.  And when I said a moment ago that this

24   fraud is unlike what this Court has seen before, that's really

25   what I mean.  Because what --

1          THE COURT:  Mr. Essley, I appreciate your advocacy.

2   You don't know the breadth of cases that this Court has seen, so

3   I would emphasize that you need to argue about the facts and

4   circumstances of this case instead of speaking to this judge

5   about the other cases that I've seen.

6          MR. ESSLEY:  Thank you, Your Honor.

7          THE COURT:  You may proceed.

8          MR. ESSLEY:  And the scope of defendant's conduct is

9   this, Your Honor.  Defendant, for 17 years, from 2006 to 2023,

10  executed a scheme to defraud on vulnerable victims, victims who

11  were primarily elderly, primarily between their 60s to their 90s

12  at the top end, victims who were widows, who were lonely and had

13  limited support in their lives, who were estranged from their

14  children.

15       Nearly all of those people, including the ones you've heard

16  from today, had limited financial knowledge and wherewithal.  In

17  2010, the defendant started a legitimate business, from all

18  outside appearances, called Midwest Senior Solutions.  And the

19  business model for that business was to target and exploit the

20  vulnerable victims.

21       And he did so by grooming them over the course of years.

22  He had relationships with these individuals, some of which began

23  in 2006 and only ended in 2023.  He visited them regularly.  He

24  gave them guitar lessons.  He helped them with tasks around

25  their house.  He told them he loved them.  He helped arrange

funerals and death matters when a spouse died. It was literally a full-time job for him to visit victims and keep up with their lives.

And make no mistake about it, the defendant was good at what he did, because defendants -- or, excuse me, because the victims trusted him completely. They loved him, too. They thought extremely highly of him. They thought he was a financial genius, a second son. And at that point, once the defendant had his victims' trust, he lied to them about the investments they could obtain with him, the investments they had with him, the risks of those investments, and the penalties they were suffering.

Now, unlike the victims and what truly shows the defendant's danger is that the defendant had a broad knowledge of the products he was offering and the financial investments. He was licensed in multiple states. He had a specialized skill that he had learned over multiple years of selling insurance, and he had to take classes every year to maintain that licensure and to obtain the permission to sell insurance annuities on behalf of each company he worked for.

The defendant also caused a great amount of damage, and I am not going to repeat what the victims said today. And the only thing I want to focus on is about the ongoing harm the victims endure every single day, the anger they feel and the shame they feel for what happened to them, and the physical

1  manifestations of all of those emotions that they have to deal

2  with every day, including heart problems and other health issues

3  that they have had to endure since learning the truth about the

4  defendant, learning that he betrayed the relationships he

5  developed over many, many years.

6      And then this Court's need for deterrence.  The defendant

7  has had so many opportunities to stop his criminal behavior over

8  that 17-year period, and each time he kept going.  From 2012 to

9  2021, he received numerous complaints from insurance companies

10 and from insurance customers, and each time he received a copy

11 of those complaints, complaints claiming he had been high

12 pressuring them, that he had lied on their forms or forged

13 documents.  And every time he did receive one of those

14 complaints, he doubled down, lied some more, produced documents

15 that victims had never seen before to regulators, and blamed the

16 victims for what had happened to them.

17     Even after the defendant learned he was under

18 investigation, first in March 2022, and again when a search

19 warrant was executed at his house in November of 2022, he

20 continued to engage in the fraud for which he is charged.  Even

21 after he was charged with the crimes that we are here to talk

22 about today, he continued engaging in new frauds with

23 construction customers or with business partners.

24     And time and time again, he has indicated the rules don't

25 apply to him.  At least four court orders have been violated by

1   the defendant.  First, the pretrial release conditions; second,

2   the no-contact order prohibiting him from contacting victims;

3   third, the post-indictment protective order which he violated in

4   multiple ways; and finally, the order restraining the use of his

5   personal property.

6        Finally, I'd speak on the lack of acceptance and lack of

7   remorse that the defendant has indicated to date.  For 17 years

8   the defendant's entire life was funded by the hard work and the

9   decades of work of his victims.  He bought his house to pay down

10  his mortgage.  He bought luxury vehicles.  He bought a boat.  He

11  took luxury trips.  He paid off his own tax bills, making

12  payments to the U.S. Treasury, and in all, the individual

13  victims in this case lost over $3 million of money that they

14  sometimes worked multiple jobs to earn.

15       There's not much money left for the victims.  Regardless of

16  this Court's restitution order, based on the information in the

17  PSR, there's just not a lot of money left to be had for the

18  victims.

19            THE COURT:  And, Mr. Essley, I understand from the

20  papers that you are seeking restitution and not an order of

21  forfeiture because of the fact that there are not assets

22  available to forfeit at this time?

23            MR. ESSLEY:  That coupled with the fact, Your Honor,

24  that the Government's belief at this time is that in this case

25  the restitution order allows us sufficient protection to go

1  after any assets that could be used to pay that restitution

2  order.  And so later today, I would move to dismiss the

3  forfeiture notice.

4          THE COURT:  Thank you.

5          MR. ESSLEY:  Despite the fact the defendant has lived

6  his life and the fact that he, his family, and businesses have

7  benefited a great deal from the money he took from victims, he

8  has not accepted responsibility for his actions.  He doesn't

9  think his crimes were real.  He said that on a jail call to his

10  wife, that wire fraud, it's not real crimes.

11      One thing that is real are the people you saw here today,

12  their family members, the ones who have to live every single day

13  with what he did to them.  He said also in that call, "Did I

14  take the money?  Well, yeah, I took the money.  Did I earn the

15  money?  I probably took less than I should have."  He believes

16  he earned the money, through whatever conduct, whatever work he

17  did with the victims, and that he should have even more money.

18      But the only thing the defendant has earned is a

19  significant term of imprisonment and an order of restitution

20  that fully accounts for the losses of the victims that they have

21  not been able to recover to this date.  And based on that, this

22  Court should impose the requested term of imprisonment -- a term

23  of imprisonment of 210 to 240 months plus an additional 6 months

24  for the contempt conviction, and then award restitution

25  consistent with the presentence report.  Thank you, Your Honor.

1          THE COURT:  The restitution number that I have seen in

2    the written materials is the total restitution amount of

3    $2,438,928.52?  Is that the correct amount?

4          MR. ESSLEY:  One moment, Your Honor.  As I'm flipping

5    through the presentence report, I believe it's at paragraph 174

6    of the presentence investigation report.  And it's

7    $2,438,928.52.  Is that the figure, Your Honor?  Thank you, Your

8    Honor.

9          THE COURT:  Thank you.  The Court is required to

10   consider a number of factors before deciding on an appropriate

11   sentence in this and every case.  Those factors are set forth in

12   Title 18, United States Code, Section 3553(a).  They include the

13   nature and circumstances of the offense and the history and

14   characteristics of the defendant.

15        The Court must also consider the need for the sentence

16   imposed to reflect the seriousness of the offense, to promote

17   respect for the law, to provide just punishment, and to

18   adequately deter future criminal conduct, both by this defendant

19   and for others who might contemplate committing such an offense

20   in the future.

21        The Court has to consider the need to protect the public

22   and to provide the defendant with needed correctional treatment

23   in the most effective manner.  The Court has to consider the

24   sentencing guidelines and the advice they provide as well as the

25   need to avoid unwarranted sentencing disparities among similarly

1  situated defendants.

2      The Court also has to consider the need to provide

3  restitution, which has been agreed to, to be ordered in this

4  case.  I may not speak about each one of the statutory

5  considerations specifically in articulating the reasoning for my

6  sentence, but in determining the appropriate sentence to impose,

7  I have considered each and every one of them.  Ultimately, the

8  sentence the Court imposes must be sufficient, but not greater

9  than necessary, to serve these purposes of sentencing.

10      This case, like all cases, was reviewed by a probation

11  officer, and a presentence investigation report calculated the

12  United States Sentencing Guideline range that is recommended but

13  not mandatory.  The Court has to consider that as a starting

14  point.

15      And the guidelines calculation in this case takes into

16  account some but not all of the aggravating factors that are

17  present here.  The guideline calculation takes into effect --

18  excuse me -- into account the amount of loss.  Here the range

19  that applies to this defendant is a range of between $1.5

20  million and $3.5 million.  The amount of loss that's been

21  calculated here and acknowledged by the defendant is about $3.1

22  million.

23      That likely is a lower estimate than actually occurred.

24  And that's because of the things that we've heard about in terms

25  of not knowing all of the amounts that have been given to the

1   defendant.  It's also at the higher end of that range.

2       The guidelines account for some of the aggravating factors

3   here in terms of the vulnerable victims and the amount of harm

4   that was caused to individuals.  There are upward adjustments

5   that reflect that that have been scored that increase the

6   recommended range, an adjustment for role in the offense, which

7   accounts for the fact that the defendant was in a position of

8   trust.

9       There's an upward adjustment for vulnerable victims.  As

10  we've heard, many of the victims here were individuals who had

11  reached advanced age and were on fixed incomes and maybe had

12  health limitations.  There's an upward adjustment because five

13  or more victims suffered substantial financial hardship.

14  There's an adjustment because the defendant obstructed justice,

15  and those are the actions the defendant took to try to get rid

16  of the assets that could otherwise be used to reimburse the

17  victims of the offense.

18      There is not a reduction for acceptance of responsibility.

19  Because although the defendant pleaded guilty, the defendant's

20  actions since that plea have been inconsistent with acceptance

21  of responsibility.

22      So the guideline recommendation of between 168 and 210

23  months takes into account many of the aggravating factors here.

24  It does not completely take into account all of the aggravating

25  factors.  There's nothing about the length of time that this

1  occurred.  That is notable.  The presentence investigation

2  report reflects that the defendant -- the defendant's conduct

3  goes back over 15 years.  That length of time was not reflected

4  in the guideline calculation.

5      Also, the excessive fees or charges that were resulting to

6  the victims, beyond the money that was taken, isn't used to

7  calculate the amount of loss under the guidelines, so those

8  aspects of the harm here aren't otherwise accounted for in the

9  guideline calculation.

10      The guideline calculation doesn't take into account the

11  fact that it appears that the defendant's entire livelihood was

12  committing fraud.  The bank records that are reflected in the

13  materials that the Court has reviewed show the influx of money

14  from fraud into accounts that are not otherwise funded.  And all

15  of the employment history that's noted on here include companies

16  that appear in the defendant's fraudulent conduct.

17      That's a fact that the guidelines suggest warrants an

18  upward departure in 5H1.9.  The incorrigibility is also not

19  accounted for in the pre-plea conduct here.  The fact that when

20  confronted with complaints to the Insurance Division or other

21  attempted interventions by clients or friends of clients or

22  family members, the defendant did not change tack.  Each of

23  those interventions was an opportunity to take a different road,

24  to take a road of ethics, in compliance with the rules under

25  which the defendant was required to operate as an insurance

1   salesman, licensed in the state of Iowa, as well as other

2   states.  And at each intervention, at each attempted

3   intervention or investigation or question, the defendant chose

4   not to realign his principles and act ethically and in

5   compliance with the law.

6       The presentence investigation report and the evidence

7   presented by the Government shows that the defendant, in other

8   aspects of his life and other businesses, was also engaged in

9   fraudulent conduct in using funds that were not designated for

10  his personal use or his personal benefit in ways that are also

11  not accounted for in the guidelines.  And, of course, as we

12  heard at the beginning of the hearing, separately from all of

13  this is the conduct that's resulted in the criminal contempt

14  conviction, which is only a continuation of a pattern of

15  obstructive conduct.

16      So the factors the Court has to consider include

17  aggravating factors that are not fully represented by the

18  guideline calculation when you look at the seriousness of the

19  offense and the issue of just punishment or deterrence.

20  Specific deterrence is highly relevant here because nothing

21  deterred the defendant before.

22      The defendant is 48 years old.  He has the capacity to work

23  in the future.  He's well educated.  He has a family, and he's

24  had opportunities.  While we heard comments today about the

25  defendant's father and his actions, there's nothing in the

1    record about the defendant's childhood that suggest any harm or

2    experiences that could contribute to such conduct.

3        It really is staggering, the amount of harm that's been

4    inflicted to vulnerable victims and the harm that is

5    generational because of the age of the victims.  We heard from,

6    in the victim impact statements, comments from family members

7    who are forced to alter their lives to support their loved ones

8    because of the harm here, which goes beyond the harm to the

9    individuals in terms of their own financial security in a period

10   of life that they thought they had planned for, that they

11   thought they had prepared for.

12       The Court will order restitution in the amount I previously

13   stated, but that restitution amount is a finite number tied to

14   demonstrated losses.  It does not compensate, to the extent that

15   it's ever paid -- and I hope it is -- to the extent that it's

16   ever paid, it doesn't compensate for those ancillary losses that

17   are real harms, that there's nothing the Court can do in that

18   regard.

19       Counsel, do you know of any legal reason why the Court

20   should not impose sentence at this time?

21            MR. ESSLEY:  No, Your Honor.

22            MR. BROWN:  No, Your Honor.

23            THE COURT:  For the foregoing reasons and after

24   considering all of the relevant statutory factors and the

25   materials previously discussed, it is the judgment of the court

1 that the defendant, Zachary James Flaherty, is sentenced as

2 follows:  On Count 15 of the indictment, the defendant is

3 sentenced to 222 months of imprisonment.  On the count of

4 criminal contempt reflected in ECF 80 on the docket, the

5 defendant is sentenced to 6 months of imprisonment, for a total

6 term of imprisonment of 228 months with those sentences to be

7 served consecutively, or back to back.

8        This sentence represents an upward variance from the

9 advisory guideline range for the reasons I have previously

10 stated.  I varied upward because of the length of time of the

11 scheme, the variety of means of the scheme, including asking for

12 money to be invested and then simply taking that money, as well

13 as the abuse of the process of seeking annuities on the behalf

14 of individuals, and for the purpose of gaining commissions and

15 then repeating that action over and over again for the

16 defendant's benefit.

17        The Court recognizes that I could sentence the defendant to

18 a higher term, up to the 240 months on the wire fraud count, and

19 the 6 months on the criminal contempt count.  Having considered

20 all of the statutory factors, I have concluded that the sentence

21 I have imposed is sufficient, but not greater than necessary, to

22 serve the purposes of sentencing, in particular in light of the

23 fact that although the defendant did not fully accept

24 responsibility, he did plead guilty, which removed the need for

25 witnesses to testify at trials and provided a more prompt

1   resolution of these issues than would have occurred had the

2   matter proceeded to trial.

3       I recognize my authority to vary below the guideline range,

4   as advocated for by the defense.  For all of the reasons I have

5   stated and after considering the 3553(a) factors, including the

6   need for specific deterrence, general deterrence, protecting the

7   public, and reflecting the seriousness of the offense, I find

8   that a downward variance is not supported by the record.

9       I do not impose a fine, finding that to the extent that the

10  defendant has any financial resources available to him, those

11  resources should be spent on the restitution the Court will

12  order.  As previously stated, I order restitution in the amount

13  of $2,438,928.52 to be paid as designated in the materials

14  submitted.

15      Does the Government wish for the Court to identify the

16  breakdown, or is the written submission sufficient?

17          MR. ESSLEY:  We believe the submission is sufficient,

18  Your Honor.

19          THE COURT:  Mr. Brown?

20          MR. BROWN:  Concur.

21          THE COURT:  I also impose a $100 special assessment on

22  the first count, 15, and a $10 special assessment on the

23  criminal contempt conviction for a total of $110.  Interest is

24  waived on all financial penalties.

25      Upon release from the custody of the Bureau of Prisons, the

1 defendant will be required to serve a three-year term of

2 supervised release. That term is the maximum authorized by the

3 law, and I find that it's warranted in this case.

4 Mr. Flaherty, within 72 hours of release from the custody

5 of the Bureau of Prisons, you will be required to report in

6 person to the probation office in the district to which you are

7 released. While on supervised release, you shall not commit

8 another state, federal, or local crime. You shall not

9 unlawfully possess a controlled substance, and you shall not

10 unlawfully use a controlled substance. You must cooperate with

11 the collection of DNA.

12 You must make restitution in the amount that I previously

13 stated in accordance with 18 United States Code Section 3663 and

14 3663(a), and any other statutes that authorize the restitution

15 imposed here today.

16 You are now a felon. You cannot possess a firearm,

17 destructive device, or ammunition either during your term of

18 supervised release or any time thereafter. And you must abide

19 by the standards of supervised release that have been set forth

20 by the United States Sentencing Commission and will be reflected

21 in the written judgment entered here today as well as the

22 special conditions of supervised release that were proposed in

23 the presentence investigation report and were unobjected to by

24 the defense.

25 I'll briefly summarize those for you now, sir. You should

1  note that they will be implemented and enforced in full as

2  written.  They are in part F of the report beginning at

3  at paragraph 284.  You must participate in a program of testing

4  and treatment for substance abuse.  In furtherance of that

5  treatment, you must not use alcohol or any other intoxicants

6  during your term of supervision.

7       You must maintain full-time, legitimate employment and not

8  be unemployed for a period of more than 30 days unless you're

9  excused for schooling, training, or other acceptable reason.

10  And you must provide documentation of your earnings, including

11  pay stubs and other materials, in support to the probation

12  office.  If you are separated from employment for any reason,

13  you must notify the probation office within 48 hours.

14       You are prohibited from engaging in any business that

15  offers securities, investments, or business opportunities to the

16  public.  You are prohibited from telemarketing, direct mail, or

17  other national advertising campaigns for business purposes

18  without the written permission of the probation office.  And you

19  must obtain prior approval from the probation office for any

20  form of self-employment.

21       You must not contact the victims nor the victims' family

22  without the prior permission from the U.S. Probation Office.

23  And that would be electronic contact, contact through the mails,

24  or contact through third parties.  You must not apply for,

25  solicit, or incur any further debt without the prior permission

1  from the probation office, and you must provide complete

2  financial access to the probation office as to your personal

3  financial information.  And these conditions are imposed to

4  facilitate making sure that all monies available are paid

5  towards restitution.

6      You must pay restitution in the amount that I have stated,

7  and you must cooperate with the probation office in developing a

8  monthly payment plan to set forth those payments.  You'll be

9  required to participate in any IRS offset program or Treasury

10  offset program which may include garnishment of wages or any

11  other seizure of any income tax refunds or any other government

12  payment.

13      You'll be subject to a search condition, and that search

14  condition can be effectuated with or without the assistance of

15  law enforcement, including the United States Marshals Service.

16  It's not recommended, although I believe it would be beneficial

17  to the defendant, and I would like to impose an additional

18  condition that requires cognitive behavioral treatment.  That

19  can be journaling or other exercises that address thinking

20  errors or patterns of decision-making.

21      Any objection to that, Mr. Brown?

22          MR. BROWN:  No, Your Honor.

23          THE COURT:  Both the length of the term of supervision

24  and the conditions I have imposed are based upon an

25  individualized and particularized assessment of this defendant's

1  supervision needs after reviewing and considering each of the

2  relevant factors under 18 United States Code Section 3553(a) and

3  3563(b).

4      Mr. Brown, any request as to designation or programming?

5          MR. BROWN:  Yes, Your Honor.  Midwest region,

6  Residential Drug Assistance Program.

7          THE COURT:  So the Court will recommend to the Bureau

8  of Prisons that the defendant be designated at a facility within

9  the Midwest region.

10      Mr. Brown, I assume that's to facilitate family visitation?

11          MR. BROWN:  Yes, Your Honor.

12          THE COURT:  And that will be indicated on the judgment.

13  I'll also recommend that the defendant have the opportunity to

14  participate in a 500-hour residential drug abuse treatment

15  program or any other substance abuse treatment program.

16      To be clear, there is no supervised release imposed on the

17  criminal contempt sanction -- or sentence.  The supervised

18  release term is only on the wire fraud count, as authorized by

19  law.

20      There are counts to be dismissed?

21          MR. ESSLEY:  Yes, Your Honor.  At this time the United

22  States would move to dismiss Counts 1 through 14, 16 through 20,

23  and then also, as we discussed earlier, the notice of

24  forfeiture.

25          THE COURT:  And that motion is granted.

1      Mr. Flaherty, you do have the right to appeal the sentence

2 that I just imposed and the conviction under the criminal

3 contempt conviction.  If you wish to pursue an appeal, you must

4 file a written notice of appeal within 14 days of the entry of

5 judgment.  Do you understand the time limit for filing a notice

6 of appeal, sir?

7           THE DEFENDANT:  Yes, I do.

8           THE COURT:  Additionally, if you wish to pursue an

9 appeal and you cannot afford an attorney, one can be appointed

10 to represent you.  You can also have transcripts of this or

11 other relevant proceedings made at no cost to you in furtherance

12 of the appeal if you qualify financially.  Do you understand

13 your appeal rights, sir?

14           THE DEFENDANT:  Yes.

15           THE COURT:  Mr. Essley, any matters that I failed to

16 address?

17           MR. ESSLEY:  No, Your Honor.

18           THE COURT:  Anything further on behalf of the

19 Government?

20           MR. ESSLEY:  No, Your Honor.

21           THE COURT:  Mr. Brown, any matters that I failed to

22 address?

23           MR. BROWN:  No, Your Honor.  Thank you.

24           THE COURT:  Anything further on behalf of the defense?

25           MR. BROWN:  No.  Thank you, Your Honor.

1          THE COURT:  The defendant is committed to the custody

2   of the United States Marshals Service for transportation to the

3   designated Bureau of Prisons facility.

4       I appreciate the presence of the victims here and hearing

5   their words.  I recognize that this Court has no power over how

6   you resolve these issues for yourself, but I wish you all peace

7   moving forward.

8       Mr. Flaherty, I wish you the best moving forward as well.

9   That will conclude the hearing.

10       (The hearing concluded at 4:38 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X
E X H I B I T S

GOVERNMENT'S EXHIBITS                              RECEIVED
1. Victim impact statement                            25
2. Victim impact statement                            25
3. Victim impact statement                            25
4. Victim impact statement                            25
5. Victim impact statement                            25
6. Victim impact statement                            25
7. Victim impact statement                            25
8. Victim impact statement                            25
9. Victim impact statement                            25
10. Victim impact statement                           25
10A. Victim impact statement                          25
10B. Email correspondence                             25
11. Email correspondence                              25
12. Biennial report                                   25
13. Transcript                                        25
14. Transcript                                        25
15. Transcript                                        25
16. Transcript                                        25
17. Transcript                                        25
18. Transcript                                        25
19. Transcript                                        25
20. Affidavit                                         25
21. Affidavit                                         25
22. Email correspondence                              25
23. Interview summary                                 25
24. Petition and jury demand                          25
25. Judgment entry on default                         25
26. Amended petition and jury demand                  25
27. Project contract form                             25
28. Motion to continue                                25
29. Order continuing hearing                          25
30. Iowa Insurance Fraud Bureau report                25
31. Recorded jail conversation                        25
32. Recorded jail conversation                        25
33. Recorded jail conversation                        25
34. Recorded jail conversation                        25
35. Victim impact statement                           25
36. Iowa Insurance Fraud Bureau report                25
37. Iowa Insurance Fraud Bureau report                25
38. Iowa Insurance Fraud Bureau report                25
39. Iowa Insurance Fraud Bureau report                25

DEFENDANT'S EXHIBITS
A. Sealed letters at ECF No. 102-1                    24

## <u>C E R T I F I C A T E</u>

        I, Karla M. Ray, a Certified Shorthand Reporter of the State of Iowa and Federal Official Realtime Court Reporter in and for the United States District Court for the Southern District of Iowa, do hereby certify, pursuant to Title 28 U.S.C. Section 753, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

        Dated at Des Moines, Iowa, July 2, 2024.


<u>/s/ Karla M. Ray</u>
Karla Ray, CSR, RDR, CRR
Federal Official Court Reporter